UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LAURA PATRICK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 04-CV-10427 RGS |
| | ) |
| JANSSON CORPORATION, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Jansson Corporation submits this Memorandum in Support of its Motion for Summary Judgment on Plaintiff Laura Patrick's complaint. The Court should dismiss Patrick's sex and pregnancy disparate treatment claims because she did not experience any adverse employment action: When Patrick returned from her FMLA leave and demanded to change what she did, when she did it, and how much she would be paid for it, Jansson agreed to a modified position and schedule, and applied its well-established practice of paying part-time non-exempt employees a lower hourly wage than full-time, exempt, salaried employees. Under these circumstances, Jansson did not create working conditions so intolerable that would have made Patrick's resignation reasonable. Patrick's disparate impact claim fails because Jansson does not select the individuals who elect to change from salary to hourly employment and Patrick has made no showing that Jansson's wage-setting practice disproportionately or unfairly affects women. Finally, Patrick's retaliation Family and Medical Leave Act ("FMLA") claim must be dismissed because Jansson did not take any retaliatory action against her for the exercise of her rights under that statute.

## STATEMENT OF UNDISPUTED FACTS

I. **Background on Jansson**

At all times relevant to this action, Jansson was a printing company that specialized in high-end printed products, including social invitations and commercial business cards and envelopes. (Affidavit of Arlene Osoff, ¶2, hereinafter "Osoff Aff., ¶__"). Jansson designed new social (wedding, Bar and Bat Mitzvah, and Party) invitations annually. Each year, new product lines were introduced at trade shows and produced for distribution in catalogues to stationery shops across the country. (Osoff Aff., ¶3).

Jansson was originally started by Arlene Osoff and two other partners in 1976. (Osoff Aff., ¶4). In December 1998, Jansson became an operating division of Taylor Corporation. (Osoff Aff., ¶5). After Taylor purchased the business, Osoff remained as the General Manager of Jansson. (Osoff Aff., ¶6).

II. **Jansson's Workforce**

In 2001, Jansson employed approximately sixty-six in-house employees. Forty-eight out of these sixty-six employees were women. (Osoff Aff., ¶7). Eight of Jansson's eleven senior managers (including Laura Patrick) were women. (Osoff Aff., ¶8). Eleven of Jansson's 20 female assemblers were on part-time schedules for childcare reasons. (Osoff Aff., ¶9). Additionally, Jansson contracted with another 10-20 women (depending on seasonality) who worked out of their homes: Jansson picked up and delivered work to them so that they could stay home with their children. (Osoff Aff., ¶10).

III. **Patrick's Employment At Jansson**

Patrick began her employment at Jansson as a customer service representative in August 1994. (Deposition of Laura Patrick, p. 59 hereinafter "Patrick, ___", attached to the Affidavit of

Joel Rudy). In 1998, Osoff promoted Patrick to Design Development Manager, the senior design position at Jansson. (Patrick, 60-61). In this role, Patrick was responsible for the development, design and initial production of Jansson's entire product line. The design process is a multiple-step process: Ideas are developed into designs, mockups of the prospective design are created, and typesetting of the items is completed so the samples are ready for press. (Osoff Aff., ¶13). The samples are then printed and fully assembled to be included in catalogues that are distributed to customers. The samples are inspected for accuracy, color, layout, and paper choice as they are being printed, and reviewed on a mockup to ensure that the prospective design turned out as anticipated. (Osoff Aff., ¶13).

Other than Osoff, Patrick was the senior (and only) designer on staff at Jansson from 1998 until her resignation in 2001. (Osoff Aff., ¶14). Osoff was Patrick's predecessor in the position of senior designer. (Osoff Aff., ¶15). For most of the history of Jansson, Osoff was the sole designer of Jansson's product line. (Osoff Aff., ¶15). Osoff continued to perform some design work throughout Patrick's tenure, and worked very closely with Patrick from 1998 until Patrick's resignation in December 2001. (Osoff Aff., ¶16).

