UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LAURA PATRICK, )<br>　　　　Plaintiff, )<br>v. )<br>JANSSON CORPORATION, )<br>　　　　Defendant. ) | Civil Action No. 04-CV-10427 RGS |

## AFFIDAVIT OF ARLENE OSOFF

Arlene Osoff hereby deposes and states as follows:

1.　　I was the General Manager of Jansson Corporation in December 2001.

2.　　At that time, Jansson was a printing company that specialized in high-end printed products, including social invitations and commercial business cards and envelopes.

3.　　Jansson designed new social (wedding, Bar and Bat Mitzvah, and Party) invitations annually. Each year, new product lines were introduced at trade shows and produced for distribution in catalogues to stationery shops across the country.

4.　　Jansson was originally started by me and two other partners in 1976.

5.　　In December 1998, Jansson became an operating division of Taylor Corporation.

6.　　After Taylor purchased Jansson, I remained as the General Manager of Jansson.

7.　　In 2001, Jansson employed approximately sixty-six in-house employees. Forty-eight out of these sixty-six employees were women.

8.　　At that time, eight of Jansson's eleven senior managers (including Laura Patrick) were women.

9. Eleven of Jansson's 20 female assemblers were on part-time schedules for childcare reasons.

10. Additionally, Jansson contracted with another 10-20 women (depending on seasonality) who worked out of their homes: Jansson picked up and delivered work to them so that they could stay home with their children.

11. Laura Patrick began her employment at Jansson as a customer service representative in August 1994.

12. In 1998, I promoted Ms. Patrick to Design Development Manager, the senior design position at Jansson.

13. In this role, Ms. Patrick was responsible for the development, design and initial production of Jansson's entire product line.  The design process is a multiple-step process: Ideas are developed into designs, mockups of the prospective design are created, and typesetting of the items is completed so the samples are ready for press.  The samples are then printed and fully assembled to be included in catalogues that are distributed to customers.  The samples are inspected for accuracy, color, layout, and paper choice as they are being printed, and reviewed on a mockup to ensure that the prospective design turned out as anticipated.

14. Other than me, Patrick was the senior (and only) designer on staff at Jansson from 1998 until her resignation in 2001.

15. I was Patrick's predecessor in the position of senior designer.  For most of the history of Jansson, I was the sole designer of Jansson's product line.

16. I continued to perform some design work throughout Patrick's tenure, and worked very closely with Patrick from 1998 until Patrick's resignation in December 2001.

17.    The Design Development Manager position is a full-time job: The senior designer is responsible for all phases of design and production supervision.  The Design Development Manager creates designs and produces the design prototypes.  The Design Development Manager must also continuously interact with and be available to all departments as needed to supervise the production and resolve the questions that arise in the production process.

18.    This process went on 5 days per week, as well as on Saturdays, when design, typesetting and press work was often done (so that live print jobs were not displaced during the week).  Working on Saturdays was particularly critical in the 3-4 months preceding trade shows, when all new products must be completed.

19.    Except for the time Patrick was on FMLA leave, Patrick regularly worked Saturdays with and without me, creating, and bringing to completion the designs that were designated to be included in the newest albums.

20.    In October 2001, Patrick requested a FMLA leave from October 15 to November 26, 2001.  Patrick indicated at the outset that the leave was necessary to undergo additional fertility treatments.

21.    I granted Patrick this leave without question.  Moreover, I suggested to Patrick she might be able to get paid during the leave under Jansson's new salary continuation policy that went into effect in 2001.  The salary continuation policy, which by its terms did not expressly include fertility treatments, allows employees to receive a percentage of their salary, based on length of service, during specified types of leaves.

22.    At my suggestion, Patrick applied for a salary continuation and was able to receive 75% of her salary during her seven-week FMLA leave.  Prior to my suggesting to Patrick that the salary continuation policy may apply, Patrick had not sought any pay for her leave.

23. On November 26, 2005, the date that was to be the end of Patrick's FMLA leave, Patrick called me to inform me that she was pregnant and to request an additional week off. I told Patrick that I was elated about her pregnancy and agreed, without question, to the additional time off. I anticipated that when Patrick returned, she would resume her position as Design Development Manager, which we held open for her during her FMLA leave.

