UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-CV-10427-RGS

```
*****************************************
LAURA PATRICK,                          *
        Plaintiff,                      *
                                        *
v.                                      *
                                        *
JANSSON CORPORATION,                    *
        Defendant.                      *
*****************************************
```

       DEPOSITION OF LAURA PATRICK, taken pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Susan L. Prokopik, Registered Merit Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the offices of Riley & Dever, P.C., 210 Broadway, suite 201, Lynnfield, Massachusetts, on Tuesday, January 25, 2005, at 10:04 a.m.

KACZYNSKI REPORTING
72 CHANDLER STREET, SUITE 3
BOSTON, MASSACHUSETTS 02116

(617) 426-6060

Page 2

```
 1  APPEARANCES:
 2
       ON BEHALF OF THE PLAINTIFF:
 3
       THERESA FINN DEVER, ESQ.
 4     Riley & Dever, P.C.
       210 Broadway, suite 201
 5     Lynnfield, MA  01940
       (781) 581-9880
 6
 7
       ON BEHALF OF THE DEFENDANT:
 8
       DANIEL L. PALMQUIST, ESQ.
 9     Leonard, Street and Deinard
       150 South Fifth Street, suite 2300
10     Minneapolis, MN  55402
       (612) 335-1500
11
12  ALSO PRESENT:
13     Joel Rudy
14
```

Page 3

```
 1         INDEX
 2
    EXAMINATION BY MR. PALMQUIST..............Page 4
 3
 4
 5
            EXHIBITS
 6
    No.   Description              Page No.
 7
    1   1/17/03 memo                  93
 8
    2   2/16/00 note                  93
 9
    3   6/23/01 note                  93
10
    4   10/5/01 letter                93
11
    5   Salary Continuance Plan       93
12
    6   Response to Request for
13      Family Medical Leave          94
14  7   Charge of Discrimination      94
15  8   Complainant's Response to
        Respondents' Position Statement  94
16
    9   Complaint                     94
17
    10  Plaintiff's Rule 26(A)
18      Disclosures                   94
19  11  Jansson Information for Employees  94
20  12  Employee Acknowledgment       120
21
22        Transcript Marked
23        *** Page 9, line 17
24
```

Page 4

```
 1           PROCEEDINGS
 2              - - - - -
 3           LAURA PATRICK
 4  having been satisfactorily identified and duly
 5  sworn by the Notary Public, was examined and
 6  testified as follows:
 7  EXAMINATION BY MR. PALMQUIST:
 8  Q. Miss Patrick, my name is Dan Palmquist and I
 9     represent Jansson Corporation in this matter.
10     I'm here to ask you some questions about your
11     lawsuit. You understand that?
12  A. Yes.
13  Q. Now, when you returned from your FMLA leave in
14     December of 2001, you told Arlene Osoff that you
15     wanted to cut back your hours from full-time to
16     32 hours per week, correct?
17  A. No.
18  Q. You told her you wanted to cut back your hours at
19     the plant; isn't that correct?
20  A. Yes.
21  Q. And Arlene Osoff told you that you would be
22     making approximately $22 or 22.50 an hour; is
23     that correct?
24  A. Yes. She did mention that.
```

Page 5

```
 1  Q. Okay. She told you that you would make that
 2     because you were moving from full-time to
 3     whatever part-time arrangement you wanted; isn't
 4     that correct?
 5  A. It wasn't considered part-time. But because it
 6     was not going to be five days, it was going to be
 7     four days, she classified that as part-time.
 8     Therefore, the change in the hourly rate.
 9  Q. Because you were moving from five days to four
10     days; is that correct?
11  A. That's what she said, yes.
12  Q. Now, Arlene Osoff didn't tell you your proposed
13     wage of 22 or 22.50 an hour would be that until
14     you told her you wanted to reduce your hours;
15     isn't that correct?
16  A. I'm sorry. Can you repeat the question?
17  Q. Okay. Arlene Osoff did not tell you that your
18     wage would be $22 an hour until you told her you
19     wanted to go from five days to four days a week;
20     is that correct?
21  A. Yes.
22  Q. Okay. You are not claiming that she would have
23     proposed a reduced wage if you had not requested
24     a modified schedule, are you?
```

Page 6

1  A. I'm not sure I quite understand what you're
2     saying. Just repeat that.
3  Q. Okay. Ms. Osoff proposed a $22 an hour wage
4     because you asked for a modified schedule, didn't
5     you?
6         MS. DEVER: Objection.
7         You can answer. I'm just stating an
8     objection.
9  A. Yes.
10 Q. Okay. She didn't say that she was paying you 22
11    -- going to pay you $22 an hour because you're
12    female, did she?
13 A. No.
14 Q. She didn't propose that wage because you were
15    pregnant, did she?
16 A. No.
17 Q. Okay. She didn't propose that wage because you
18    took family and medical leave, did she?
19 A. No.
20 Q. Have you ever had your deposition taken before
21    today, Miss Patrick?
22 A. No.
23 Q. Do you understand the process and the purpose of
24    this deposition?

