Page 18

1  message for Nicole. And then I said if she -- if
2  she was busy and we had a hard time connecting
3  with each other, I would give her the lawyer's
4  number directly and she could call the lawyer
5  directly. I said I just want to make sure before
6  she approaches the lawyer that in fact her
7  situation was similar.
8  Q. Do you know whether Nicole ever contacted your
9  attorney?
10 A. That I don't know. I don't remember.
11 Q. Do you know what Nicole Lee's job was at Jansson?
12 A. I believe -- she definitely worked in the
13 commercial division in the customer service
14 office. And I believe she managed and organized
15 the office.
16 Q. Have you had any conversations with Wendy Canty
17 since early 2003?
18 A. No.
19 Q. Have you had any other communications with her
20 since then?
21 A. No.
22 Q. Where does Anne Rascoe live?
23 A. I believe she lives in Lake Placid. I'm not
24 really sure. The last time I spoke to her,

Page 19

1  that's where she lived.
2  Q. New York?
3  A. Yes.
4  Q. How about Wendy Canty? Do you know where she
5  lives?
6  A. No, I don't.
7  Q. Do you know where Nicole Lee lives?
8  A. No, I don't.
9  Q. Did you ever tape record any conversations or
10 discussion that you had with anyone at Jansson?
11 A. No.
12 Q. Did you ever tape record any other conversation
13 or discussion at Jansson that you were not a part
14 of?
15 A. I'm sorry? I'm not sure I -- no, I didn't.
16 Nothing that a recorder was ever involved in.
17 Q. Okay. Have you destroyed any documents related
18 to this case?
19 A. No.
20 Q. How do you claim that Jansson discriminated
21 against you on the basis of your sex?
22 A. When I approached Arlene about my pregnancy, the
23 conversation was completely centralized around my
24 pregnancy. And she had made a predetermined

Page 20

1  decision that I would not be able to handle the
2  job while I was pregnant and would not be able to
3  handle the job when I returned from my pregnancy
4  because of scheduling when you have a child.
5  Q. Was this on December 3, 2001?
6  A. There was several conversations that took place
7  between the week of December 3rd and December
8  7th. It was probably -- it came up in every
9  discussion that we had throughout the week.
10 Q. And what do you claim that she did to
11 discriminate against you on the basis of your
12 sex?
13 A. She had predetermined that I would not be able to
14 do my job because I was pregnant.
15 Q. Did she fire you?
16 A. No. She asked me to leave. She didn't actually
17 say, You're fired.
18 Q. Well, now I'm a little confused. She did fire
19 you or she didn't fire you?
20 A. I guess it's how you define being fired.
21 Sometimes people come right out and say you're
22 fired and then sometimes it's said indirectly. I
23 took it as being fired but I was asked to leave.
24 Q. What did she say that led you to believe that she

Page 21

1  was asking you to leave?
2  A. During our last conversation on that Friday, she
3  -- we had discussed -- we had rehashed everything
4  all over again. And there were a few comments
5  that she made about me not being capable in doing
6  my job if I was pregnant and she was concerned
7  with fertility treatments that there can be
8  multiple births and what was I going to do if I
9  had more than one baby. And I said to her, Well,
10 you'll be happy to know that it's confirmed that
11 I'm only having one.
12     She got very angry with me. And we
13 exchanged a few personal comments. And she said,
14 Obviously you're very upset with me and we cannot
15 come to an understanding. And I said, Well,
16 maybe we can just come to an agreement that we
17 agree to disagree on this.
18     And she said that I wasn't allowing any
19 dialogue between the two of us and that I was
20 obviously very angry and that I should leave. It
21 was a very heated moment. She had slammed her
22 fist on the table. She had pointed her finger
23 directly in my face. She was obviously very
24 upset. It got me very upset that she was so

KACZYNSKI REPORTING

9090b848-634f-47eb-be47-55f4720ab753

Page 22

1   upset.
2           And the conversation truly wasn't
3   productive. It was turning counterproductive.
4   So when she asked me to leave, I thought that was
5   the best thing to do.
6           MS. DEVER: Is this an okay place? I
7   just need to use the ladies' room just for one
8   minute.
9           MR. PALMQUIST: That's fine.
10          (Recess.)
11  Q. The conversation you just described occurred on
12     December 7, 2001; is that correct?
13  A. Yes.
14  Q. I would like to back up to the beginning of that
15     week to December 3rd when you came back from your
16     family and medical leave.
17  A. Mm-hmm.
18  Q. Act leave.
19  A. Mm-hmm.
20  Q. What time did you get to work that day?
21  A. Usually I was in at eight. I don't really know
22     what time I got in that day.
23  Q. Was it --
24  A. Probably eight.

