Page 38

1  preliminary work and had left them in a filing
2  cabinet. I went over all of it with Arlene just
3  in case she needed to step into it for any
4  reason.
5  Q. Isn't it true that Arlene was perfectly capable
6  of doing all the design work while you were out
7  on leave?
8  A. She is very capable of doing any design work but
9  there wasn't any design work that needed to be
10 done when I was out.
11 Q. And how do you know that?
12 A. Because I coordinate the department. It's what I
13 do so I had set it up so that everything was in
14 its place before I left and had a meeting with
15 Arlene about that before I left.
16 Q. Just a moment.
17    Did you also tell Arlene when you came
18 back on December 3, 2001 that you wouldn't work
19 any overtime?
20 A. Define "overtime."
21 Q. More than 40 hours a week.
22 A. Yes.
23 Q. Did you also tell Ms. Osoff that you were not
24 prepared to continue your employment with Jansson

Page 39

1  if Jansson did not accede to or agree to these
2  demands that you were making?
3  A. Can you repeat that, please?
4  Q. Did you tell Arlene that you were not prepared to
5  continue your employment with Jansson if Jansson
6  did not allow you to cut back to four days a
7  week, not work Mondays, not work Saturdays, and
8  not work any overtime?
9  A. No.
10 Q. In other words, if Arlene had not agreed to any
11 of your demands, you would have stayed employed?
12 A. If she would not agree to any of my --
13 Q. Correct.
14 A. I never thought of that.
15 Q. Let's talk about the wage that Arlene proposed to
16 you. What is your basis for claiming that she
17 should have paid you $25 an hour?
18 A. If I'm understanding what you're asking me
19 correctly, if she was considering my four days to
20 be less than 40 hours, which she labeled
21 part-time, or I would become an hourly employee,
22 I said, That's fine. If for some reason I worked
23 38 hours, I understand you are only going to pay
24 me for 38 hours.

Page 40

1     So I don't understand -- I do not know
2  where she came up with the number but our numbers
3  didn't jibe. And my calculation was that you
4  take my yearly salary and calculate it to an
5  hourly rate and then only pay me that rate for
6  the hours that I work. So if there was a week
7  that I only worked 38 hours or 37 hours or 39
8  hours, then you would only pay me for those hours
9  with the calculation of my base pay.
10 Q. What was that calculation?
11 A. It was approximately $25 an hour.
12 Q. And did you get that by taking your annual salary
13 and dividing by 2,080?
14 A. I'm not sure how I did it. I think what I did
15 was I took -- divided it by 52 weeks and then
16 divided it by hours.
17 Q. Okay. And 52 weeks, 40 hours a week?
18 A. Yes.
19 Q. So 52 times 40 I think is 2,080?
20 A. I don't know. I'm not a mathematician.
21    MS. DEVER: There is a calculator right
22 there.
23 A. You can do the math. I don't know. It may work
24 out to be the same.

Page 41

1  Q. What did Arlene tell you when you told her that
2  you expected to be paid $25 an hour?
3  A. She said that's not the company policy.
4  Q. What was the company policy according to Arlene?
5  A. According to Arlene, the company policy was when
6  you work non -- when you're a nonsalary
7  individual, hourly salary individual, she brought
8  to my attention that when you work salary, from
9  what I understand there is a certain amount of
10 hours that's built in for overtime, which I
11 believe when she does her calculations, maybe
12 those hours are taken away. I'm not really sure
13 how she did the math.
14 Q. Can you remember with any specificity what
15 exactly Arlene said was the company policy?
16    MS. DEVER: Objection.
17 A. She said that when you came back -- I'm sorry.
18 I'm going to answer it the same way because I'm
19 not sure if I'm maybe not answering it correctly
20 but she said to me that when you are an hourly
21 employee, you get a different rate because they
22 take out the overtime. I don't know what that
23 means.
24    I never knew that that's how -- I

11 (Pages 38 to 41)

Page 42

1  thought I was getting paid $25 an hour because I
2  was worth -- I was a valued employee at $25 an
3  hour. And it was just a professional
4  understanding that at times you're going to work
5  extra hours but you're not paid for them. It's
6  -- that was just to -- that was my understanding.
7  Q. How did you respond to Arlene when she told you
8  that about the hours that are built in for
9  overtime in the salary?
10 A. I told her, first of all, I didn't know that that
11 was a policy. A policy. And that was the
12 policy. And that why should I be paid less for
13 doing the same job?
14 Q. What did Arlene say to that?
15 A. She said that all hourly employees that come from
16 salaried pay are adjusted the same way.
17 Q. Did you have any reason to doubt her at that
18 time?
19 A. I'm not sure I understand what you're asking.
20 Q. Did you think she was making that up?
21 A. No. I thought --
22 Q. Do you think she was making it up now?
23 A. Well, there's nothing in the handbook that
24 applies to it so I'm not sure where the

