Page 78

1  in the marketplace, I needed to update some of my
2  skills. So they guided me through that process.
3  Q. What was the name of this career counselor?
4  A. It's -- I believe North Shore Career Center in
5  Salem.
6  Q. Did you pay a fee for this service?
7  A. No.
8  Q. Are you claiming that you suffered emotional
9  distress damages because of your employment at
10 Jansson?
11 A. Yes.
12 Q. What conduct do you claim caused you to suffer
13 emotional distress?
14 A. I'm sorry? What do you mean by "what conduct"?
15 Q. What caused you stress, distress?
16 A. Finance. Finances. The lack of.
17 Q. What did Jansson do to cause you distress
18 regarding your finances?
19 A. Not working with them anymore.
20 Q. Have you been to see a doctor, psychologist or
21 counselor about emotional distress issues you
22 claim to have suffered in connection with your
23 employment at Jansson?
24 A. No.

Page 79

1  Q. I would like to get some more detail from you
2  regarding your claim of emotional distress or
3  mental anguish. Would you describe for me the
4  symptoms that you experienced -- let's start with
5  from December, 2001 until September, 2003 when
6  you started your new job?
7  A. I'm sorry. Can you rephrase --
8  Q. I would like for you to describe for me the
9  symptoms that you have experienced of emotional
10 distress.
11 A. From what dates?
12 Q. From December, 2001 to September of 2003.
13 A. Well, it was after December 7th that the
14 emotional distress started.
15 Q. How did it manifest itself? What did you
16 experience?
17 A. Well, when Arlene asked me to write a letter of
18 resignation, which was the final say of not being
19 employed by Jansson any longer, I was not
20 financially prepared to not have a job.
21 Q. Let's talk about that letter. When did she ask
22 you to write a letter of resignation?
23 A. That Friday, December 7th.
24 Q. What was your response?

Page 80

1  A. At that time I said I would write one.
2  Q. And did you?
3  A. No, I did not.
4  Q. Why did she ask you to write a letter of
5  resignation?
6  A. Because when she asked me to leave and I got up
7  to leave, when I opened the door, she said, I
8  want you to write me a letter of resignation.
9  And I said, Fine. I'll take care of it over the
10 weekend.
11 Q. But you're claiming now that you didn't resign;
12 is that correct?
13 A. Well, when I thought about it over the weekend, I
14 felt that I wasn't resigning from my position. I
15 wanted to work my position.
16 Q. But you wanted to work your position at $25 an
17 hour; isn't that correct?
18 A. Yes.
19 Q. And you weren't going to work your position for
20 $22 an hour, were you?
21 A. Well, that was the disagreement that we were
22 trying to resolve.
23 Q. And from your perspective, there was no
24 resolution of that because Arlene didn't agree to

Page 81

1  pay you $25 an hour, did she?
2  A. At that time, we weren't coming up with a new
3  agreement. We weren't resolving it.
4  Q. You walked out when she said you weren't going to
5  get paid $25 an hour. Isn't that true?
6       MS. DEVER: Objection.
7  A. I walked out when she asked me to leave.
8  Q. Isn't it true that she asked you to leave now as
9  opposed to working for two weeks after you had
10 given your two-week notice saying that it was
11 unnecessary for you to stay for the two weeks?
12 Isn't that correct?
13 A. She said it was unnecessary. I offered to help
14 if she needed it. When I was getting up to leave
15 on my way to the door, I said, If you need help,
16 if you would like me to stay for two weeks and
17 help -- or to the end of the month is I believe
18 what I said. I didn't say two weeks.
19     If you would like me to stay to the end
20 of the month and help through the transition, I
21 would be happy to do that.
22 Q. But the only transition is because you told her
23 you were submitting your resignation; isn't that
24 correct?

KACZYNSKI REPORTING

9090b848-634f-47eb-be47-55f4720ab753

Page 82

1  A. She said that after.
2  Q. But you agreed you were going to give her a
3     resignation notice, correct?
4  A. I did agree I would write one.
5  Q. Isn't it true Miss Osoff told you she didn't want
6     you to leave?
7  A. Yes. She did say that.
8  Q. Okay. Didn't she also tell you she didn't think
9     you wanted to leave either?
10 A. That's true.
11 Q. Isn't it true that you said that your demands
12    were not negotiable and that you were leaving on
13    December 7th?
14 A. No. I didn't say that.
15 Q. When Ms. Osoff told you that you could simply
16    leave and not come back, it was because she said
17    if you're really resigning, you can simply leave
18    and not come back; isn't that correct?
19 A. I'm not sure if it was said in those exact words.
20 Q. Something to that effect?
21 A. Yes.
22 Q. Now, Miss Osoff hadn't hired a replacement for
23    you at that time, had she?
24 A. No.

