Page 98

1  A. Okay.
2  Q. Can you tell me what this is?
3  A. This was a fertility cycle that I went through.
4     And that I would be out for those given days but
5     I actually wasn't out for those days. I went in
6     and took some work home and worked from home for
7     a few of them.
8  Q. What were the dates of this absence?
9  A. Well, they're saying June 20th to June 27th.
10 Q. Did you take any of that period off?
11 A. Yes.
12 Q. How many days did you take off?
13 A. Probably -- I'm just going by memory of the
14    cycle, what the cycles are like. Probably maybe
15    three or four of the days.
16 Q. Who was the doctor that signed off on this, if
17    you know?
18 A. I don't know who did -- I'm trying to think. It
19    was a part of Dr. Rein's team so it would have
20    been one of the doctors within his group. I
21    can't read his signature so I really don't know.
22 Q. Is the Brigham and Women's Hospital where you
23    received your fertility treatments?
24 A. Yes.

Page 99

1  Q. Is that different from the North Shore Medical
2     Center?
3  A. Yes. It's a combination of two places. You go
4     for part of your treatment in the North Shore.
5     Dr. Rein's affiliated with Brigham and Women's so
6     you actually do the part of the procedure, the
7     surgical part of the procedure you actually do at
8     Brigham's.
9  Q. I'm handing you what's been marked as Exhibit No.
10    4. Would you please review that?
11 A. Okay.
12 Q. Can you tell me what that is?
13 A. This is a letter from Dr. Rein explaining a
14    particular procedure that I was going to be going
15    through during my next fertility cycle. And he
16    was recommending that I medically -- for medical
17    reasons take a particular amount of time off.
18 Q. I'm handing you what's been marked as Deposition
19    Exhibit No. 5. Would you take a moment to review
20    that, please?
21 A. Okay.
22 Q. Is that your signature on the second page of
23    Exhibit No. 5?
24 A. Yes.

Page 100

1  Q. And is this your application for salary
2     continuance with Taylor during your FMLA leave?
3  A. Yes. Now that I see the title on top, that's
4     what it's referred to as.
5  Q. All right. I'm handing you now what's been
6     marked as Deposition Exhibit No. 6. Would you
7     take a moment to review that, please?
8  A. Okay.
9  Q. Is that your signature on the last page of
10    Deposition Exhibit No. 6?
11 A. Yes.
12 Q. Can you tell me what this is?
13 A. This looks like a combination of office paperwork
14    from Jansson for the leave that I took in
15    October, 2001 and it also looks like a form that
16    I believe Dr. Rein had to fill out and sign. So
17    they're copies of both.
18 Q. This was your Family and Medical Leave Act leave
19    from October to November of 2001, correct?
20 A. Yes.
21 Q. Do you claim that Jansson retaliated against you
22    for taking this leave?
23 A. No.
24 Q. Did they impede or otherwise prevent you from

Page 101

1     asserting your rights under the Family and
2     Medical Leave Act for taking this leave?
3  A. No.
4  Q. On the second page of Exhibit 6, towards the
5     bottom, it says "Paid benefits SCP." Do you know
6     what that stands for?
7  A. No.
8  Q. Do you claim that Jansson did not fulfill any of
9     its duties or obligations under the Family and
10    Medical Leave Act when it granted you this leave?
11 A. What was the first part of the question? Did I
12    --
13 Q. Are you claiming that Jansson failed to --
14        MR. PALMQUIST: Could you read it back?
15    I'm sorry.
16 A. I just needed that first part.
17 Q. Okay.
18 A. I believe I want to say no but I just want to
19    make sure.
20        (Question read.)
21 A. No.
22 Q. Do you claim that Jansson took any adverse
23    employment action against you for your having
24    asserted or having taken this leave?