The Design Development Manager position is a full-time job: The senior designer is responsible for all phases of design and production supervision. (Osoff Aff., ¶17). The designer creates designs and produces the design prototypes. The Design Development Manager must also continuously interact with and be available to all departments to supervise production and resolve questions that arise in the production process. (Osoff Aff., ¶17). This process goes on 5 days per week, as well as on Saturdays, when design, typesetting and press work is often done (so that live print jobs are not displaced during the week). (Osoff Aff., ¶18). Working on

Saturdays is particularly critical in the 3-4 months preceding trade shows, when all new products must be completed. (Osoff Aff., ¶18).

Except for the time Patrick was on FMLA leave, Patrick regularly worked Saturdays with and without Osoff, creating, and bringing to completion the designs that were designated to be included in the newest albums. (Osoff Aff. ¶19).

### A. Patrick Takes Her First Fertility-Related FMLA Leave in January and February 2000.

Between January 17 and February 16, 2000, Patrick took her first FMLA leave. (Patrick Deposition Ex. 1). This leave was to undergo abdominal myomectomy, a fertility-related procedure. (Id.; Patrick Depo., p. 94-97). When Patrick returned from her FMLA leave in February 2000, Patrick resumed her position as Design Development Manager without incident. (Patrick, p.97).

### B. Patrick Takes A Second Fertility-Related Leave in February and March 2001.

Between February 28 and March 20, 2001, Patrick took a second leave to undergo emergency surgery. (Patrick Deposition Ex. 8, p.2). When Patrick returned from this leave, Patrick resumed her position as Design Development Manager without incident. (Id.).

### C. Jansson Gives Patrick A Third and Paid Fertility-Related FMLA Leave in October and November 2001.

In October 2001, Patrick requested a third FMLA leave from October 15 to November 26, 2001. (Patrick, 100; Patrick Deposition, Ex. 6). Patrick indicated at the outset that the leave was necessary to undergo additional fertility treatments. (Patrick, 99-102; Patrick Deposition Ex. 4). Osoff granted Patrick the leave without question. (Patrick, 100-102; Patrick Deposition Ex. 6). Moreover, Osoff suggested to Patrick she might be able to get paid during the leave under Jansson's new salary continuation policy that went into effect in 2001. The salary

continuation policy, which by its terms did not expressly include fertility treatments, allows employees to receive a percentage of their salary, based on length of service, during specified types of leaves. (Osoff Aff., ¶21; Patrick Deposition Ex. 5). At Osoff's suggestion, Patrick applied for a salary continuation and was able to receive 75% of her salary during her seven-week FMLA leave. (Osoff Aff., ¶22; Patrick Deposition Ex. 6). Prior to Osoff suggesting to Patrick that the salary continuation policy may apply, Patrick had not sought to be paid during her leave. (Osoff Aff., ¶22).

On November 26, 2001, the date that was to be the end of Patrick's third FMLA leave, Patrick called Osoff to inform her that she was pregnant and to request an additional week off. (Osoff Aff., ¶23). Osoff told Patrick that she was elated about Patrick's pregnancy. (Osoff Aff., ¶23). Osoff again agreed, *without question*, to the additional time off. Osoff anticipated that when Patrick returned, she would resume her position as Design Development Manager. (Osoff Aff., ¶23).

    **D.**    **Patrick Returns to Work And Demands Several Work-Related Changes, Including a Shift to Part-Time Status.**

Patrick returned from her seven-week FMLA leave on December 3, 2001. Patrick, 22. On the morning of her return, she requested a meeting with Osoff. In the meeting, Patrick made the following demands:

- She would cut back from full-time employment to four days a week. Patrick, 24-25;
- She would not work Mondays because she felt traffic was at its worst for her commute. Patrick, 26-27;
- She would not work any overtime. Patrick, 38;
- She would no longer work Saturdays. Patrick, 27.

Patrick also asked Osoff to hire another designer so that Patrick would not have all the responsibility for the design work at Jansson. (Osoff Aff., ¶26). Patrick stated that these demands were not negotiable, and that she was prepared to quit if Jansson would not accede to them. (Osoff Aff., ¶27). Patrick did not indicate that any of her demands were "medically necessary" and did not present any documentation from her health care provider indicating that they were "medically necessary." (Osoff Aff., ¶27). Osoff told Patrick she would consider her demands. (Patrick, 102-103; Osoff Aff., ¶28).