24. Patrick returned from her seven-week FMLA leave on December 3, 2001.

25. On the morning of her return, she requested a meeting with me. In the meeting, Patrick made the following demands:

- She would cut back from full-time employment to four days a week;
- She would not work Mondays because she felt traffic was at its worst for her commute;
- She would not work any overtime;
- She would no longer work Saturdays.

26. Patrick also asked me to hire another designer so that Patrick would not have all the responsibility for the design work at Jansson.

27. Patrick stated that these demands were not negotiable, and that she was prepared to quit if Jansson would not accede to them. Patrick did not indicate that any of her demands were "medically necessary" and did not present any documentation from her health care provider indicating that they were "medically necessary."

28. I told Patrick I would consider her demands.

29. Later in the week of December 3, I explained to Patrick that her proposal for work would involve a switch from salaried to hourly employment and a reduction in duties, responsibilities, and hours. I explained that all managerial and salaried positions at Jansson have built into their salary structure an assumption of 4 to 7 hours of overtime.

30. I informed Patrick that her wage would be adjusted to an hourly rate that was reflective of the fewer hours she would be working and her decreased responsibilities. Specifically, I offered Patrick an hourly wage of $22.50.

31. I explained to Patrick that I reached this number by taking Patrick's annualized salary, which was $52,260, and dividing it by 2288 hours – a figure that assumed average weekly overtime of 4 hours. This calculation resulted in an hourly wage of $22.84. I explained that Jansson rounded this hourly rate down to $22.50, to reflect Patrick's decreased responsibilities.

32. At the time I presented Patrick with her part-time wage package, I reminded Patrick that Jansson's policy had always been to adjust the wage rate of persons who moved from salary to hourly employment, and vice-versa.

33. In response to my offer, Patrick claimed that she could perform the senior design job in the four days/32 hours she was proposing, even though the job had been full-time plus for her over the previous three and a half years she had been Jansson's senior designer.

34. Patrick did not dispute that the company policy had always been to adjust the wage of employees who moved from salary to hourly employment.

35. On the morning of December 7, 2001, I had three separate conversations with Patrick about her demands. I told Patrick that Jansson was willing to arrange a flexible schedule for her, but that Patrick's demand that she not work on Mondays would pose a hardship on Jansson. I explained that, from a production scheduling point of view, the lag between the work that would be done on Saturday (which would no longer be done by Patrick, either), and the following Tuesday, would significantly delay processing of new designs and products. I therefore asked Patrick to consider taking a different day off.

36. Patrick adamantly refused to consider any other schedule than the one she demanded on December 3. In fact, Patrick refused to reconsider any of the demands she had made. She told me she did not care what had been done with other people who had gone from salaried to hourly employment, and that she would not accept anything less than four-fifths of her salary for her new, reduced-hour and reduced-responsibility schedule. Patrick told me it was her "time to be selfish," and that Jansson "might not be the right place for her at this time in her life."

37. Later in the morning of December 7, I attempted to resume a dialogue with Patrick.

38. I told Patrick that I did not want her to leave and that therefore Jansson would agree to all of Patrick's demands, but that her wage would be adjusted as I had explained to her previously. Specifically, I agreed that Patrick could work four days a week, eight hours a day. I stated that Patrick could have all Mondays and Saturdays off and that she would no longer have to work overtime.

39. Patrick replied that her demands were not negotiable and that she was leaving Jansson.

40. Patrick offered to work a few weeks to train her replacement, but I told Patrick that she did not need to come back for several reasons. For one, Jansson could not hire Patrick's replacement overnight; second, with Christmas approaching, there was little work that would be done; and third, I would perform the design duties in Patrick's absence and did not need any training.

41.     Patrick agreed to send a letter of resignation "over the weekend," but never did so.

Signed under the penalties of perjury this 31st day of January 2005.

                                          /S/ Arlene Osoff
                                          Arlene Osoff