Page 7

1  A. Yes.
2  Q. I will be relying on you to give me complete and
3     thorough answers to my questions regarding your
4     allegations of discrimination. If you don't
5     understand a question, please ask me to repeat it
6     or rephrase it as you have already done.
7  A. Okay.
8         MS. DEVER: Could I state something?
9     When we start a deposition, we usually put some
10    stipulations on the record about objections. I
11    don't know if that's the practice in Minnesota
12    but --
13        MR. PALMQUIST: If you want to tell me
14    what the stipulations are.
15        MS. DEVER: Usually we would say that
16    the witness would have 30 days to review the
17    transcript once it is available to make any
18    corrections and to sign the transcript. And
19    usually we hold all objections except objections
20    as -- all objections as to form until the time of
21    trial except maybe objections as to privilege or
22    other such matters.
23        MR. PALMQUIST: Those two stipulations
24    are acceptable.

Page 8

1         MS. DEVER: Okay.
2         MR. PALMQUIST: And normal in Minnesota
3     as well.
4         MS. DEVER: Okay.
5  Q. It's very important that you answer verbally so
6     that the court reporter can record your
7     testimony.
8  A. Okay.
9  Q. If you please wait until I finish asking my
10    question until you start your answer, that will
11    help her in terms of transcribing everything that
12    happens here today. If you need a break at any
13    time, please let me know.
14        Are you taking any medication today?
15 A. No.
16 Q. Okay. How are you feeling today?
17 A. Fine.
18 Q. What did you do to prepare for today's
19    deposition?
20 A. I read through some notes that I wrote for my
21    lawyer.
22 Q. Do you have those notes with you?
23 A. Yes, I do.
24 Q. *** Can I see them, please?

Page 9

1         MS. DEVER: No. They're
2     attorney-client privileged. It was a letter she
3     wrote to me.
4         MR. PALMQUIST: She reviewed it to
5     refresh her recollection.
6         MS. DEVER: That doesn't -- I mean,
7     it's still attorney-client privilege.
8         MR. PALMQUIST: I'm afraid that the
9     rule is that if she used it to refresh her
10    recollection in preparation for the deposition
11    it's discoverable.
12        MS. DEVER: That's not the rule.
13        MR. PALMQUIST: You can mark that
14    portion of the deposition. We'll take that up at
15    another time.
16        MS. DEVER: Okay.
17        (*** Transcript marked.)
18 Q. Did you review anything else?
19 A. No.
20 Q. Did you meet with your attorney?
21 A. Yes.
22 Q. When did you meet?
23 A. Yesterday.
24 Q. How long did you meet with her?

**Page 10**

1  A. An hour and a half.
2  Q. Did you talk with anyone else?
3  A. No.
4  Q. Who have you talked to about your lawsuit or your
5     charge of discrimination against the company
6     other than your attorney?
7  A. My husband.
8  Q. Anyone else?
9  A. No.
10 Q. Have you asked anyone if they would be a witness
11    for you in this case?
12 A. Define "witness."
13 Q. Have you asked anyone to testify or provide
14    testimony in this case?
15 A. Yes.
16 Q. Who?
17 A. I spoke with Anne Rascoe.
18 Q. Anyone else?
19 A. Wendy.
20 Q. Wendy Canty?
21 A. Yes.
22 Q. Anyone else?
23 A. No.
24 Q. Did you talk with Nicole Lee?

**Page 11**

1  A. No.
2  Q. Did you talk with Lucia McDougall?
3  A. No.
4  Q. Did you talk with Mike Stewart?
5  A. No.
6  Q. When did you speak with Anne Rascoe?
7  A. I don't know the exact date. I want to say maybe
8     two years ago.
9  Q. Did you speak with her by phone or in person?
10 A. By phone.
11 Q. Why did you call Anne Rascoe?
12 A. I called her because I believed her to have a
13    similar situation of mine and I wanted to get the
14    facts from her to make sure that my
15    interpretation of what I saw was correct before I
16    said anything to my lawyer.
17 Q. Did you speak with Anne before or after Mrs. Finn
18    Dever began representing you?
19 A. After.
20 Q. What did Ms. Rascoe tell you?
21 A. She told me that after she went out to have her
22    baby, she came back with reduced hours. And at
23    that time she was going to be taking reduced
24    responsibilities as well. And her pay scale was

**Page 12**

1     adjusted accordingly because of the change in her
2     responsibilities.
3  Q. What else did she say?
4  A. That pretty much was the gist of the
5     conversation. We talked personal about our
6     children and that pretty much was it. I did ask
7     her if she would be supportive of me if I was to
8     talk to the lawyer about her situation.
9  Q. What did she say to that?
10 A. She said she would.
11 Q. And by "supportive," what do you mean?
12 A. She would write a letter and talk to the lawyer
13    over the phone.
14 Q. Talk to Ms. Finn Dever?
15 A. Yes.
16 Q. Did she write a letter to your knowledge?
17 A. Not that I know of.
18 Q. Do you know whether your lawyer had any other
19    conversations with her?
20 A. I believe she made a phone contact.
21 Q. Do you know when that might have been?
22 A. I really don't recollect.
23 Q. Was it shortly after you talked with Ms. Rascoe?
24 A. Yes. Because after I talked to Anne, I told