Page 23

1   Q. Close to when you usually do?
2   A. Yes.
3   Q. Was Arlene there?
4   A. I don't believe so.
5   Q. Now, when did you meet with Arlene on December
6      3rd when you came back?
7   A. Well, as soon as I knew she was in, I went and
8      said hi to her. And I told her that we had a lot
9      to plan and wanted to talk to her as soon as she
10     had a moment.
11  Q. Did you meet with her that day about what you
12     were going to plan?
13  A. Yes.
14  Q. And what did you mean by you "had a lot to plan"?
15  A. Well, my job was a project oriented job. And I
16     wanted to lay out projects that were going to be
17     completed for our usual deadline, which was in
18     May. The New York show. And then the production
19     of those -- they're catalogs -- after that. So I
20     wanted to get everything in place, scheduling how
21     it was going to plan through until my maternity
22     leave, how it would plan through my leave, my
23     maternity leave, and then what would be happening
24     when I returned.

Page 24

1   Q. When was your maternity leave planned for?
2   A. My scheduled -- my due date was the end of July
3      but because of my physical circumstances and my
4      high-risk pregnancy, my due date was shifted to
5      the middle of July. So I was kind of in a
6      fortunate situation in some respects because I
7      knew exactly the day that my child was going to
8      be born so I could schedule things quite
9      precisely.
10  Q. And you knew that on December 3rd?
11  A. I didn't know that exact date but I had a
12     ballpark because I had already been advised of
13     that.
14  Q. Now, other than talking about work-related
15     project oriented plans, did you talk to Arlene
16     about your schedule between your return and when
17     you were going to go on maternity leave?
18  A. Yes.
19  Q. What did you tell her about that?
20  A. I told her I wanted to condense my work week into
21     four days.
22  Q. What else did you tell her?
23  A. That pretty much was the base of the
24     conversation.

Page 25

1   Q. What did you mean by "condense your work week
2      into four days"?
3   A. Because I was considered to be a high-risk
4      pregnancy, I had asked my doctor if it was okay
5      for me to continue working. He said yes. And I
6      said, To what level? And he said, Be
7      responsible. Not to overdo it.
8           And understanding my position in the
9      flow of how the work moves through the company of
10     the jobs that I was responsible for, I thought
11     through the scheduling that it could be done --
12     that I could do it within four days. But part of
13     that with Arlene would be that I would be allowed
14     just to do one job. I was often pulled for other
15     consultations, meetings, that directly did not
16     apply to my job. They were more everyday
17     functional scheduling of the company itself that
18     it was not necessary for me to be involved in.
19  Q. Is that your opinion?
20  A. No. It's not my opinion.
21  Q. Was there a written job description that said
22     that you weren't supposed to do those particular
23     duties?
24  A. I didn't have a written job description.

7 (Pages 22 to 25)

KACZYNSKI REPORTING

9090b848-634f-47eb-be47-55f4720ab753

Page 26

1  Q. So there wasn't a description that said that
2     wasn't part of your job?
3  A. That's right.
4  Q. So you felt that these other tasks were not
5     related to your job; is that correct?
6  A. They were not design oriented.
7  Q. Out of curiosity, how many hours a week do you
8     think you averaged working before you went out on
9     FMLA leave?
10 A. Probably 50 to 55.
11 Q. And when you came back on December 3rd, you told
12    Arlene you wanted to work 32 hours a week; is
13    that correct?
14 A. Not 32.
15 Q. Four days a week?
16 A. Four days a week.
17 Q. Okay. Did you tell her that you were willing to
18    work ten- or 12-hour days on those four days?
19 A. I said they would probably average between eight
20    and ten hours a day because it's just the way the
21    day flowed.
22 Q. Did you tell Ms. Osoff that you wouldn't work on
23    Mondays?
24 A. I told her that was the day that I wanted to have

Page 27

1     off.
2  Q. And did you tell Miss Osoff you wouldn't work on
3     Saturdays as well?
4  A. I told her I wanted to step back from Saturdays
5     because -- for my first trimester and then if it
6     was absolutely necessary, I would be more than
7     happy to come in an extra day in February.
8     February, March, April, which is when the crunch
9     gets pretty tight and I may be needed for extra
10    hours.
11 Q. I think you testified just a little bit ago that
12    your doctor said that you could work but you
13    needed to be responsible. Is that your
14    testimony?
15 A. Mm-hmm. Yes.
16 Q. Did he tell you that you could only work four
17    days?
18 A. No.
19 Q. Did he give you any sort of restrictions on your
20    ability to work?
21 A. Just the normal. No heavy lifting, standing on
22    your feet too long. That type of thing.
23 Q. Did he give you any restrictions about the
24    scheduling of your job?