Page 43

1  calculation comes from. If it was policy, I went
2  and looked in the book to make sure that I might
3  have missed something.
4  Q. Well, how much an employee gets paid isn't
5  necessarily going to be in the handbook, is it?
6  A. Not how much they're paid but a guideline for
7  adjusting I would assume from salary to an hourly
8  person or however they name it or however it's
9  titled. I would assume that something like that
10 -- even if Arlene was to say, Well, it's policy,
11 I would expect a policy to be in the book
12 applying to that statement.
13 Q. Why would you expect that?
14 A. Because it's a policy. All policies were in the
15 handbook.
16 Q. Do you think Arlene was treating you differently
17 from other employees that moved from salary to
18 hourly?
19 A. I don't know.
20 Q. Do you believe that now?
21    MS. DEVER: Objection.
22 A. I'm not sure really what you're asking me. I'm
23 not sure what you're asking.
24 Q. Well, do you think that Arlene singled you out

Page 44

1  when you asked her for a reduced schedule or a
2  different schedule and applied this policy of
3  moving from salary to hourly?
4  A. Well, it's not my business of other employees. I
5  don't know what actually went on with other
6  employees. But if she is sitting across the desk
7  telling me it's a company policy and it's done
8  with everybody, she is my supervisor. I would
9  tend to believe that that was so.
10 Q. Now, you said you had several conversations with
11 Arlene the week of December 3rd to December 7,
12 2001; is that correct?
13 A. Yes.
14 Q. And we talked I think about what happened maybe
15 on Monday, the day you came back. Is that what
16 we've talked about so far or have these sort of
17 melded together here?
18    MS. DEVER: Objection.
19 Q. I'm just asking.
20 A. Most of the conversations were taking place on
21 Monday and Friday.
22 Q. Do you remember any conversations Tuesday,
23 Wednesday or Thursday?
24 A. I do remember that there was very little exchange

Page 45

1  between us like Wednesday, Thursday. I think we
2  talked again on Tuesday about the same thing. It
3  was pretty quiet between the two of us Wednesday
4  and Thursday.
5  Q. How did the conversation end on Monday?
6  A. I believe she said that we'll talk more about it
7  later.
8  Q. Did she tell you she had to consult with anybody?
9  A. Not that I'm aware of.
10 Q. Well, let's now move to the Friday conversation
11 then. What time did you meet with Arlene on
12 Friday?
13 A. I believe it was mid-morning.
14 Q. Where did you meet with her?
15 A. In her office.
16 Q. Was there anyone else present?
17 A. No.
18 Q. How did the conversation begin?
19    Withdraw that. What did you say?
20 A. We talked more about the salary or the hourly
21 rate.
22 Q. What did you tell Arlene about the salary and the
23 hourly rate?
24 A. I told her that I did not think it was fair for

Page 46

1  me to be paid less money for doing the same job.
2  Q. What else did you say?
3  A. Well, we talked a lot about the job as far as me
4     being pregnant and not being able to do it.
5  Q. That's what you said?
6  A. No. That's what she said.
7  Q. I'm asking you what you said at that meeting.
8  A. What I said. All of my responses were -- most of
9     what I said was in response to her comments that
10    she made to me.
11 Q. You don't remember anything specific other than
12    responding to Arlene that you said at that
13    meeting?
14 A. No.
15 Q. Now, Arlene told you that you could not work
16    Mondays, correct?
17 A. She said she would agree to not working -- for me
18    not to be there on Mondays.
19 Q. Okay. And she agreed to the four day a week
20    schedule?
21 A. Yes.
22 Q. And she agreed to leaving Saturdays off?
23 A. For the first trimester.
24 Q. Which is what you asked for?

Page 47

1  A. Yes.
2  Q. And she agreed to no overtime, correct?
3  A. For the first trimester.
4  Q. Which is what you asked for, correct?
5  A. Yes.
6  Q. But she didn't agree with you on the wage; is
7     that correct?
8  A. That's correct.
9  Q. And what was your response to that?
10 A. That I didn't understand why I had to take a cut
11    in pay for doing the same job.
12 Q. Didn't you tell her that you were going to quit
13    because of that?
14 A. No. I told her that we needed to come to some
15    kind of agreement.
16 Q. What did you mean by that?
17 A. Which means we need to discuss this further.
18 Q. Wasn't she telling you the decision had been
19    made?
20 A. She didn't actually come out and say that the
21    decision had been made.
22 Q. She told you what you were going to make, didn't
23    she?
24 A. Yes. She calculated the numbers and gave them to