Page 83

1  Q. Was there a lot of work that was going to happen
2     between December 7th and the end of the year?
3  A. Yes. Because I was just returning from being out
4     for several weeks and there were two main
5     catalogs that needed to be somewhat established
6     before January.
7  Q. Before the end of the year?
8  A. Yes. Because after the Christmas rush the
9     pressroom was available and I wanted to expedite
10    the work so it could get within that time frame.
11 Q. But you knew Miss Osoff was fully capable of
12    performing those duties; isn't that correct?
13 A. Yes.
14 Q. Let's go back. We were talking about your
15    emotional distress damages or symptoms, I guess,
16    and what I would like to ask you in a little bit
17    more detail about is what kinds of physical
18    symptoms, if any, did you experience after you
19    left your employment in December of 2001.
20 A. Very high level of anxiety. Uncertainty. I was
21    pregnant. I was starting a family. I was
22    concerned for their security. I also felt a
23    tremendous loss. Jansson was a big part of my
24    life. It's where I was expecting to spend

Page 84

1     several years. And it was not there anymore.
2  Q. Any other symptoms that you experienced?
3  A. Because of the way the situation was handled, I
4     developed a level of insecurity.
5  Q. What do you mean by that?
6  A. I was an extremely dedicated employee and I
7     worked very hard for the company. I excelled in
8     my position. And I felt there was only a
9     one-sided loyalty there from me.
10 Q. Anything else?
11 A. No.
12 Q. Did you ever take any medication as a result of
13    your alleged mental anguish and emotional
14    distress?
15 A. I wasn't able to. I was pregnant.
16 Q. After you gave birth, did you take any
17    medication?
18 A. No.
19 Q. How long did these symptoms of anxiety,
20    insecurity, these things that you've been talking
21    about, how long did they last?
22 A. To this very day.
23 Q. Have you ever taken any medication for any other
24    psychological problem at any time?

Page 85

1  A. No.
2  Q. And I think I asked you this, but have you seen a
3     psychologist or counselor?
4        MS. DEVER: Objection.
5        You can answer.
6  A. No, I don't.
7  Q. You have not?
8  A. Yes. You asked that before. No, I have not.
9  Q. Sorry.
10 A. Sorry. I'm trying to follow you so --
11 Q. Okay. Where were you born?
12 A. Milton, Massachusetts.
13 Q. Okay. And where have you lived in your life?
14    You lived in the area your whole life?
15 A. Yes. In the Boston area. North of -- south of
16    the city and north of the city.
17 Q. I think we talked a little bit about your
18    educational background. You have an Associate's
19    degree in --
20 A. Yes.
21 Q. -- clothing design?
22 A. Yes.
23 Q. Did you graduate from high school on time?
24 A. Yes.

Page 86

1  Q. You have siblings?
2  A. Yes.
3  Q. How many?
4  A. Seven. I had seven. Sorry.
5  Q. Any learning disabilities as a child?
6  A. No.
7  Q. Did you have a happy childhood?
8  A. Yes.
9  Q. Did you have many friends growing up?
10 A. Yes.
11 Q. Any health-related problems as a child?
12 A. No.
13 Q. Any mental health issues or problems as a child?
14 A. No.
15 Q. Any problems related to your parents?
16 A. No.
17 Q. I would like you to describe your job history.
18    Let's just start from when you got your
19    Associate's degree to Jansson.
20 A. My first job out of college was with Louis of
21    Boston. I went in as a salesperson. I was
22    having a hard time breaking into the design field
23    so I went into retail, which was part of my
24    major. I worked for them for six years.

Page 87

1  Q. Louis?
2  A. Louis of Boston. Louis Incorporated I believe it
3     is.
4  Q. Okay.
5  A. I worked for them for six years. After that, I
6     opened my own design company, which I worked for
7     -- I believe it was about ten years. And I
8     picked up additional work while I was running my
9     business.
10 Q. Describe for me what your design company was.
11 A. It was a custom bridal design shop. And brides
12    would come to me with ideas of what they wanted
13    their wedding gown to be. I would draw up a
14    draft, pattern, sew. It entailed a lot of tasks
15    that you have when you run your own company. The
16    financials. The promotional-type literature.
17 Q. Did you actually make the clothing, too?
18 A. Yes. In the beginning. And when I got too busy,
19    I eventually subcontracted the work to other
20    seamstresses.
21 Q. And you made a living at this for ten years?
22 A. Yes. For different periods throughout the ten
23    years, I worked for other companies on a
24    part-time basis for extra income.