Page 102

1  A. No.
2  Q. I'm handing you what's been marked as Deposition
3     Exhibit No. 7. Take a moment to review that,
4     please, and let me know when you're done.
5  A. Okay.
6  Q. Can you tell me what this is?
7  A. This is a complaint filed with the discrimination
8     board in Massachusetts.
9  Q. And is everything in this Exhibit 7 true and
10    accurate to the best of your knowledge?
11 A. Yes.
12 Q. Is that your signature on the bottom of page one
13    of Exhibit 7?
14 A. Yes.
15 Q. And is that your signature -- I'm sorry. Strike
16    that. There is no signature.
17        I would like you to turn to page two of
18    Exhibit 7 and review paragraph number seven.
19 A. Okay.
20 Q. What led you to believe that it was medically
21    necessary for you to decrease your hours to a
22    four-day work week rather than the five or six
23    days that you had previously been working?
24 A. In talking to my fertility specialist in regards

Page 103

1     to my newly discovered pregnancy, I asked him to
2     give me an outline of the -- what to expect the
3     next couple of months. And he explained to me
4     that I would be considered a high-risk pregnancy
5     and that I needed to be careful, to take care of
6     myself. And as I said to you before, to be
7     responsible.
8         And that's when -- my husband was
9     present with me and he said that, you know, we
10    should discuss work. And I talked to Dr. Rein
11    about that. And he said that I was able to work
12    but to not go overboard. Just to be careful.
13    Because I wasn't quite out of the woods yet.
14 Q. Did you tell Miss Osoff it was medically
15    necessary for you to work a four-day work week?
16 A. I told her what Dr. Rein said. That we had
17    discussed it.
18 Q. And Dr. Rein hadn't specifically ordered you to
19    work four days a week; is that correct?
20 A. No.
21 Q. No, that's not correct, or no, he didn't order
22    you to work four days a week?
23 A. No. He didn't order me to work four days a week.
24 Q. On the third and fourth pages of Exhibit 7 is a

Page 104

1     listing of comments that you allege Ms. Osoff
2     made to you on December 7th. And it's December
3     7, 2001; is that correct? Is this a typo?
4  A. That's a typo.
5  Q. Have we talked about all of those comments here
6     today?
7  A. We've covered all of them.
8  Q. On the last page of Exhibit 7, paragraph 12, you
9     claim that "Unable to endure Miss Osoff's tirade
10    of discriminatory comments and arbitrary pay cut,
11    I was constructively discharged from my
12    position."
13        Do you know what that means?
14 A. Yes.
15 Q. What does that mean to you?
16 A. Well, I believe what it's saying here is Arlene's
17    comments to me being discriminatory between my
18    pregnant and my job and then between that and the
19    pay cut, that I was constructively discharged
20    from my position. I mean, it pretty much says it
21    right there.
22 Q. What does "constructively discharged" mean to
23    you?
24 A. Constructively discharged means that the

Page 105

1     situation at hand -- in other words, we couldn't
2     come to an agreement about what we were trying to
3     negotiate or compromise on.
4  Q. And so you were justified in leaving?
5  A. Yes. I wasn't actually fired but I was asked to
6     leave and to write my resignation.
7  Q. Under paragraph 14, you claim that Jansson's
8     treatment of you constitutes discrimination on
9     the basis of gender and pregnancy. Have we
10    talked today about all of the allegations that
11    you claim constitute discrimination on the basis
12    of gender and pregnancy?
13 A. Yes.
14 Q. Are there any other allegations that you haven't
15    talked about here today that you are including in
16    your claim against the company?
17 A. No.
18 Q. Paragraph 14 also indicates that you believe that
19    Jansson's treatment of you constitutes a
20    violation of the Family and Medical Leave Act.
21    How do you claim Jansson violated the Family and
22    Medical Leave Act?
23 A. Well, I'm not sure that I'm extremely well read
24    on the Family and Medical Leave Act and I went

Page 106

1  through the guidance of my counsel on that.
2  Q. But as you sit here today, you can't tell me any
3  facts that lead you to believe that the company
4  violated the Family and Medical Leave Act with
5  regard to your situation; is that correct?
6  A. Well, in not ensuring my position to be there for
7  me when I come back from my maternity leave, I
8  believe that there is some type of discrimination
9  there.
10 Q. Did you ever take maternity leave?
11 A. No, but it was on the table open for discussion.
12 Q. Paragraph 16 of Exhibit 7 indicates you claim you
13 have suffered emotional distress and lost wages
14 as a result of Jansson and Miss Osoff's treatment
15 of you. Have we talked about all the ways that
16 you claim to have suffered emotional distress
17 here today?
18 A. Yes.
19 Q. How much in lost wages are you claiming you have
20 suffered as a result of Jansson and Miss Osoff's
21 treatment of you?
22 A. At least a year's salary.
23 Q. And what do you base that on?
24 A. I base that on from the time I left and my