   E. **Jansson Responds to Patrick's Demands.**

Later in the day on December 3, Osoff explained to Patrick that Patrick's proposed switch from full to part time employment would involve a reduction in duties, responsibilities, *and* hours. (Patrick, p. 41-43; Osoff Aff., ¶29). Osoff explained that all managerial and salaried positions at Jansson have built into their salary structure an assumption of 4 to 7 hours of overtime. (Id.). Osoff informed Patrick that her wage would be adjusted to an hourly rate that was reflective of the fewer hours she would be working and her decreased responsibilities. (Osoff Aff., ¶30). Specifically, Osoff offered Patrick an hourly wage of $22.50. (Patrick, 4-5; Osoff Aff., ¶30). Osoff explained to Patrick that she reached this number by taking Patrick's annualized salary, which was $52,260, and dividing it by 2288 hours – a figure that assumed average weekly overtime of 4 hours. (Osoff Aff., ¶31). This calculation resulted in an hourly wage of $22.84. Osoff explained that Jansson rounded this hourly rate down to $22.50, reflecting Patrick's decreased responsibilities. (Osoff Aff., ¶31).

   F. **Jansson's Practice With Respect to Employees Who Switch From Salaried to Hourly Employment and Vice Versa.**

At the time Osoff presented Patrick with her part-time wage package, Osoff reminded Patrick that Jansson's practice had always been to adjust the wage rate of persons who moved

from salary to hourly employment, and vice-versa. (Patrick, 41-43). Patrick does not claim that she was treated any differently than other employees who moved from salaried to hourly employment. (Patrick, 42-44). In fact, since 1998 (when Taylor Corporation purchased Jansson), five Jansson employees transferred from full-time, salaried employment to part-time, hourly employment, or vice-versa. (Affidavit of Joel Rudy, ¶2. hereinafter ("Rudy Aff.", ¶__)). In each case, (and regardless of the reason for the transfer), Jansson has adjusted the salary or wage of the individual up or down, according to the direction of change. (Rudy Aff., ¶3.) The hourly wage of every individual who moved from salaried to hourly employment was decreased to reflect the decreased responsibilities, as well as the decreased hours of a non-salaried employee. (Rudy Aff., ¶4.) The wage of salaried employees assumes that the employees work 4-7 hours of overtime each week. (Rudy Aff., ¶5). Patrick does not dispute that the company policy is to adjust the wage of employees who moved from salary to hourly employment. (Patrick, 42-43). <u>Patrick does not claim that Jansson proposed to reduce her hourly wage because she was pregnant, because of her sex or because she took FMLA leave</u>. (Patrick, 4-6; 100-102).

      **G.**      **Patrick Refuses To Accept a Decreased Wage, Claiming She Could Do the Job in Four Days.**

Patrick explained that she could perform the senior design job in the four days/32 hours she was proposing even though she had spent 50-55 hours a week performing the job over the previous three and a half years she had been Jansson's senior designer. (Patrick, 26). Her ability to do so, however, depended upon Osoff not assigning her particular tasks that Patrick believed were not part of her senior design manager job. (Patrick, 25-32).

On the morning of December 7, 2001, Osoff had three separate conversations with Patrick about her demands. (Osoff Aff., ¶35). Osoff told Patrick that Jansson was willing to

arrange a flexible schedule for her, but that Patrick's demand that she not work on Mondays would pose a hardship on Jansson. (Osoff Aff., ¶35). Osoff explained that, from a production scheduling point of view, the lag between the work that would be done on Saturday (which would no longer be done by Patrick, either), and the following Tuesday, would significantly delay processing of new designs and products. (Osoff Aff., ¶35). Osoff therefore asked Patrick to consider taking a different day off. (Osoff Aff., ¶35). Patrick refused to consider any other schedule than the one she demanded on December 3. (Osoff Aff., ¶36). Patrick suggested that Jansson hire another designer to work with her. (Patrick, 55).