**Page 13**

1     Theresa about that and she scheduled the phone
2     conversation or Anne might have reached her. I'm
3     not sure how that actually unfolded but it was
4     after that.
5  Q. Did Ms. Rascoe tell you she felt that she had
6     been treated unfairly?
7  A. Yes.
8  Q. What did she say about that?
9  A. She said that in many respects she was still
10    doing the same responsibilities. She was pretty
11    much doing the same job and she felt that that
12    was unfair that her pay be adjusted. She
13    understood that her pay would be adjusted for
14    coming back to her job doing less
15    responsibilities but she actually wasn't doing
16    less responsibilities. Therefore, felt that she
17    should be paid what she was originally paid when
18    -- before she left because that's the job she was
19    still doing.
20 Q. I'm sorry. Perhaps I asked this. Did she write
21    a letter?
22 A. Not to my knowledge.
23 Q. Do you remember anything else about your
24    conversation with Miss Rascoe?

Page 14

1  A. Not really, no.
2  Q. Other than that contact approximately two years
3     ago, have you spoken with her at all since then?
4  A. No.
5  Q. Has she contacted you at any time since then?
6  A. Just after that a Christmas card. Picture of her
7     daughter.
8  Q. When did you speak with Wendy Canty?
9  A. I believe I -- I think I spoke to Anne around
10    Christmastime a couple years ago and I spoke to
11    Wendy a couple months after that so it was early
12    in the following year.
13 Q. Would this be 2003?
14 A. Yes. I believe so. I'm not exactly sure of the
15    dates.
16 Q. Did you speak with Wendy by phone or in person?
17 A. By phone.
18 Q. Did you call her or did she call you?
19 A. I called her.
20 Q. Why did you call her?
21 A. I called her because I wanted to make sure before
22    I presented her name to my lawyer that my
23    impression of what I saw at work, I wanted to
24    make sure that I had my facts before I approached

Page 15

1     the lawyer. Her situation being similar to Anne
2     Rascoe's.
3  Q. What was your impression of work or what had
4     happened at work?
5  A. My impression was that she went out to have her
6     child. She came back after her leave with
7     reduced hours and she was paid a different rate
8     for doing less responsibilities but it appeared
9     to me that she was doing the same job. Just
10    shorter hours.
11 Q. What did Miss Canty tell you?
12 A. She basically supported that observation.
13 Q. Can you be a little bit more specific about what
14    she said?
15 A. I believe she said that when she came back --
16    when she came back with her reduced hours, her
17    pay was cut and that she would be doing less
18    responsibility but in fact she was doing the same
19    responsibility. She was working in the same
20    office doing the same tasks.
21 Q. Did she tell you she felt she had been treated
22    unfairly?
23 A. She felt that that was not fair.
24 Q. What was Ms. Canty's job?

Page 16

1  A. She worked in the office that the flow of human
2     resource tasks happened. The accounting, report
3     generation for different departments. It was an
4     administrative-type office for the entire
5     company.
6  Q. Do you know what her job description was?
7  A. No, I do not.
8  Q. Who was her supervisor?
9  A. I believe her direct supervisor was Pamela
10    Greene.
11 Q. Did Miss Canty tell you she ever complained about
12    this?
13 A. She told me that she was upset about it and that
14    she had talked to Pamela about it several times.
15    And I believe she also talked to Arlene about it.
16 Q. Was there ever any resolution of that?
17 A. I'm not aware if there was.
18 Q. Was Miss Canty still working at Jansson when you
19    had this conversation with her?
20 A. No.
21 Q. Did you ask Miss Canty to write a letter?
22 A. I asked her if she would support me if it came to
23    that. She said that she would be more than happy
24    to and that Nicole went through a similar

Page 17

1     situation. That she would contact Nicole and
2     have Nicole contact me. And she said if I needed
3     a letter written or needed to talk to the lawyer,
4     she would be more than happy to do that.
5  Q. Do you know whether she did talk with your
6     lawyer?
7  A. That I don't remember. I think there might have
8     been a phone call, not a letter, but I think
9     there might have been a phone call but I'm not
10    really sure.
11 Q. You're not aware of any letter that she's written
12    on your behalf?
13 A. No.
14 Q. Do you know whether she contacted Nicole Lee?
15 A. She said that she left her a message and that
16    Nicole said she would be willing to talk with me
17    but it never materialized.
18 Q. So did you have two conversations with Wendy?
19    The first one where you asked her if she would
20    support you and then a subsequent conversation
21    when she told you she had left a message for
22    Nicole?
23 A. I -- yes, I believe we did because I connected
24    with her again and she told me she had left a