Page 28

1  A. No.
2  Q. How were you going to perform in 32 to 40 hours a
3     week the same job that you were performing 50 to
4     55 hours a week before your leave?
5  A. Because I would be doing my design projects and
6     overseeing the production of the design samples.
7     Everything that I ultimately was responsible for
8     I would be able to do within those 40 hours or
9     those four days. What I was asking, that I not
10    be pulled for these other tasks that were not
11    necessary.
12        There were other management staff
13    within the company that were directly more
14    involved with these projects anyways so therefore
15    it made more sense that they focus in on it as
16    opposed to bringing in another person.
17 Q. All right. Can you give me an example of the
18    kind of tasks you're talking about?
19 A. Yes. There was a department called a finishing
20    department, which I happened to have run for a
21    couple years.
22 Q. What about the finishing department was not part
23    of your job?
24 A. It was where the work flowed through daily. The

Page 29

1     assembly and scheduling of it. And in the early
2     stages, I always oversaw it through the
3     transition of me leaving it and me going strictly
4     into design. And we were having a lot of
5     difficulties within the entire plant with quality
6     control. They were trying to cut back hours to
7     keep the overtime down. Therefore, a lot of work
8     was being printed sloppy, assembled sloppy
9     because they were rushing to get things done
10    within a short amount of time because the company
11    was trying to cut down the overtime to keep it
12    more manageable on a financial level.
13 Q. How were you brought into the finishing
14    department before you went on your leave? What
15    kinds of projects?
16 A. Well, there were problems with some of the staff
17    that I was very familiar with them so I might be
18    asked to sit in on their review or sit in on a
19    problem that they were having that I might be
20    more familiar with. The department was kept
21    untidy and I would go in and offer them some
22    organizational ideas on how to keep it clean and
23    organized.
24        Whenever anything was kind of deviating

Page 30

1  from its normal function of running efficiently,
2  Arlene would always ask me to step in and see if
3  I could troubleshoot and get it back on cue.
4  Q. Were there other tasks that you believe were not
5  part of your design job that you were not going
6  to do going forward?
7  A. Yes. I was for quite a few hours a day working
8  on a computer program that the company was
9  switching over to. When we were purchased from
10 -- when we were purchased by Taylor Corporation,
11 they had a base computer program that they used
12 for order entry, for scheduling -- not
13 scheduling. Report writing, that type of thing
14 so we were basically trying to take a round peg
15 and put it in a square peg.
16     It wasn't quite fitting and I was asked
17 to work with the individuals that were
18 coordinating the computer system to offer insight
19 as to how the finishing department ran and how to
20 apply their program to -- how to adapt their
21 program to our program.
22 Q. Who asked you to do that?
23 A. Arlene.
24 Q. Did you tell her that wasn't part of your job?

Page 31

1  A. I told her it was taking away from my design job.
2  Q. Who was responsible for assigning your work?
3  A. I ultimately was. Arlene oversaw it.
4  Q. Were there other tasks that you thought were not
5  part of your job?
6  A. Yes. At times I was asked to speak with customer
7  service on how to enter orders that would assist
8  production in understanding their entry.
9  Q. Are there other tasks?
10 A. No. I was asked to sit in on management meetings
11 but that I felt was indirectly a part of my job
12 anyways.
13 Q. So that particular task you were willing to keep
14 doing?
15 A. Right. Because I understood the benefits of me
16 being a part of that.
17 Q. Okay. So we talked about the finishing
18 department, the computer program and speaking
19 with customer service regarding orders as tasks
20 that you thought were outside your job
21 description and were things that you were not
22 going to do going forward. Is that correct?
23 A. I said -- I never said that I would not do them.
24 I just said that they were time eaters and they

Page 32

1  kept me from keeping the design work on schedule
2  and that there were other individuals within the
3  company that were perfectly capable of doing the
4  same thing.
5  Q. Was that your decision to decide who did what at
6  the plant?
7  A. No. It wasn't my decision. Unless it was design
8  related. Then it was my decision.
9  Q. But overseen by Arlene?
10 A. Yes.
11 Q. Now, Arlene agreed to give you Mondays off,
12 didn't she?
13 A. Yes, she did.
14 Q. And she agreed to let Saturdays drop off for a
15 while, didn't she?
16 A. Yes, she did.
17 Q. And she agreed that it might be possible to
18 perform your job on those four days a week; isn't
19 that right?
20 A. Yes, she did.
21 Q. But you weren't happy with the pay; is that
22 correct?
23 A. Well, she was saying to me that my hourly rate
24 was being adjusted because I wouldn't be doing