Page 48

1  me.
2  Q. And you didn't agree with them?
3  A. No, I did not.
4  Q. What was there to discuss?
5  A. Because at that point she was telling me that I
6     wouldn't be doing the same job. That I would be
7     training my replacement and I would be stepping
8     down from my position.
9  Q. What was your response to that?
10 A. I said that that's not what I planned -- I said,
11    Because I'm pregnant and coming back to work to
12    do my job, I don't understand why I have to step
13    down from that. And she said it was because I
14    would not be able to do the job being pregnant.
15    It was something she had predetermined and that's
16    what we were discussing mostly that day.
17 Q. Well, let's talk about that. Why do you say that
18    her decision was predetermined?
19 A. She said that I may be unwell during my pregnancy
20    and may not be able to work. She was concerned
21    about my possibility of having multiple births.
22    She was concerned that after the baby was born I
23    wouldn't be able to make that decision now about
24    coming back until I held the baby in my arms.

Page 49

1     She said, What's going to happen when the baby
2     gets sick? She said, you know, It's a man's
3     world. The woman stays home with the baby.
4     You're not going to be able to come in. What are
5     you going to do about day care? That type of
6     thing.
7  Q. Well, let's take each of those. You first said
8     that she said you may be unwell. Was that during
9     your pregnancy or after the baby was born?
10 A. During my pregnancy.
11 Q. What was your response to Arlene when she said
12    that?
13 A. That that couldn't be determined.
14 Q. How did Arlene respond to that?
15 A. I don't remember.
16 Q. Do you claim that that comment was
17    discriminatory?
18 A. Yes.
19 Q. Why?
20 A. Because I felt basically she was telling me that
21    because I was pregnant I wouldn't be able to do
22    my job.
23 Q. Are there any other facts that lead you to
24    believe that that comment was discriminatory?

13 (Pages 46 to 49)

Page 50

1   A. No.
2   Q. You said Arlene also asked you about the
3      possibility of multiple births. What exactly did
4      she say?
5   A. She said, What are you going to do if you have
6      more than one baby?
7   Q. All right. How did you respond to that?
8   A. I said, You would be happy to know that it's
9      already been confirmed. I'm only having one.
10  Q. What did Arlene say to that?
11  A. She slammed her fist on the desk and said, How
12     dare you speak to me so sarcastically?
13  Q. Was your response sarcastic?
14  A. I apologized to her for sounding curt. But I
15     said, You're taking this conversation to a place
16     that it doesn't need to be.
17  Q. How did you respond to that?
18  A. How did she respond to that?
19  Q. I'm sorry. Yes. How did she respond to that?
20  A. She pointed her finger at me and raised her voice
21     saying that I was being ungrateful.
22  Q. Were those her words?
23  A. I believe she said that I was not appreciative of
24     the gift she had given me.

Page 51

1   Q. What was she referring to?
2   A. I asked her that because I did not know what she
3      was referring to. And she said she was referring
4      to my paid leave. Then I said to her that I was
5      not aware that that was a gift. I thought that
6      that was a company benefit that was -- that I was
7      entitled to as an employee for Jansson and that I
8      filled out all the proper paperwork for that
9      leave and that I do not consider that a gift.
10  Q. What leads you to believe that Ms. Osoff's
11     comment about the possibility of multiple births
12     was discriminatory?
13  A. Because I felt it had nothing to do with what we
14     were talking about. We were talking about my
15     job, not about how being pregnant with more than
16     one child might affect my job.
17  Q. But in fairness, you were talking about
18     scheduling of your job, weren't you?
19  A. Yes.
20  Q. You also said Ms. Osoff made a comment that you
21     could not make a decision about coming back until
22     you had had your baby. What did she say?
23  A. She said that. Exactly that.
24  Q. Okay. And what was your response to that?

Page 52

1   A. I said that my intention was to come back
2      full-time and pick up my position and do what I
3      always did.
4   Q. Are we talking -- are these comments
5      chronological that we're talking about? I mean,
6      did that -- may be unwell comment was the first
7      one and the possibility of multiple births was
8      the second comment she said?
9   A. I don't know exactly when they happened.
10         MR. PALMQUIST: I'm sorry. Could you
11     read back the question just to me? Question and
12     answer.
13         (Question and answer read.)
14         MS. DEVER: Before you continue, could
15     I use -- I need another bathroom break. I
16     apologize. I'm drinking water because of my
17     cold. We can go off the record.
18         MR. PALMQUIST: I'll hold on to that
19     question.
20         (Recess.)
21  Q. Did Arlene respond?
22  A. I believe -- no. I don't know if she did.
23  Q. The next thing you said Arlene told you was,
24     What's going to happen -- what did she say?