Page 88

1  Q. Doing the same thing?
2  A. For one company, yes. And for another company, I
3     touched on my retail experience.
4  Q. Can you give me a range of the kinds of revenues
5     you were generating with your own business?
6  A. Not a whole lot. Small. Small business.
7  Q. More than 10,000 a year?
8  A. Yes. But --
9  Q. More than 50?
10 A. Under 50.
11 Q. Under 50.
12 A. Yes. It was very minimal.
13 Q. Okay. More than 20?
14 A. Yes. Probably. Let's put it this way. In the
15    good years. There was always that start-up
16    period, which I worked while I was starting it
17    up. And there were a few years that this did
18    pretty good. I just drew a very small paycheck
19    because I pretty much put the money back into the
20    company.
21 Q. What do you think your best year was? Forty?
22 A. It's been a long time. I don't really remember.
23 Q. Okay. Fair enough.
24 A. I really don't.

Page 89

1  Q. I'm just trying to put bookends on it. That's
2     fine.
3  A. I'm sorry. I really don't.
4  Q. All right. You said you did your design company
5     for ten years supplemented by various other
6     part-time employment; is that correct?
7  A. Yes.
8  Q. And does that lead us up to Jansson?
9  A. Yes.
10 Q. Why did you leave Louis?
11 A. I think that was more design-related. I wanted
12    to establish more of my design degree as opposed
13    to the retail.
14 Q. You left voluntarily?
15 A. Yes.
16 Q. Why did you decide to leave your design company
17    to go to work for Jansson?
18 A. I think it came to a turning point where I was in
19    the middle of writing a small business loan for
20    funding to open up an actual bridal shop, which
21    would generate more revenue and become a more
22    permanent situation but there was a lot of talk
23    in the area that there was a large discount
24    bridal shop coming into the area. And a lot of

Page 90

1  bridal shops were already going under because of
2  it.
3       Because the process of me writing the
4  loan and working with the small business
5  consultant, you know, was a process of about a
6  year and in that meantime, the shop had come in
7  and a couple of bridal shops had already gone
8  out. And I felt it was too much of a risk and I
9  didn't want to take that type of financial risk.
10 Q. Did you submit the SBA loan or --
11 A. No, I didn't.
12 Q. Are you married now?
13 A. Yes.
14 Q. How many times have you been married?
15 A. Once.
16 Q. Were you ever engaged before?
17 A. No.
18 Q. Any problems associated with your marriage?
19 A. No.
20 Q. Have you been in marriage counseling?
21 A. No.
22 Q. Have you ever attempted suicide?
23 A. No.
24 Q. Have you ever had thoughts of suicide?

Page 91

1  A. No.
2  Q. Have you ever made a claim of any kind against an
3     employer prior to this lawsuit?
4  A. No.
5  Q. Have you ever been convicted of a crime of any
6     kind?
7  A. No.
8  Q. Have you ever been involved in any other
9     litigation?
10 A. No.
11 Q. Court cases?
12 A. No.
13 Q. Who were your friends at Jansson?
14 A. Define "friends."
15 Q. Were there any people at Jansson that you
16    socialized with outside of work?
17 A. Maybe, you know, we went out to -- for a bite to
18    eat or a drink after work but never actually made
19    plans from home to meet. It was usually just a
20    connection from work or extension of work.
21 Q. Who did you have a drink with after work?
22 A. Pamela Greene, Paul Capasso, Lucia McDougall.
23 Q. Anyone else?
24 A. No. Sometimes it was more than one person would

Page 92

1  come along so -- there might have been a group.
2  Combination of people.
3  Q. Do you keep in contact with anybody that still
4     works at Jansson?
5  A. One particularly that has remained after all this
6     time.
7  Q. Who is that?
8  A. Sandy Dube.
9       MR. RUDY: She is not there anymore.
10      THE WITNESS: She is not there anymore?
11      MR. RUDY: Sorry.
12 Q. Who is Sandy Dube?
13 A. Sandy -- you mean what did she do when she was at
14    Jansson?
15 Q. Yeah.
16 A. She wore many hats. She worked with the
17    accounts. She helped out customer service.
18 Q. When was the last time you talked to Sandy?
19 A. A few weeks ago when my brother died.
20 Q. What did you talk to Sandy about?
21 A. My brother's death.
22 Q. It was about your brother?
23 A. Mm-hmm.
24 Q. Do you see Sandy on a regular basis or had you