Page 107

1  aggressive job search through my pregnancy,
2  during the time that my child was born and after.
3  I wasn't able to retrieve or bounce back from
4  that within that year. And still to this day.
5  Q. Any other lost wages you're claiming in this
6  matter?
7  A. I'm not sure if it's considered wages but my
8  401(k) I had invested in, I think there was a
9  technicality of dates and that I wasn't entitled
10 my matched amount so I'm asking for that.
11 Q. Can you explain that to me a little bit? You had
12 an account and --
13 A. Yes.
14 Q. Your employer matched a certain amount?
15 A. There was a certain amount vested after a certain
16 date and there was a discrepancy in the date. I
17 think it was a matter of days.
18 Q. How much was in the 401(k)?
19 A. You know, I don't remember offhand. It was
20 several thousand. And then I believe there was
21 around 2,000 that was -- that I lost because of
22 that date change. And --
23 Q. These are funds that would have been contributed
24 to the account if you remained employed to a

Page 108

1  certain date?
2  A. Yes.
3  Q. And this would have been contributed from the
4  company to your account?
5  A. Yes.
6  Q. A sort of matching fund?
7  A. Yes.
8  Q. Is there any other element of damages that you
9  are claiming in this matter?
10 A. No.
11 Q. I'm handing you what's been marked as Patrick
12 Exhibit No. 8. It's a legal pleading dated
13 October 24, 2002. And the last page of Exhibit 8
14 is an affidavit of Laura E. Patrick dated October
15 24, 2002. Is that your signature on the last
16 page?
17 A. Yes.
18 Q. In paragraph one, you indicate, "At no time did I
19 request to change my position from an exempt
20 position to a nonexempt position." Do you know
21 what that means?
22 A. No, because it's never been described to me in
23 that wording before.
24 Q. Do you know who makes determinations about exempt

Page 109

1  and nonexempt employment at Jansson?
2  A. I believe Arlene to make all those decisions.
3  Q. In paragraph three, you indicate, "Miss Osoff
4  never told me that all managerial and salary
5  positions at Jansson have built into their salary
6  structure an assumption of five to seven hours of
7  overtime."
8     Is that still an accurate statement?
9  A. Yes, it is.
10 Q. Is it your claim that she never told you anything
11 about the assumptions that went into setting
12 salaries for salary level positions?
13 A. No.
14 Q. Paragraph four you indicate, "At no time did I
15 tell Miss Osoff that I wanted to decrease my
16 responsibilities."
17    Is that a true statement?
18 A. Yes, it is.
19 Q. Paragraph six, "I know the identity of the
20 employee referred to as NL. Upon reducing her
21 schedule, NL was tasked with the same exact --
22 the exact same responsibilities she had before
23 her reduction."
24    How do you know that?

KACZYNSKI REPORTING

9090b848-634f-47eb-be47-55f4720ab753

Page 110

1  A. It was through my observation. And she was one
2     of the individuals that I wanted to speak to in
3     regards to that.
4  Q. I think we talked about -- this is Nicole Lee?
5  A. Yes.
6  Q. And you never talked to her?
7  A. No. I talked to her while she still worked at
8     Jansson because her office was right next to
9     mine.
10 Q. Did you talk about her change from salary to
11    hourly while she was still working there?
12 A. I believe yes, we did. And she said that she was
13    in agreement but that when -- that she would be
14    doing less responsibility so I thought her pay
15    cut was because she had stepped down from her
16    position. But she had mentioned to me that she
17    was still doing the same work.
18 Q. Did she complain to you while she was still
19    working there that she was still doing the same
20    work?
21 A. She made a statement to me once about it, which
22    is something that I had remembered, which is why
23    I wanted to talk to her to confirm.
24 Q. So when Arlene Osoff told you that your hourly