Later in the morning of December 7, Osoff attempted to resume a dialogue with Patrick. (Osoff Aff., ¶37). Osoff told Patrick that she did not want her to leave and that therefore Jansson would agree to all of Patrick's position duty and scheduling demands, but that her hourly wage would reflect the fewer responsibilities she would be undertaking. (Patrick, p.82; Osoff Aff., ¶38). Osoff also stated that she did not think that Patrick wanted to leave Jansson. (Patrick, 82). Therefore, Osoff agreed that Patrick could work four days a week, eight hours a day. (Patrick, 46). Osoff stated that Patrick could have all Mondays and Saturdays off and that she would not be required to work overtime. (Patrick, 46-47). Patrick did not agree to the reduced wage. (Patrick, 47). Patrick does not claim that Jansson terminated her employment; rather, she claims Jansson constructively discharged her from her employment. (Complaint, ¶26). Patrick agreed to send a letter of resignation "over the weekend," but never did so. (Patrick, 79-80; Osoff Aff., ¶41).

In the course of their discussion about Patrick's reduced schedule and level of pay on December 7, 2001, Patrick claims Osoff:

> Stated that Patrick's reduced schedule would not work because Patrick would probably not be feeling well during her pregnancy.

      Patrick, 48-49.  Patrick believes this comment was discriminatory because she felt Osoff was telling her she couldn't do her job because she was pregnant. Patrick, 49.

      Stated that Patrick would not be sure that she wanted to return to work after her maternity leave until Patrick had the baby.  (Patrick, 51).  Patrick admits that whether she was going to return from maternity leave was critical to scheduling her job.  (Patrick, 54).

      Stated that Patrick would need to stay home with the baby when he or she was ill and said "[l]et's face it, it's a man's world and the woman always stays home with the child."

      Stated that the company had already given Patrick a "gift" in that Patrick had been given paid medical leave, referring to the salary continuation she received for her last FMLA leave.  (Patrick, 50-51).

      Questioned Patrick "what happens if you have a multiple birth?"  (Patrick, 50-51).  Patrick admits that this question arose in the context of setting Patrick's new schedule.  (Patrick, 51).

      Told Patrick that she would be hiring a designer to work with Patrick and stated that Patrick would basically be training her replacement.  (Patrick, 54-55).  Patrick admits, however, that she suggested to Osoff that Osoff hire another designer to work with Patrick.  (Patrick, 54-55).

Patrick does not claim that Osoff or anyone else at Jansson made any discriminatory or offensive comments to her prior to the time she returned from her leave in December 2001.  (Patrick, 56-58).

### III.  LEGAL ARGUMENT

#### A.  Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Rule 56 is designed to secure "'the just, speedy and inexpensive determination of every action.'"  Celotex Corp. v. Catrett, 477 U.S. 317, 327, 106 S. Ct. 2548, 2555 (1986).  The moving party is entitled

to summary judgment when the nonmoving party has failed to set forth sufficient facts to establish the existence of an essential element of the nonmoving party's case. Celotex, 477 U.S. at 322-23, 106 S. Ct. at 2552. Where the moving party makes an initial showing that there exists no genuine issue of material fact, the non-moving party may not merely rely on allegations or unsupported speculations to avoid summary judgment. Byrd v. Ronayne, 61 F.3d 1026, 1030 (1st Cir. 1995); Smith v. Stratus Computer, Inc., 40 F.3d 11, 13 (1st Cir. 1994). *cert. denied*, 514 U.S. 1108, 115 S. Ct. 1958 (1995). Rather, the moving party must set forth specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

    **B.**    **Patrick's Sex And Pregnancy Claims Fail Because She Has Not Made Out A *Prima Facie* Case Of Disparate Treatment Or Disparate Impact Discrimination**

Patrick has alleged disparate treatment and disparate impact discrimination claims in this case. Her disparate treatment claim is that she was constructively discharged because of the comments Ms. Osoff allegedly made on the last day of her employment. Complaint, ¶ 26. Her disparate impact claim is that Jansson's practice of calculating the hourly wage of individuals who move from full time, salaried, exempt employment to part-time, non-exempt hourly employment disparately impacts women because they are more likely to request such a change. Complaint, ¶ 33. Jansson is entitled to judgment as a matter of law because Patrick does not raise any issues of material fact on either of these claims.