Page 33

1  the same job. She said I would not be -- that my
2  responsibilities were going to change. I didn't
3  quite understand this because when I came back, I
4  had all plans to do my job. I wasn't asking to
5  step down from my position. And she said in
6  essence coming back and cutting -- what she
7  considered cutting back my hours or cutting back
8  my days, in essence I was stepping down from my
9  position and that she was going to hire another
10 designer and that I would be training my
11 replacement.
12 Q. Well, in fact, your responsibilities by your own
13 suggestion were going to be changed, weren't
14 they?
15 A. Not as a design development manager. As a design
16 development manager, I would still be designing
17 projects and I would still be coordinating their
18 production. I would still be participating in
19 the New York show. I would still be doing my
20 job.
21 Q. Okay. But not your job insofar as it related to
22 the finishing department, computer programs or
23 speaking with customer service, correct?
24 A. I would be more than happy to do those but as I

Page 34

1  said before, they're time eaters and that it was
2  not necessary for me to be involved in that
3  aspect. That there were other people that were
4  more capable of doing it. So if I was strictly
5  allowed to do my design development management
6  position, which is what my title was, then I
7  would be able to do it within that time frame.
8  Q. The job you were proposing was different from the
9  job that you were performing before you went out
10 on leave; isn't that right?
11 A. I was asking Arlene to look at my job more
12 closely and see that I was involved in areas that
13 were not necessary for me to be involved in.
14     MR. PALMQUIST: Could you repeat the
15 question, please?
16     (Question read.)
17 A. That was what we were discussing. My job was
18 never clearly defined as to what it was.
19 Q. Well, that's not exactly my question. My
20 question is, you had a job before you went on
21 leave --
22 A. Mm-hmm.
23 Q. -- that encompassed certain responsibilities that
24 you did, correct?

Page 35

1  A. Mm-hmm. Yes.
2  Q. And when you came back from leave, you were
3  proposing a different job that didn't include
4  some of the responsibilities you had before you
5  went out on leave; isn't that correct?
6  A. I was still doing the design development
7  management job, which is what my job was. The
8  other jobs or tasks that I was involved in were
9  things that I was asked for Arlene to just sit in
10 and help out another department with.
11 Q. Did you ever tell Arlene you wouldn't do those
12 things?
13 A. No, I didn't.
14 Q. Why did you do them if they weren't part of your
15 job?
16 A. Because that's the type of person I am. I'm more
17 than happy to help out whenever I can and when
18 I'm asked.
19 Q. Did you ever tell Arlene before your leave that
20 these other duties were not part of your job?
21 A. No. It was never discussed.
22 Q. Before the leave, did you think that, Gosh, I'm
23 doing a lot of duties that are really not part of
24 my job?

Page 36

1  A. No. The only thing I stressed to Arlene was that
2  it was very dangerous to run a company of this
3  level on just one designer. Arlene was planning
4  to retire. She had no set date. But she was
5  planning to retire. And she was sort of training
6  other individuals to pass the baton. And all of
7  us understood that indirectly.
8      I said to her it was very dangerous to
9  run a company of that level with just one
10 designer and that she really should be a design
11 team. Therefore, I felt it would strongly help
12 the company if we started to develop another
13 individual to work with me as an assistant.
14     I proposed this to her several years
15 ago because the more she left me alone to work on
16 the design projects because she trusted me and I
17 was doing a good job, the more involved she was
18 in the GM responsibilities. She didn't have to
19 collaborate as much with me on design.
20     So in realizing the flow, I had
21 discussed with her several times that I thought
22 we should start to develop a design team so just
23 in case if anything happened to anybody, if
24 anything happened to her, something happened to

Page 37

1  me, there would always be another individual
2  there to be able to keep the flow going until the
3  other person returned.
4  Q. Before you worked in the design position, who did
5  the design work at Jansson?
6  A. Arlene.
7  Q. And when you were out on leave, who did the
8  design work at Jansson?
9  A. It pretty much was put on hold until I came back.
10 I had set it up so that nothing really needed to
11 be done. The only thing that needed to be done
12 was the production of a catalog that was already
13 designed. There was another individual that
14 worked there that took care of coordinating the
15 production.
16 Q. Who was that?
17 A. Her name was Laura Kelly.
18 Q. So for the six weeks that you were out on that
19 family and medical leave or however long it was,
20 there was simply no design professional there?
21 A. Arlene was there if anything needed to be done.
22 But I had set it up so that that project was all
23 -- was in control. And the two projects I had to
24 work on when I got back, I had done a lot of

10 (Pages 34 to 37)