Page 53

1   A. I'm not sure I understand what you --
2   Q. Yeah. My notes are incomplete.
3   A. Okay.
4   Q. Hold on a second.
5         "What's going to happen if you need to
6      stay home with the baby when he or she is ill?"
7         Is that correct?
8   A. Yes.
9   Q. What was your response to that?
10  A. I told her it pretty much was irrelevant to what
11     we were discussing. She said, Well, let's face
12     it. It's a man's world. The woman always stays
13     home with the child.
14  Q. And what was your response?
15  A. I told her that that was really personal. That
16     really wasn't any of her business, but I said,
17     You know that my husband works an opposite
18     schedule of me and we're actually in a unique
19     position that we would be able to coordinate.
20  Q. How did Arlene respond?
21  A. I don't remember.
22  Q. What leads you to believe that Arlene's comment
23     was discriminatory?
24  A. Because I felt that she kept focusing on the

Page 54

1  pregnancy and how it was going to affect the way
2  I worked or the possibility of not being able to
3  come to work because I was going to be sick. And
4  I just felt that all of these comments may have
5  some relevance but it wasn't what we were talking
6  about.
7       I said anything was possible but all we
8  can plan on is what we know.
9  Q. Whether or not you returned from your maternity
10 leave was important for scheduling who was going
11 to do your job, wasn't it?
12 A. Yes.
13 Q. And whether or not there was coverage in the
14 designer position if you were home with your baby
15 was a legitimate question about scheduling,
16 wasn't it?
17 A. I'm not -- can you repeat that?
18 Q. Figuring out the coverage for the designer
19 position in your absence was a legitimate thing
20 for Arlene to be looking at, wasn't it?
21 A. Right. That's what we were trying to discuss.
22 Q. Now, Ms. Osoff also told you that she would be
23 hiring a designer to work with you; isn't that
24 right?

Page 55

1  A. Yes. And that was my replacement. Or what she
2  said was going to be my replacement. Those were
3  her words.
4  Q. Now, didn't you suggest to Arlene that she hire
5  somebody to work with you?
6  A. Yes. Work with me. But not to replace me.
7  Q. Do you remember any other comments that Arlene
8  made to you during this conversation on December
9  7?
10 A. In response to the comment that I just made, she
11 said, Why should I pay another salary for another
12 designer? Because if you didn't get pregnant,
13 there was no need for me to hire another designer
14 because you would be the designer.
15 Q. All right. I would like you to tell me exactly
16 what you remember Miss Osoff saying about that.
17 What exactly did she say?
18 A. I think that's somewhat exactly what she said.
19 She said, Do you expect me to pay an additional
20 salary plus your own for another designer?
21 Essentially she said, If you didn't get pregnant,
22 I was not planning to hire another designer
23 because you would be the designer.
24 Q. Well, that's where I'm a little confused. You

Page 56

1  said essentially she said that. Did she say
2  that?
3  A. Yes. She did say that.
4  Q. "If you didn't get pregnant, I wouldn't have to
5  hire a new designer?"
6  A. Right.
7  Q. Had she hired a new designer at that point?
8  A. No.
9  Q. Is it possible that she said that because you
10 were going to work a reduced schedule going
11 forward?
12 A. She wasn't -- from what I understood is that she
13 wasn't hiring this designer as an assistant. She
14 was hiring this designer for me to train to
15 replace me. She actually said in essence, You
16 would be retraining your replacement.
17 Q. To do the job that you were doing before you were
18 on your leave?
19       MS. DEVER: Objection.
20 A. To do the design development manager job.
21 Q. Okay. Are there any other comments that you
22 recall Ms. Osoff making on December 7th?
23 A. Not at this time.
24 Q. Before December 7, 2001, did Miss Osoff ever make

Page 57

1  any comments to you that you feel were
2  discriminatory?
3  A. Yes. Because when I first came back on the 3rd
4  is when the initial conversation started. Some
5  of these comments were made and then also
6  repeated at other times when we had other
7  conversations during that week.
8  Q. Well, what comments do you recall her making on
9  December 3rd?
10 A. I don't know exactly. I do know that the first
11 initial comment came up about not being able to
12 work when I was pregnant. Or I might be out when
13 I was pregnant. I might be sick when I was
14 pregnant.
15 Q. What was it? Might not be able to work or might
16 be out while you were pregnant?
17 A. I'm using "might be out" and "might not be able
18 to work" in the same context. Same meaning.
19 Q. Okay. You might not be able to work because you
20 would be out?
21 A. Exactly.
22 Q. Got you. And you think she made that comment on
23 December 3rd as well?
24 A. Yes.