Page 93

1  seen her on a regular basis before that?
2  A. We get together every few months.
3  Q. Have you talked to her about this lawsuit?
4  A. No.
5  Q. Anyone else that you keep in contact with at
6     Jansson?
7  A. Every -- periodically I might hear from Hollie
8     Prince just to say hi.
9  Q. Hollie Prince?
10 A. Yes.
11 Q. Who did you talk to regarding your decision to
12    bring this lawsuit other than your attorneys?
13 A. My husband.
14      MR. PALMQUIST: Okay. Do you want to
15    take just a short break? I'm going to have her
16    mark some exhibits and we're going to run through
17    a few of those.
18      (Off the record.)
19      (Recess.)
20      (1/17/03 memo marked Exhibit No. 1.)
21      (2/16/00 note marked Exhibit No. 2.)
22      (6/23/01 note marked Exhibit No. 3.)
23      (10/5/01 letter marked Exhibit No. 4.)
24      (10/10/01 Salary Continuance Plan

24 (Pages 90 to 93)

KACZYNSKI REPORTING

Page 94

1  marked Exhibit No. 5.)
2      (Response to Request for Family Medical
3  Leave marked Exhibit No. 6.)
4      (Charge of Discrimination marked
5  Exhibit No. 7.)
6      (Complainant's Response to Respondents'
7  Position Statement marked Exhibit No. 8.)
8      (Complaint marked Exhibit No. 9.)
9      (Plaintiff's Rule 26(A) Disclosures
10 marked Exhibit No. 10.)
11     (Jansson Information for Employees
12 marked Exhibit No. 11.)
13 Q. Ms. Patrick, I'm handing you what's been marked
14   as Deposition Exhibit No. 1. Would you take a
15   moment to review that, please?
16 A. I'm sorry. This is 12/22/2000? Is that what
17   this is? Is that what that is? 2000? I mean,
18   '00?
19 Q. I believe so.
20 A. Okay.
21 Q. I'm asking you, though.
22     MR. RUDY: Might have been cut off.
23 That's what it looks like.
24     MS. DEVER: Is there a question? I

Page 95

1  can't remember.
2      MR. PALMQUIST: There isn't. No. Not
3  yet.
4      MS. DEVER: Okay.
5  A. Okay. So this --
6      MS. DEVER: There's no question.
7  A. Oh, okay. I'm just looking it over? I'm sorry.
8  Q. Can you tell me what that is?
9  A. Oh. This was a surgery -- a scheduled surgery
10   that I had in January. That was the one that I
11   flipped the day I was -- it was one of the
12   surgical procedures I needed to have before I
13   could start my fertility treatments.
14 Q. And does this document refresh your recollection
15   as to what the dates were of that particular
16   surgery?
17 A. I'm confused.
18 Q. I will suggest that I think that that 12/22/00 is
19   probably a mistake. It looks like the date's --
20 A. It was in -- I believe --
21 Q. Right. That's what I'm suggesting but I don't
22   know that.
23 A. All right. I had a -- I'll just brief you on
24   this because this is the best way for me to

Page 96

1  understand this. I got married in '98. Saw a
2  fertility specialist in '99. I had a series of
3  tests during the fall. I had a minor surgical --
4  in November of '99, which I did over the
5  Thanksgiving weekend. And then that's when they
6  determined I needed additional surgery, so that
7  they would have been notified about it in '99 it
8  was. It was scheduled for January, 2000. And
9  then it goes from there.
10     Okay? So that's what I believe this
11 is. The date's confusing to me.
12 Q. If you look at the second to last page of Exhibit
13   1 --
14 A. 1/17.
15 Q. This is the certification from your health care
16   provider. Is this when you had an abdominal
17   myomectomy?
18 A. Yes.
19 Q. Who was your treating health care provider?
20 A. You mean what was my insurance provider or the
21   doctor?
22 Q. No. Your doctor.
23 A. Dr. Rein.
24 Q. Is that him on the last page of this exhibit?

Page 97

1  A. Yes.
2  Q. Did you fill this out or did somebody at Jansson
3     do this?
4  A. Someone at Jansson did.
5  Q. Do you know whether you took this as FMLA leave?
6  A. No, I didn't.
7  Q. Have you ever seen this before today?
8  A. No. I haven't.
9  Q. Do you claim that anyone at Jansson retaliated
10    against you because you took this leave?
11 A. No.
12 Q. I'm handing you what's been marked Deposition
13   Exhibit 2. Would you tell me when you're done
14   reviewing that?
15 A. Yes.
16 Q. Do you know what this is?
17 A. Yes.
18 Q. What is it?
19 A. This is a letter from Dr. Rein just stating that
20   I was undergoing the surgery and the time frame
21   that I would be out from work.
22 Q. I'm handing you now what's been marked as
23   Deposition Exhibit No. 3. Can you tell me when
24   you're done reviewing that?