Page 111

1     wage was going to be different from what you
2     expected, that wasn't a surprise to you, was it?
3  A. Yes, it was.
4  Q. Yet you had seen other employees go from salary
5     to hourly and understood that their pay had
6     changed?
7  A. It was my impression that it was because they
8     were doing less responsibility. In other words,
9     they stepped down from their original position.
10 Q. And the job you were proposing had fewer
11    responsibilities than the one that you performed
12    before you went out on leave; isn't that right?
13 A. No, it wouldn't.
14 Q. All right. I'm handing you now what's been
15    marked as Deposition Exhibit No. 9. It's a copy
16    of the complaint in this matter.
17       Have you had a chance to review that?
18 A. Yes.
19 Q. Have you seen that before?
20 A. I don't believe so. I'm not sure. A lot of
21    these statements have been discussed.
22 Q. Is there anything in this document that we
23    haven't talked about yet today?
24 A. I believe we've touched on everything.

Page 112

1  Q. You applied for unemployment benefits after you
2     left Jansson?
3  A. Yes.
4  Q. And were they initially denied?
5  A. Yes.
6  Q. Why were they initially denied?
7  A. I don't know the exact reason. I just know that
8     the impression I was getting is that the other
9     party, because of the response from the other
10    party, they made the decision that it would not
11    be covered.
12 Q. And you appealed that decision?
13 A. Yes, I did.
14 Q. Did you have the help of an attorney?
15 A. Yes, I did.
16 Q. And was there an actual hearing on your appeal?
17 A. Yes, there was.
18 Q. And was Jansson represented at that hearing?
19 A. No, it was not.
20 Q. Did you go to the hearing?
21 A. Yes.
22 Q. And your attorney went with you?
23 A. Yes.
24 Q. Who else was there?

Page 113

1  A. Just the individual who was conducting the
2     hearing.
3  Q. What happened at the hearing?
4  A. They had a set of questions that they asked me.
5     I answered them. And after we were finished, she
6     said she would make a decision and let me know.
7  Q. Okay. Do you remember any of the questions they
8     asked you?
9  A. Similar to yours.
10 Q. On page five of Exhibit 9, paragraph 33 alleges
11    that "Jansson's policy of arbitrarily pro rating
12    downward the hourly salary rate of employees
13    working less than 40 hours per week disparately
14    impacts females in violation of Massachusetts
15    General Law Chapter 151B."
16       Do you know what that means?
17 A. I don't know exactly what Chapter 151B is. But
18    this policy that Arlene refers to seems to
19    directly affect the women in the company that
20    became pregnant and reduced their hours.
21 Q. Why do you claim it only impacts people who are
22    pregnant?
23 A. Because the individuals that I have spoken to or
24    felt experienced this were all females.

Page 114

1  Q. And those were Wendy, Anne and Nicole?
2  A. Yes.
3  Q. Anyone else?
4  A. There are other women that experienced the same
5     situation. Darlene, I can't remember her last
6     name. And Lucia McDougall. All of which I was
7     under the impression was taking on less
8     responsibility, taking -- doing a different job.
9     In turn, I thought their change in salary
10    reflected that.
11        MS. DEVER: I just ask, could we take
12    another break? I know --
13        MR. PALMQUIST: Sure.
14        MS. DEVER: I don't know if you're
15    reaching toward the end.
16        MR. PALMQUIST: I am. I'm getting
17    close. I'm getting very close.
18        MS. DEVER: Okay.
19        (Recess.)
20        (Question and answer read.)
21 Q. How do you know those individuals didn't have
22    decreased responsibilities?
23 A. I'm sorry. How did I --
24 Q. How do you know that -- let's start with Wendy