        1.    **Patrick's Disparate Treatment Claim Fails Because She Suffered No Adverse Employment Action**

Patrick must set forth either (1) direct evidence of intentional sex-based disparate treatment or (2) circumstantial evidence of sex-based discrimination under the burden-shifting analytical framework established in McDonnell Douglas Corp. v. Green in order to prove gender

or pregnancy discrimination under Massachusetts General Laws Chapter ("MGL") 151B.  Scott v. Sulzer Carbomedics, Inc., 141 F. Supp.2d 154 (D. Mass. 2001).  Direct evidence is comprised of "statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision." Febres v. Challenger Caribbean Corp., 214 F.3d 57, 60 (1st Cir. 2000).  "Direct evidence of discrimination would involve that exceptionally rare situation where a supervisor actually admits that unlawful animus motivated his decision or played a significant part in it."  Scott, 141 F. Supp.2d at 171.  *See also* Hodgens v. General Dynamics Corp., 144 F.3d 151, 171 n.8 (1st Cir. 1998) ("smoking gun" evidence such as an outright admission by an employer is "rarely found in today's sophisticated employment world").

There is no direct evidence of gender or pregnancy discrimination in this case.  The comments that Patrick alleges Osoff made during the last week of her employment do not constitute direct evidence of gender or pregnancy discrimination because a fact-finder would have to draw additional inferences in order to link these statements to any adverse action by Osoff.  *See also* Scott, 141 F. Supp.2d at 172 (derogatory comments about a woman's appearance were not direct evidence of gender discrimination where a fact-finder would have to draw additional inferences to link comments to the employment decisions at issue). Osoff did not take any adverse employment action against Patrick.

Under the McDonnell-Douglas burden-shifting framework, Patrick must establish that she (1) is a member of a protected class; (2) met her employer's legitimate job expectations; and (3) suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination.  LaValley v. Quebecor World Book Services, LLC, 315 F. Supp.2d 136, 143-144 (D. Mass. 2004);  School Comm. of Braintree v. Massachusetts Comm'n Against

Discrimination, 386 N.E.2d 1251 (Mass. 1979).  Patrick has not made and cannot make a *prima facie* case of discrimination becauyse she did not suffer an adverse employment action.

Patrick has alleged constructive discharge as the only alleged "adverse employment action" she experienced.  Patrick's decision to leave the workplace must have been reasonable under the circumstances, however, in order to impute an adverse employment action to Jansson.  In order to establish that she was constructively discharged, Patrick must show that Jansson imposed "working conditions that were so intolerable [ ] that a reasonable person would feel compelled to forsake his job rather than to submit to looming indignities."  Simas v. First Citizens Federal Credit Union, 170 F.3d 37, 46 (1st Cir. 1997). *See also* Keeler v. Putnam Fiduciary Trust Co., 238 F.3d 5, 9-10 (1st Cir. 2001) ("'constructive discharge'" usually describes harassment so severe and oppressive that staying on the job while seeking redress is intolerable").

Even assuming as true all of Patrick's allegations (as Jansson must for purposes of this motion), Patrick's working conditions fall far short of being so intolerable that a reasonable person would feel compelled to quit her job.  The "intolerable working conditions" Patrick describes are that, on a single day, Osoff (1) allegedly made six ambiguous comments to Patrick concerning her scheduling and availability during her pregnancy and (2) communicated the hourly wage Patrick would receive if she changed from being a full-time, salaried employee to a part-time hourly employee with fewer responsibilities.  As a matter of law, these allegations are simply not so intolerable that they would force a reasonable person to quit his or her job.  Keeler, 238 F.3d at 9-10 (plaintiff did not establish constructive discharge where basis of claim was that plaintiff had reduced responsibilities and thus received reduced bonuses, salary, and benefits, and plaintiff was removed from multiple projects).