Page 115

1     Canty.
2  A. Mm-hmm.
3  Q. Did not have decreased responsibilities.
4  A. How did I know that Wendy didn't have --
5  Q. Yes. After she came back from her leave.
6  A. When I had talked to her over the phone, she said
7     that she really was doing the same job. Pretty
8     much the same tasks.
9  Q. She told you?
10 A. Yes.
11 Q. Okay. Was that true for Anne as well?
12 A. Yes.
13 Q. Did you ever talk to Lucia McDougall about that?
14 A. No, not really. It was just an observation.
15 Q. So no one told you that she was doing the same
16    responsibilities? You just observed that you
17    thought she was?
18 A. Yes. And technically she was -- her title was
19    taken away from her and assigned to someone else.
20 Q. But you don't personally know what duties and
21    responsibilities she had in her position, do you?
22 A. I do because I worked closely with her.
23 Q. Did you assign her duties and responsibilities?
24 A. No. That wasn't my job.

Page 116

1  Q. Who assigned the duties and responsibilities to
2     her?
3  A. Arlene.
4  Q. How do you know Darlene's responsibilities were
5     not reduced?
6  A. She worked in customer service as well. And
7     again, it was just my observation. I believe she
8     was taking on extra responsibilities during
9     somebody else's leave and then when it was her
10    turn, she also was -- she was doing different
11    responsibilities. So it was my impression
12    through my observation that Darlene was doing
13    less responsibility.
14 Q. Okay. And I think we talked about Nicole Lee?
15 A. Mm-hmm.
16 Q. She told Wendy that her duties -- she didn't
17    think her duties decreased? Is that correct?
18 A. I don't know what she told Wendy. I know that
19    she told Wendy that she would be willing to talk
20    to me and we would work something out for all of
21    us to meet. I think that's what we were trying
22    to do is to meet.
23 Q. You don't have any personal knowledge of what
24    Nicole Lee's duties and responsibilities were in

Page 117

1     her job, do you?
2  A. No, just an impression of what they would be like
3     because she worked for the commercial division
4     customer service and since I was familiar with
5     the setup of customer service, she was the
6     manager and I understood what the structure of it
7     was. And she had a very small office so she was
8     still taking on the same responsibilities even
9     after technically she was not the office manager
10    there.
11 Q. And you don't know what your duties and
12    responsibilities would have been under your
13    four-day work week because you never started
14    that, did you?
15 A. I knew what my responsibilities would be because
16    I knew what my job was and what needed to be
17    done.
18 Q. But you never worked that four-day work week, did
19    you?
20 A. Obviously. We never got to that point.
21 Q. Other than these examples that we've just talked
22    about, are you aware of any facts that lead you
23    to believe that Jansson's, quote, unquote, policy
24    of pro rating downward the hourly salary rate of

Page 118

1   employees working less than 40 hours per week has
2   a disparate impact on females? Any other facts
3   that leads you to believe that, other than those
4   examples that we've talked about?
5   A. No.
6   Q. Okay. Are you aware of any situations where this
7   policy was applied to males?
8   A. No.
9   Q. Would you make the same claim if the policy was
10  applied to males?
11  A. Good question. I think I would -- I think it
12  would depend on if they were doing the same job.
13  If they were doing the same job, why should they
14  take a cut in pay just for doing the same job but
15  within different hours? If he was taking less
16  responsibility and doing a different job that was
17  valued at a less pay rate, then I could
18  understand that that applies.
19  Q. But if it were applied to a man, then it wouldn't
20  be discriminatory, would it?
21  A. I think it's discriminatory towards the position
22  as well. I am just familiar with it being with
23  women so it's -- it gives me the impression that
24  it really is a policy that seems to strongly

Page 119

1   discriminate women that happen to get pregnant.
2   Q. All right. I'm handing you now what's been
3   marked as Deposition Exhibit No. 10. These are
4   some disclosures that your attorney made in this
5   case. Have you seen these before?
6   A. I haven't actually seen this paperwork. I never
7   actually saw my personnel file. I did see the
8   correspondence between myself and Jansson
9   concerning the settlement demand and the charge
10  of discrimination. If that's what you're
11  referring to.
12  Q. I'm just asking if you've seen this before.
13  A. Okay.
14  Q. Have you seen it before today?
15  A. I haven't seen this actual paper.
16  Q. Before today. Okay. Were you aware that Jansson
17  made an offer of reinstatement to you?
18  A. Define "reinstatement."
19  Q. Giving you your job back.
20  A. Yes. Through Joel.
21  Q. Why did you reject that?
22  A. I didn't feel confident working for a company
23  that I felt didn't support me.
24  Q. We're going to mark one more here.