When viewed in the context of the undisputed allegations of what happened on her last day of employment, Patrick's decision to leave was not reasonable. On the same day Osoff allegedly made these comments to Patrick, Osoff told Patrick that she wanted Patrick to stay at Jansson. Patrick, 82 (Q: "Isn't it true that Ms. Osoff told you she didn't want you to leave? A: Yes. She did say that."). During the same conversation, Osoff had also agreed to all of Patrick's other demands regarding her working conditions, including Patrick's demands that she not work Saturdays and Mondays, and that she not work overtime. Patrick was demanding to dictate when she worked, what she would do, and how much she would be paid; in this light, Jansson's response to Patrick was exceedingly reasonable. Patrick's decision to leave her employment was based on her own unreasonable unwillingness to accept that her employer had the right to dictate the terms and conditions of the part-time employment she requested. Jansson did not create any "intolerable conditions" for Patrick, much less conditions that would make her resignation reasonable.

Patrick's disparate treatment claim depends upon a finding that she suffered an adverse employment action through her alleged constructive discharge. On these facts, Patrick cannot meet the legal standard for establishing that she was constructively discharged. Patrick has therefore failed to establish a *prima facie* case of disparate treatment discrimination because she cannot show an adverse employment action. It should therefore be dismissed.

>    2.   **Patrick's Disparate Impact Claim Fails Because Jansson Does Not Select The Employees Who Are Subject To The Practice And Patrick Has No Evidence That Jansson's Practice Disparately Impacts Women.**

To make a claim of disparate impact discrimination, Patrick must (1) identify a particular facially neutral employment practice; (2) show that there is a disparate impact on members of the protected group to which she belongs; and (3) link the practice and the disparate impact, showing

that the former is the cause of the latter. Gaines v. Boston Herald, Inc., 998 F. Supp. 91, 104 (D. Mass. 1991) (disparate impact involves discrimination through ostensibly neutral rules and practices whose net effect is to discriminate). *See also* Holt v. Gamewell Corp., 797 F.2d 36, 37 (1st Cir. 1986)(to establish disparate impact plaintiffs must show a facially neutral practice has a significant discriminatory impact on members of the protected class). Patrick's claim fails because there is no evidence that Jansson's pay policies disparately impact women or any other protected class.

Patrick specifically claims Jansson's practice of calculating the hourly wage of those who elect to change from full time, exempt, salaried employment to part-time, non-exempt, hourly employment disparately impacts women *because more women than men request such a change*. This rationale is fatally flawed as a matter of law, and even if it were not, Patrick has not adduced and cannot adduce any evidence to show that this policy disparately impacts women generally, or pregnant women specifically.

In the context of a claimed disparate impact, the plaintiff must show that "the process used by the employer *to select* employees [subject to the practice] resulted in unfavorable treatment of a disproportionate number of the members of the protected class." *Holt v. Gamewell Corp.*, 797 F.2d 36, 38 (1st Cir. 1986). In this case, the claimed disparate impact practice only applies to those employees who *elect* to change from full-time, exempt, salaried employment to part-time, non-exempt, hourly employment.[1] Patrick's disparate impact analysis therefore fails in the first instance because Jansson does not select the employees who are subject to this practice. If a disproportionate number of women elect to move from salary to hourly

---

[1] The policy would theoretically apply to those who involuntarily change from salary to hourly employment (as in a forced demotion), but Patrick has not alleged Jansson's application of the practice in those circumstances disparately impacts women.

employment, it is because of their decision to do so, not because Jansson's practice disparately impacts women.

Second, even assuming, *arguendo*, that Jansson were responsible for selecting the persons subject to the practice, Patrick's claim fails because she has not established that the practice disparately impacts women. The fact that a neutral policy "has an adverse effect on a single employee or even a few employees" does not establish a *prima facie* case of disparate impact discrimination. *Holt*, 797 F.2d at 38. In the context of disparate impact hiring cases, "long-lasting and gross disparity between the composition of the workforce and the relevant labor market may provide important proof of employment discrimination." *Gaines*, 998 F. Supp. at 105. Patrick has provided no evidence (statistically significant or otherwise) of disparate impact in this case.

Instead, as her sole evidence of a disparate impact, Patrick points to the fact that four of the five employees who were affected by this practice between 1998 and 2003 were women who requested a change from salary to hourly employment after they returned from maternity leave.[2] As an initial matter, (again assuming that Jansson is responsible for selecting to whom the practice applies, and it is not) this sample is too small to support her claim that the practice disparately impacts women. *See Holt*, 797 F.2d at 38.