Page 120

1   (Employee Acknowledgment marked Exhibit
2   No. 12.)
3   Q. I'm handing you two documents marked Deposition
4   Exhibits 11 and 12. Deposition Exhibit 11 is a
5   copy of the employee handbook at Jansson
6   effective January 1, 2001. And Deposition 12,
7   Exhibit 12 is an acknowledgment form dated April
8   11, 2001.
9       You don't have to look at the whole
10  handbook but if you could tell me if that's your
11  signature on Deposition Exhibit No. 12.
12  A. Yes, it is.
13  Q. And did you receive a handbook while you were
14  employed by Jansson?
15  A. Yes.
16  Q. Did you read it?
17  A. Yes.
18  Q. Does Deposition Exhibit 11 look like the handbook
19  you received? Take some time to look at it if
20  you need to.
21  A. Without knowing the exact content of this, it
22  looks like a copy of it. It was a booklet.
23  Q. Did you receive more than one handbook when you
24  were at Jansson?

Page 121

1   A. Just this one.
2       MR. PALMQUIST: I just want to take a
3   very short break. I think we're probably done.
4       MS. DEVER: Okay.
5       (Recess.)
6   Q. Have we talked about all of the facts that
7   underlie your lawsuit against the company here
8   today?
9   A. I believe we have.
10  Q. Is there anything that you can think of before we
11  end that you are asserting that was unfair or
12  discriminatory or retaliatory by Jansson?
13  A. We pretty much discussed it.
14      MR. PALMQUIST: I have no further
15  questions.
16      MS. DEVER: I have no questions.
17      MR. PALMQUIST: Okay.
18      (Whereupon, the deposition was
19  concluded at 2:36 p.m.)

Page 122

1  Excerpt from Rule 30(e):
   Submission to Witness; Changes; Signing.
2
       When the testimony is fully transcribed,
3  the deposition shall be submitted to the witness
   for examination and shall be read to or by
4  him/her, unless such examination and reading are
   waived by the witness and by the parties. Any
5  changes in form or substance which the witness
   desires to make shall be entered upon the
6  deposition by the officer with a statement of the
   reasons given by the witness for making them.
7
       ************************************
8
9      I, Laura Patrick, have examined the above
   transcript of my testimony and it is true and
10 correct to the best of my knowledge, information
   and belief. Any corrections are noted on the
11 errata sheet.
12
       Signed under the pains and penalties of
13 perjury this    day of         , 2005.
14
15
       _____
16         Deponent's Signature
17     On this    day of      , 2005, before
   me, the undersigned notary public, personally
18 appeared         , proved to me through
   satisfactory evidence of identification, which
19 were      , to be the person whose name is
   signed on the preceding or attached document, and
20 who swore or affirmed to me that the contents of
   the document are truthful and accurate to the
21 best of his/her knowledge and belief.
22
23     _____
             Notary Public
24 My commission expires:

Page 123

1
       COMMONWEALTH OF MASSACHUSETTS
2      ESSEX, SS.
3
4          I, Susan L. Prokopik, Registered Merit
5      Reporter and Notary Public duly commissioned and
6      qualified in and for the Commonwealth of
7      Massachusetts do hereby certify that there came
8      before me on the 25th day of January, 2005 the
9      person hereinbefore named, who was satisfactorily
10     identified by me and duly sworn to testify to the
11     truth of her knowledge concerning the matters in
12     controversy in this cause; that she was thereupon
13     carefully examined upon her oath and her
14     examination reduced to typewriting under my
15     direction; and that the deposition is a true and
16     accurate record of the testimony given by the
17     witness.
18         I further certify that I am not
19     interested in the cause of this action.
20
21
           SUSAN L. PROKOPIK, RMR, CRR
22              (CSR #124893)
23
       My commission expires:
24     April 15, 2005