Moreover, at the time Patrick left her employment, 73% of Jansson's work force was comprised of women, and 73% of its senior managers were women. This is hardly a "gross disparity between the composition of the workforce and the relevant labor market" that might provide some evidence of discrimination. *Gaines*, 998 F. Supp. at 105. Patrick has not offered any statistical proof whatsoever to establish that Jansson's practice disparately impacts women.

---

[2] Jansson also provided evidence of a male employee who was subjected to this policy when he was promoted from an hourly position to a salaried position.

2573227v1                                                  15

Because Patrick fails to identify a facially neutral employment policy or to establish that such a practice disparately impacts women, summary judgment should be granted on Patrick's disparate impact claim.

### C. Patrick's FMLA Claim Must Be Dismissed Because She Does Not Allege Any Facts To Support A Claim Of FMLA Retaliation.

In order to establish a prima facie case of FMLA retaliation, Patrick must show that (1) she asserted a protected right under the FMLA; (2) she was adversely affected by an employment decision; and (3) there is a causal connection between her protected activity and Jansson's adverse employment action. Hodgens v. General Dynamics, Corp., 144 F.3d 151, 161 (1st Cir. 1998). There is no dispute that Patrick asserted rights under the FMLA when she took a leave in October and November 2001. Patrick's FMLA claim fails because Jansson did not take any adverse employment action against her and she does not claim that her proposed hourly wage was adjusted because she took FMLA leave. In fact, Patrick admitted at her deposition that she did not believe that Jansson retaliated against her, impeded, or otherwise prevented her from asserting her rights under the FMLA. Patrick, 100-101.

The undisputed evidence shows that Jansson was wholly supportive of Patrick's FMLA leave. Specifically, the evidence shows that Jansson granted Patrick's request for FMLA leave in October and November 2001 without issue. Second, Jansson paid Patrick 75% of her salary during her FMLA leave, even though the law requires only unpaid leave. Third, it was Osoff who alerted Patrick to the fact that she could apply for paid leave for fertility-related treatments – a benefit of which Patrick was unaware. Fourth, when Patrick called on November 26, 2001 and requested a one-week extension of her FMLA leave, Jansson again granted the leave without question. Fifth, in December 2001, Patrick was reinstated to her former position without question. Finally, the undisputed evidence shows that Jansson proposed a reduced hourly wage

only after Patrick requested that she cut back her schedule to four days a week. This decision to reduce Patrick's salary was made pursuant to Jansson's long-standing practice to pay part-time employees a lower hourly wage than full-time employees. Patrick does not claim that there is a connection between the wage calculation and her FMLA leave. Patrick, 6.

Patrick does not set forth any evidence suggesting that Jansson took any adverse employment action against her because of her assertion of rights under the FMLA. The only statement that Patrick alleges that Osoff or anyone at Jansson made that was remotely related to her FMLA leave is Patrick's claim that Osoff stated that Jansson had already given Patrick a "gift" in the form of paid FMLA leave. This statement, in the absence of any adverse employment action, is insufficient to establish that Jansson retaliated against Patrick because she took FMLA leave. Therefore, summary judgment should be granted on Patrick's FMLA claim.

## CONCLUSION

For the foregoing reasons, Defendant Jansson Corporation respectfully requests that the Court grant summary judgment on all of Patrick's claims.

    JANSSON CORPORATION,

    By its attorneys,

    /s/ Daniel L. Palmquist
    Daniel L. Palmquist (MN State Bar #217694)
    Amy Walsh Kern (MN State Bar #307609)
    LEONARD, STREET AND DEINARD
     PROFESSIONAL ASSOCIATION
    150 South Fifth Street, Suite 2300
    Minneapolis MN  55402
    Telephone:  (612) 335-1500

>
> Of Counsel:
>
> Jeffrey L. Levy (BBO# 559438)
> CORRIGAN & LEVY LLP
> 896 Beacon Street
> Boston, MA  02215
> Telephone:  (617) 247-3800

Dated: January 31, 2005.