# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **LAURA E. PATRICK,**<br>**Plaintiff,**  ) | **CIVIL ACTION NO.:04-10427RGS** |
| )  | |
| **vs.**  ) | |
| )  | |
| **JANSSON CORPORATION,**<br>**Defendant**  ) | |

### Affidavit of Theresa Finn Dever, Esq.

Theresa Finn Dever,  hereby deposes and states as follows:

1.  I am co-counsel of record in the above-captioned matter.

2.  Attached hereto as Exhibit A is a true and accurate copy of the transcript of the deposition of Joel Rudy.

3.  Attached hereto as Exhibit B is a true and accurate copy of the transcript of the deposition of Laura Patrick.

Signed under the pains and penalties of perjury this 4th day of March 2005.

Theresa Finn Dever, Esq.

3/4/05

CERTIFICATE OF SERVICE

I, Theresa Finn Dever, attorney for the Plaintiff,
hereby certify that a true copy of the above document was
served upon the attorney of record for each other party by
first class mail on March 4, 2005.

THERESA FINN DEVER

3/4/05

**Page 1**

VOLUME: I
PAGES: 1 - 87
EXHIBITS: 1 - 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - x

LAURA PATRICK,
    Plaintiff

vs          No. 04-CV-10427RGS

JANSSON CORPORATION,
    Defendant

- - - - - - - - - - - - - - - x

DEPOSITION of JOEL RUDY, a witness called

on behalf of the Plaintiff, taken pursuant to notice before

Deborah L. Maren, Registered Professional Reporter and

Notary Public in and for the Commonwealth of Massachusetts,

at the offices of Corrigan & Levy, 896 Beacon Street,

Boston, Massachusetts, on Wednesday, January 26, 2005,

commencing at 11:05 a.m.

BRAMANTI & LYONS COURT REPORTING, INC.
REGISTERED PROFESSIONAL REPORTERS
92 STATE STREET - 8TH FLOOR
BOSTON, MASSACHUSETTS 02109
TEL: 617.723.7321 / FAX: 617.723.7322
www.bramanti-lyons.com

**Page 2**

APPEARANCES:

Joseph P. Dever, Esq.
Riley & Dever, P.C.
Lynnfield Woods Office Park
210 Broadway, Suite 201
Lynnfield, Massachusetts 01940
Attorney for the Plaintiff

Daniel L. Palmquist, Esq.
Leonard, Street and Deinard
150 South Fifth Street, Suite 2300
Minneapolis, Minnesota 55402
Attorney for the Defendant

**Page 3**

INDEX

Deposition of:              Page

JOEL RUDY

Examination by Mr. Dever         4

- - - - - -

EXHIBITS

No.                  Page

1  Answers to complaint      35

2  Memo                64

**Page 4**

PROCEEDINGS

MR. DEVER: Dan, did you have any stipulations yesterday?

MR. PALMQUIST: Same stipulations, yeah. Objections are reserved for trial except as to the form. And we will read and sign.

MR. DEVER: Did Theresa waive the signing in front of a notary? I'm sure she did.

MR. PALMQUIST: No, she didn't.

MR. DEVER: She didn't? Well, we will. And just then if it's not signed within 30 days of receipt, it will be deemed signed.

MR. PALMQUIST: All right.

JOEL RUDY, a witness called for examination by counsel for the Plaintiff, first having been duly identified and sworn, was examined and testified as follows:

Examination by Mr. Dever:

Q.  Okay. Mr. Rudy --

A.  Yes.

Q.  -- my name is Joe Dever, as you know. And I represent the plaintiff, Laura Patrick. I'm going to be asking

5

1  you a few questions. Have you ever been deposed before?
2  A. Yes.
3  Q. And then you are probably familiar with the process, but
   just to cover it again, I'll be asking you questions.
   If you'll do your best to answer those questions and to
6  verbalize your responses so that the court reporter can
7  take down what you're saying, I would appreciate it.
8  I'll do my very best to wait until you finish answering
9  your question before I ask the next one. And you might
10 want to wait for me to finish my question before you
11 answer, and that will help keep the record clean.
12      If for any reason you need to take a break,
13 just ask, and I'll be happy to accommodate you. I just
14 ask that you not take a break when there's a question
15 pending, that you answer the question and then feel free
16 to take a break.
17      If you need to talk to your attorney at any
18 time for any reason, just let me know and I'll do my
19 best to accommodate you there as well.
20      Do you have any questions before we begin?
21 A. No.
22 Q. Could you state your name for the record, Mr. Rudy.
23 A. Joel Rudy.
24 Q. And where do you live?

6

1  A. Milford, Massachusetts.
2  Q. Is there a street address there?
3  A. Yes. One Isaiah Circle.
4  Q. The Zip Code?
5  A. 01757.
6  Q. Who do you live there with?
7  A. Stacey Klein.
8  Q. Is Ms. Klein your wife?
9  A. Fiancee.
10 Q. Anyone else reside with you at that address?
11 A. No.
12 Q. And what's your date of birth?
13 A. April 9th, 1950.
14 Q. That would make you 54 in April?
15 A. 55 in April.
16 Q. 55 in April. Have you taken any medication or any
17      substances today that would impair your ability to
18      understand my questions that you know of?
19 A. No.
20 Q. You said you were deposed before?
21 A. Yes.
22 Q. Under what circumstances?
23 A. There were some unemployment hearings I've been to.
24      There may have been one other legal case. I can't

7

1  remember the details of it. It was quite a while ago.
2  Q. Were you testifying on behalf of your current employer
3      at those hearings?
4  A. Yes.
5  Q. Did any of them have to do with the issues that are
6      relevant here, employment discrimination on the basis of
7      gender or pregnancy?
8  A. No.
9  Q. Have you ever been convicted of a crime?
10 A. No.
11 Q. Have you ever been sued personally?
12 A. In conjunction with my employment, once, yes.
13 Q. What were the circumstances? What were the allegations
14      in that suit?
15 A. It was a sexual harassment allegation about 15 years
16      ago.
17 Q. While you worked for Jansson?
18 A. While I worked for Taylor Corporation.
19 Q. I'm sorry. Maybe you could explain to me the
      relationship between Taylor and Jansson.
21 A. Taylor is the parent company of Jansson.
22 Q. And do you work for Taylor Jansson?
23 A. I'm employed by Jansson.
24 Q. Do you have any position in Taylor at all?

8

1  A. I'm a minority stockholder.
2  Q. Are you a stockholder in Jansson as well?
3  A. In so much as Taylor owns Jansson, yes.
4  Q. Do you know if Jansson is owned 100 percent by Taylor?
5  A. Yes.
6  Q. And Taylor is a Minnesota corporation?
7  A. Yes.
8  Q. And where is its principle place of business? Do you
9      know?
10 A. Mankato, Minnesota.
11 Q. And Jansson is a Massachusetts corporation?
12 A. I'm not sure if it's a separate corporation. I don't
13      believe so.
14 Q. Have you ever filed any lawsuits? Have you been a
15      plaintiff in a lawsuit ever?
16 A. Once.
17 Q. What were the circumstances regarding that lawsuit?
18 A. It was a home improvement conflict with a contractor.
19 Q. Never much fun.
20 A. No.
21 Q. Did you do anything to prepare for your deposition
22      today?
23 A. I looked at a couple of -- I looked at this complaint
24      that was filed. And Dan and I discussed a few things on

**9**

1  Monday.

2  Q. Did you talk to anyone else besides your attorney about

3  your testimony today?

4  A. No.

Q. Aside from the complaint, did you look at any other

6  documents to prepare for today?

7  A. No.

8  Q. Do you report to anyone at Taylor?

9  A. Yes.

10  Q. Who is that?

11  A. His name now is Erv -- Ervin. It's E-R-V-I-N,

12  W-E-I-B-E.

13  Q. And what is Mr. Weibe's position with Taylor?

14  A. He's a director.

15  Q. Any other position besides director that you know of?

16  A. I think he's the president of one of the companies, one

17  of the divisions.

18  Q. Do you know how many divisions Taylor has?

19  A. Probably about 85. That's a guess, give or take.

20  Q. Did you know which one of the divisions that Mr. Weibe

21  is the president of?

22  A. It's a company called Sunset Canada or Sunset Limited.

23  Q. And what does Sunset Limited do?

24  A. They're an imprinting company similar to Jansson.

**10**

1  Q. Are most of Taylor's divisions similar to Jansson and

2  Sunset Limited in that they do imprinting and --

3  A. About a third of them.

4  Q. What about the other two-thirds?

5  A. Most of it is assorted types of printing, speciality

6  printing.

7  Q. You said that you're the president of Jannson?

8  A. Yes.

9  Q. Could you describe what Jannson does.

10  A. Jannson does imprinting of social stationary and

11  business stationary and invitations and greeting cards.

12  Q. As president of Jannson, would you be empowered to

13  settle this lawsuit?

14            MR. PALMQUIST: Object to the form of the

15  question.

16  A. No.

17  Q. Who would you have to confer with to do that?

18  A. Probably our general counsel.

19  Q. And who is that?

20  A. Dick -- no, Greg Jackson.

21  Q. Anyone else?

22  A. Probably our division president.

23  Q. Who is your division president?

24  A. Keith Herwig.

**11**

1  Q. How do you spell his last name?

2  A. H-E-R-W-I-G.

3  Q. And is Mr. Herwig, would he be above or below Mr. Weibe?

4  A. Above. Taylor.

5  Q. Would Mr. Weibe report to Mr. Herwig as well?

6  A. Indirectly.

7  Q. Maybe you could explain to me how that works or what the

8  chain of command is.

9  A. It's a changing situation, but a president reports to a

10  director. The director reports to both the operations

11  vice president and the president of the division. And

12  the president of the division reports to an executive

13  committee.

14  Q. And for significant decisions concerning Jannson, you

15  would have to go through that chain of command; is that

16  fair to say?

17  A. Yes. Correct. Let me just add something that will make

18  this -- it might help. At the time of this allegation,

19  I was a director for Taylor Corp overseeing Jannson.

              MR. PALMQUIST: Let him ask the questions.

21              THE WITNESS: Okay.

22              MR. PALMQUIST: I understand you want to be

23  helpful.

24  Q. So would that mean that you were in Mr. Weibe's

**12**

1  position --

2  A. Yes.

3  Q. -- then? Why did you leave your director position to

4  become the president of Jannson?

5  A. Primarily health issues.

6  Q. When was that?

7  A. December of 2003.

8  Q. And are your responsibilities less or less taxing at

9  least at this point?

10  A. Yes.

11  Q. What are your responsibilities today?

12  A. I'm the president of the combined company of Jannson and

13  Chase.

14  Q. And do both Jannson and Chase do the same thing?

15  A. Yes.

16  Q. Is there a name for the combined company?

17  A. Jannson Chase.

18  Q. Do you know if that is incorporated?

19  A. Yes. It isn't.

20  Q. It is not?

21  A. As far as I know.

22  Q. As far as you know it's just an internal combination of

23  divisions?

24  A. Yes.

13

1  Q.  And as president of Jannson Chase, what are your
2      responsibilities?
3  A.  To oversee the day-to-day operation and oversee the
4      sales and marketing of the company.
   Q.  How many people fall under you as president of Jannson
6      Chase?
7  A.  About 110.
8  Q.  And who held that position prior to you?
9  A.  Arlene Osoff.
10 Q.  When you became the president of Jannson Chase, what
11     happened to Arlene Osoff?
12 A.  I was the president while she was the general manager.
13     And she had the base responsibilities I have now. It's
14     fairly close, those two positions.
15 Q.  So let me back up a little bit. There's a president of
16     Jannson Chase, and then there's also a general manager
17     of Jannson Chase?
18 A.  There was. There's no longer a general manager.
19 Q.  Was Arlene Osoff the president before you?
20 A.  Yes.
21 Q.  How long had she been the president before you took
22     over?
23 A.  No, I'm not sure she was the president. She was one of
24     the owners of the company before we purchased it.

14

1  Q.  So Miss Osoff owned Jannson?
2  A.  Half of it, yes.
3  Q.  With who else?
4  A.  Steve Shulman.
5  Q.  Anyone else?
6  A.  No.
7  Q.  At some point Miss Osoff and Mr. Shulman sold Jannson to
8      Taylor?
9  A.  Correct.
10 Q.  Do you know when that was?
11 A.  I believe it was 1998.
12 Q.  And in 1998 were you a director at Taylor?
13 A.  Yes.
14 Q.  Were you involved in the acquisition of Jannson in 1998?
15 A.  Yes.
16 Q.  What was your role?
17 A.  I was just part of the acquisition team.
18 Q.  Were you involved in conducting due diligence on
19     Jannson?
20 A.  Some, yes.
21 Q.  For a period of time, though, you were the director at
22     Taylor that Miss Osoff reported to; is that fair to say?
23 A.  Correct.
24 Q.  For how long did that happen?

15

1  A.  About four years.
2  Q.  That would have been about 1998 to 2001, 2002?
3  A.  2002, yes.
4  Q.  And, again, you may have already answered this, Miss
5      Osoff was the general manager of Jannson not its
6      president during that time frame?
7  A.  Yes.
8  Q.  Did Jannson have a president during that time frame?
9  A.  I was the president.
10 Q.  Were you both the president of Jannson and the director
11     of Taylor?
12 A.  Yes.
13 Q.  After the acquisition of Jannson by Taylor, at any point
14     was Miss Osoff the president of Jannson?
15 A.  No.
16 Q.  After the acquisition of Jannson by Taylor, were you
17     always the president of Jannson?
18 A.  Yes.
19 Q.  Then in December of 2003, you gave up your position as
20     director and began working as only the president of
21     Jannson; is that fair to say?
22 A.  Correct.
23 Q.  When did you meet Laura Patrick?
24 A.  1998.

16

1  Q.  And Miss Patrick worked for Jannson at the time?
2  A.  Correct.
3  Q.  What was her position?
4  A.  I think she was the art director. I don't know exactly
5      what her specific title was.
6  Q.  Do you know what her responsibilities were as art
7      director?
8  A.  She was responsible for helping to develop our sales
9      catalogs.
10 Q.  What did that consist of?
11 A.  Coming up with new designs, help design the layout of
12     the catalog, work with the manufacturing of the
13     products, and then be of assistance to other departments
14     within the company.
15 Q.  Did you have personal dealings with Miss Patrick in
16     1998?
17 A.  They were limited.
18 Q.  At some point did that change?
19 A.  No.
20 Q.  Does Jannson have a general manager now?
21 A.  No.
22 Q.  Have they had a general manager since Miss Osoff left?
23 A.  No.
24 Q.  Do they have any plans on hiring a general manager?

17

1  A. No.

2  Q. Is it fair to say that you never supervised Miss

3     Patrick?

4  A. Not directly.

   Q. Was there anyone other than Miss Osoff between you and

6     Miss Patrick?

7  A. No.

8  Q. Were there any other art directors at the time?

9  A. No.

10 Q. Prior to 2001, did you ever have any conversations with

11    Miss Osoff about Miss Patrick?

12 A. Yes.

13 Q. What were the substance of those conversations?

14 A. There were conversations about her annual review. There

15    were conversations about the job she did in general.

16    There were conversations about some of her leaves or

17    that type of thing.

18 Q. Anything else that you can remember?

19 A. There were conversations when this situation arose.

20 Q. Her pregnancy?

21 A. It wasn't about her pregnancy. It would have been about

22    her change in work schedule.

23 Q. As far as her annual reviews went, how often -- were

24    they actually conducted annually, her reviews?

18

1  A. Yes.

2  Q. Does anything stand out about her reviews to you? Any

3     negative performance reviews or anything like that?

4  A. No.

5  Q. Generally her annual reviews were positive?

6  A. Very positive.

7  Q. Regarding her leaves, were there requests for leaves

8     from her employment?

9  A. Yes.

10 Q. When did those come up?

11 A. Whenever the records show. I'm not sure of the exact

12    dates. There were a couple of them.

13 Q. You recall at least two times that Miss Patrick

14    requested leaves of absence from her employment?

15 A. I believe so.

16 Q. Do you recall what the first request -- why she made the

17    first request or why she told you she made the first

18    request?

19 A. I know they all had -- they revolved around fertility

20    treatments.

21 Q. And then at some point Miss Patrick told you that she

22    was pregnant?

23 A. No. She never told me she was pregnant, no.

24 Q. Did you ever have any conversations with Miss Patrick

19

1     about her requests for leaves for fertility treatments?

2  A. No, not directly.

3  Q. Were they all through Miss Osoff?

4  A. Yes.

5  Q. Did Miss Osoff object to Miss Patrick taking leaves for

6     fertility treatment?

7  A. No.

8  Q. At some point Miss Osoff told you that Miss Patrick was

9     pregnant?

10 A. Yes.

11 Q. Do you recall when that was?

12 A. It would have been that December 3rd or 4th. That

13    Monday, I believe.

14 Q. What year was that? I'm sorry. 2001?

15 A. I don't know. According to this, it's 2000 or 2001.

16    Yes, probably.

17          MR. PALMQUIST: Let's put that away. That's

18    fine. Just turn it over.

19 Q. Is this your copy of the complaint --

    A. Yes.

21 Q. -- that you were referring to?

22 A. Yes.

23 Q. Could you tell me what -- how Miss Osoff described Miss

24    Patrick's capabilities?

20

1          MR. PALMQUIST: Object to the form of the

2     question. Vague.

3  A. She was very pleased with Laura's work. She enjoyed

4     working with her. She felt she was a valuable part of

5     the company.

6  Q. At some point did that change, to your knowledge?

7  A. No. That never changed.

8  Q. Is the first time you met Miss Osoff when Taylor was

9     acquiring Jannson?

10 A. No. I worked with her in 1977.

11 Q. Under what circumstances?

12 A. I was the sales manager at Jannson, and she was the

13    typesetter.

14 Q. How long had you worked at Jannson?

15 A. Six months.

16 Q. Did you have any other dealings with Miss Osoff after

17    you left Jannson until Taylor acquired Jannson?

18 A. Yeah. We occasionally had conversations or ran into

19    each other at trade events.

20 Q. Did you ever socialize with her?

21 A. No.

22 Q. Do you know where she is now?

23 A. Last I heard she was in Florida.

24 Q. Do you know where in Florida?

21

1  A. West Palm Beach, I think.

2  Q. Do you know what her address is?

3  A. No, I don't.

4  Q. Do you know who would know what her address is?

   A. I believe we have that somewhere at the company.

6  Q. Either Jannson or Taylor?

7  A. Probably at Jannson somewhere.

8  Q. Does Miss Osoff still consult or have any other role

9     with Jannson?

10 A. No.

11 Q. Is she retired?

12 A. Yes.

13 Q. When did she retire?

14 A. December of 2003.

15 Q. What were the circumstances of her retirement?

16 A. She just came in and said she wanted to retire.

17 Q. It was voluntary?

18 A. Yes.

19 Q. Did she come in to you to tell you --

20 A. Yes.

21 Q. -- that she wanted to retire?

22 A. She probably either told me over the phone or in a fax

23    or in an e-mail. I can't recall.

24 Q. What were your impressions of Miss Osoff's management

22

1     style?

2            MR. PALMQUIST: Object to the form of the

3     question. Vague. Go ahead.

4  A. She was very involved in the organization. It was a

5     very big part of her life.

6  Q. How long had she worked at Jannson? Do you know?

7  A. From 1976 until she retired.

8  Q. And eventually she bought into it as well?

9  A. Her ex-husband was one of the original partners.

10 Q. Did she get the company, his half, in the settlement

11    or --

12 A. I don't know the exact details. It was pretty

13    convoluted.

14 Q. Do you know who her ex-husband was?

15 A. Jeff Osoff.

16 Q. Did he have any role in the company after they were

17    divorced that you know of?

18 A. I don't -- I don't know what the chronological order of

19    that was.

20 Q. In any event, when Taylor purchased Jannson, did they

21    purchase the company from Miss Osoff by herself or Miss

22    Osoff and Mr. Shulman?

23 A. Yes.

24 Q. Not from Mr. Osoff?

23

1  A. Correct.

2  Q. Do you know when they were divorced, Miss Osoff and

3     Mr. Osoff?

4  A. No. No, it's not -- no, I don't.

5  Q. Any other observations about her management style?

6            MR. PALMQUIST: Object to the form of the

7     question. Vague.

8  A. No, I think I covered it.

9  Q. Any weaknesses in her management style that you noticed?

10           MR. PALMQUIST: Same objection.

11 A. Not that I can really articulate. I mean, everybody has

12    weaknesses.

13 Q. That's for sure. And it's your recollection that she

14    voluntarily retired?

15 A. Absolutely.

16 Q. Was she given a severance package from --

17 A. No.

18 Q. -- Taylor or Jannson?

19 A. No.

   Q. Do you know if she had an attorney representing her when

21    she left the company?

22 A. Not that I'm aware of.

23 Q. When was the last time you spoke with Miss Osoff?

24 A. Probably about two months ago.

24

1  Q. Was that about this case?

2  A. No.

3  Q. What was it about?

4  A. It was a social call, to see how she was doing.

5  Q. When was the last time you talked to her about this

6     case?

7  A. It's quite a while ago. Probably the last time we had

8     any real discussion about it was when we got the papers

9     from your firm.

10 Q. You think that was the last time you spoke with her

11    about this case?

12 A. Probably.

13 Q. Shortly after you were served with the complaint?

14 A. Correct.

15 Q. Do you recall what Miss Osoff said in that conversation?

16 A. No, I don't.

17 Q. What did you say to her?

18 A. I don't recall.

19 Q. Did you ask her what this was all about?

20 A. There was no need for me to. I was pretty familiar with

21    the situation.

22 Q. When you say the last time you spoke with Miss Osoff was

23    when the complaint was filed in this case, are you

24    referring to the complaint or the charge of

25

1    discrimination at the Massachusetts Commission Against
2    Discrimination? If you know?
3    A. We probably spoke at both those cases -- both those
4       times. Again, I don't remember the chronological order
5       of those. But whenever there was new paperwork that
6       came in, we probably discussed it.
7    Q. So it's your testimony that you don't remember the
8       substance of either of those conversations with Miss
9       Osoff?
10   A. That's correct.
11   Q. In December of 2001, who had authority to make personnel
12      decisions at Jannson?
13   A. Depending on the situation, either Arlene or myself.
14   Q. And who made the personnel decision regarding Miss
15      Patrick?
16            MR. PALMQUIST: Object to the form of the
17      question. Vague. What personnel decision?
18   A. She and I discussed it on how to handle it.
19   Q. Is it fair to characterize it as a joint decision
20      between you and Miss Osoff? Or more one than the
21      other?
22            MR. PALMQUIST: Same objection. Go ahead.
23   A. It was my final. The final decision was mine.
24   Q. But Miss Osoff made a recommendation?

26

1    A. Yes.
2    Q. What was her recommendation?
3            MR. PALMQUIST: Same objection.
4    A. Her recommendation was that we allow Laura to work the
5       schedule she want -- she had requested, even though it
6       wasn't probably the best schedule for the company but in
7       turn would follow our normal practice of changing her
8       compensation according to the hours she would be
9       working.
10   Q. Okay. Before we continue with that, where did you go to
11      high school?
12   A. Newton South High School.
13   Q. When did you graduate?
14   A. 1966.
15   Q. And college?
16   A. Northeastern University. Well, I went to Dean -- Dean
17      College for a year, and I graduated from Northeastern.
18   Q. With a bachelor's degree?
19   A. Yes.
20   Q. What was your course of study?
21   A. Business management.
22   Q. Do you remember what year that was?
23   A. Graduated in '73.
24   Q. Any certifications or post-graduate work?

27

1    A. No.
2    Q. How long have you worked for Taylor?
3    A. Since 1970 -- August 1st, 1977.
4    Q. And before Taylor?
5    A. I worked for Jannson right before that. Previous --
6    Q. 1976 you said?
7    A. Yes. Well, '76 to '77.
8    Q. And prior to that?
9    A. Chase. I believe it was 1973 to 1976.
10   Q. And prior to that you were in school?
11   A. Yeah. And I worked for Regency Thermographers.
12   Q. What is a thermographer?
13   A. It's a company that does rays printing.
14   Q. So you've been in the printing business --
15   A. Since 1970.
16   Q. And you said that you were a minority shareholder in
17      Taylor?
18   A. Yes.
19   Q. And the president of Jannson?
20   A. Yes, correct.
21   Q. What is your salary now?
22            MR. PALMQUIST: Object. Go ahead.
23            THE WITNESS: I have to answer that?
24            MR. PALMQUIST: Yeah.

28

1    A. My base salary is about 158,000, I think.
2    Q. And you have incentives on top of that?
3    A. Yes. And I don't -- I forget what it's called, a cost
4       of living adjustment for the Boston area.
5    Q. COLA? Is that what they call it?
6    A. I'm not sure.
7    Q. And you have stock options as well?
8    A. No.
9    Q. Were you given your stock?
10   A. No. I purchased it.
11   Q. I'm sorry. Where is Jannson's business located?
12   A. 49 Maple Street in Milford.
13   Q. Did you ever work for a company called Celebrations?
14   A. Yes, I did.
15   Q. When was that?
16   A. It was another division of Taylor Corp. I was the
17      president of that company for probably about 18 years.
18   Q. Was that prior to becoming the president of Jannson?
19   A. It was prior, and it also was during the time I was the
20      president of Jannson.
21   Q. So you held both presidencies, so to speak?
22   A. Yes.
23   Q. Is that common in Taylor, that one person would hold
24      more than one president slot?

29

1   A. As the director it's common, yeah.

2   Q. Do you know if Jannson has ever been sued before?

3   A. Yeah.

4   Q. It has?

    A. Yup.

6   Q. Do you know how many times?

7   A. There's only one other time that sticks out in my mind.

8   Q. What did that concern?

9   A. That was a -- what do you call it?  The person claimed

10     they were discharged unfairly.

11  Q. Why did they claim they had been discharged unfairly?

12     Do you remember?

13  A. They claimed they were discharged unfairly because of

14     their misinterpretation of the situation, from my

15     perspective.

16  Q. Is this Paul Valdenbrini?

17  A. Yes.

18  Q. What position did Mr. Valdenbrini have at Jannson?

19  A. He was a press operator.

20  Q. Do you recall what his complaint was or what the

21     substance of his complaint was?

22  A. He was complaining he had physical limitations but never

23     brought any evidence from a doctor that would restrict

24     his work.

30

1   Q. Was he discharged?

2   A. Eventually, yes.

3   Q. Did you discharge him?  Or was it Miss Osoff?

4   A. I authorized her to discharge him.

5   Q. Did he claim that Jannson hadn't made a reasonable

6      accommodation of his --

7   A. No, he --

8           MR. PALMQUIST:  Object to the form of the

9      question.  Lack of foundation.

10  A. He claimed we didn't.

11  Q. And your position or Jannson's position was that he had

12     never proved that he was disabled?

13          MR. PALMQUIST:  Object to the form of the

14     question.

15  Q. To the best of your knowledge?

16  A. That was part of it, that we didn't make accommodations

17     for him.

18  Q. Was his case resolved?  Do you know?

19  A. Yes.

20  Q. How was it resolved?

21  A. It was settled.

22          THE WITNESS:  Can I just get a tissue?

23          MR. DEVER:  Sure.  Do you want to take a

24     break?

31

1           (Discussion off the record.)

2   Q. Do you know the terms of the settlement?

3           MR. PALMQUIST:  I'm going to object to the

4      question and instruct the witness not to answer.  I

5      don't know what the terms -- or I don't know if there is

6      a confidentiality provision in place.

7           MR. DEVER:  That's fine.  I'll hold off on

8      that, if we ever get to it again.

9           MR. PALMQUIST:  Yeah.

10  Q. What about Carol Reed?  Do you remember Carol Reed?

11  A. Yes.  I remember her sending a letter, but I don't

12     remember the details of it.

13  Q. Do you know what the substance of the letter was?

14  A. I remember it had something to do with her not -- not

15     doing the job she was expected to be hired for.  That's

16     what I recall about it.

17  Q. Was she discharged from Jannson?

18  A. I don't remember.

19  Q. Did you have any involvement with her claim that you

20     remember?

21  A. I would have had some involvement.  I would have --

22     whatever the -- I would have been consulted on whatever

23     happened with her.

24  Q. Miss Osoff and you would have talked about it?

32

1   A. Correct.

2   Q. To your knowledge, is there anyone more knowledgeable

3      than you at Jannson about Miss Patrick's case?

4   A. At Jannson currently, no.

5   Q. If Miss Osoff were still employed, would she be the

6      person with the most knowledge?

7   A. Yes.

8   Q. But now that she's gone, that falls to you?

9   A. Correct.

10  Q. Is there anyone else at Jannson that has some knowledge

11     of the lawsuit or the facts alleged in the lawsuit?

12          MR. PALMQUIST:  Object to the form of the

13     question for lack of foundation.  Go ahead.

14  A. Pamela Green is probably familiar with the situation.

15     She's the office manager and oversees human resources.

16  Q. Anyone else?

17  A. Brian Kling is probably familiar with it.  He was the

18     general manager of Chase when the company was combined.

19  Q. Kling?

20  A. K-L-I-N-G.

21  Q. Anyone else besides Miss Green and Mr. Kling?

22  A. Not from the company's perspective.

23  Q. What about Paul Capasso?

24  A. Paul is no longer with the company but -- he was the

33

1  manager of the company. But other than that, I don't
2  think the situation was discussed with him.
3         MR. DEVER: Will you excuse me for one
4  second?
5         (Recess.)
6         (Question read.)
7  Q. The answer is he is no longer with the company;
8     correct?
9  A. Correct.
10 Q. Do you know where he is?
11 A. I think he lives in -- Millis? No. Wrentham.
12 Q. Do you know what he does now?
13 A. He's a home inspector.
14 Q. Do you know why he left Jannson?
15 A. Yes.
16 Q. Why?
17 A. Because we had changed his position and his
18    compensation, and he wasn't happy with it.
19 Q. What had his position been before the change?
20 A. He was a production manager.
21 Q. What did you change his position to?
22 A. Production supervisor.
23 Q. Did his duties change as well?
24 A. Somewhat.

34

1  Q. How did they change?
2  A. They were less.
3  Q. His salary went down as well?
4  A. Correct.
5  Q. How much? Do you know?
6  A. About 20 percent.
7  Q. Why were those changes made?
8  A. Because there were reorganizations within the company.
9  Q. When did that take place?
10 A. Probably May of 2004.
11 Q. Did he file a claim against Jannson? Do you know?
12 A. No.
13 Q. Do you know what knowledge he has of Laura Patrick's
14    situation?
15 A. No, I don't.
16 Q. Do you know why he was included as someone who might
17    have information concerning Laura Patrick's claim in
18    Jannson's answers to interrogatories?
19 A. It doesn't make sense to me why he would be named, other
20    than if Laura had talked to him.
21 Q. Did you participate in responding to Miss Patrick's
22    interrogatories in this case?
23        MR. PALMQUIST: Object to the form of the
24    question. There hasn't been any responses to

35

1  interrogatories.
2         MR. DEVER: Hold on one second. You might
3  have me there.
4         Do you want to go off the record for one
5  second?
6         MR. PALMQUIST: Yeah.
7         (Discussion off the record.)
8         MR. DEVER: Let's go back on the record.
9  Q. Mr. Rudy, did you participate in answering
10    interrogatories or written questions that have been
11    submitted to Jannson in the Commission Against
12    Discrimination action concerning Laura Patrick?
13 A. I can't answer that. Our attorney -- we've had a couple
14    of conversations about it. I don't know if he used what
15    I said in that.
16        MR. DEVER: Why don't we mark this.
17        (Exhibit No. 1 answers to complaint marked.)
18 Q. Mr. Rudy, I'm showing you what has been marked as
19    Exhibit 1 to your deposition. Have you ever seen --
20    take your time and look through that. When you're done,
21    if you could just look up.
22 A. It's going to take me a minute because I don't have my
23    glasses.
24        (Pause.)

36

1  A. Okay.
2  Q. Have you ever seen what's been marked as Exhibit 1 to
3     your deposition before?
4  A. I can't remember. It doesn't look glaringly familiar.
5  Q. Is there anyone else at Jannson besides you that's
6     responsible for handling issues that arise in this
7     lawsuit?
8  A. No.
9  Q. If you look at question three in Exhibit 1, which is,
10    Identify all persons who witnessed any of the acts or
11    communications alleged in the complaint filed by the
12    plaintiff in this matter.
13        There's an objection, and then there's an
14    answer, Subject to the foregoing objection, Pamela
15    Green, Paul Capasso, Arlene Osoff and Joel Rudy.
16        Did I read that correctly?
17 A. Yes.
18 Q. Is it your testimony that you don't know of any acts or
19    communications that Paul Capasso witnessed? Correct?
20 A. Correct.
21 Q. Do you know who at Jannson would have provided that
22    information if not you?
23 A. Possibly Arlene.
24 Q. And you didn't identify Brian Kling or Jannson did not

37

1   identify Brian Kling in this answer to interrogatory; is
2   that correct?
3   A. He wasn't at that location at that time.
4   Q. What does Brian Kling -- what facts or communications
5   did Brian Kling witness concerning Laura Patrick's
6   claims, if you know?
7   A. None.
8   Q. Why did you identify him to me a few minutes ago?
9   A. Being part of upper management at the consolidated
10  company, it's possible he may have looked at the file.
11  Q. Did you ever have any conversations with Mr. Kling about
12  this -- Laura Patrick's case?
13  A. I probably mentioned it to him.
14  Q. Do you remember the substance of any of your
15  conversations with Mr. Kling?
16  A. They were probably about just basic overviews of the
17  situation.
18  Q. Did Mr. Kling respond?
19  A. Not with any facts.
20  Q. How did he respond?
21  A. I don't remember.
22  Q. Did you give Mr. Kling anything in writing concerning
23  this case?
24  A. No.

38

1   Q. Have you ever received anything in writing from
2   Mr. Kling, either by e-mail or memo or anything like
3   that --
4   A. No.
5   Q. -- concerning this matter?
6   A. No.
7   Q. Aside from Pamela Green, Arlene Osoff, or yourself,
8   anyone else at Jannson that would know anything about
9   Miss Patrick's claim?
10  A. No.
11  Q. When you read through Exhibit 1, did any mistakes jump
12  out at you or anything that was incorrect?
13  A. Nothing jumped out at me.
14  Q. Do you know Sandra Dube?
15  A. Yes, I do.
16  Q. Who is Sandra Dube?
17  A. She was a marketing coordinator for Jannson.
18  Q. Has she left the company?
19  A. Yes, she has.
20  Q. When was that?
21  A. Sometime in the beginning of 2004.
22  Q. Did you ever have any conversations with Miss Dube about
23  Miss Patrick's case?
24  A. No.

39

1   Q. Never?
2   A. No.
3   Q. When was the last time you spoke with Miss Dube?
4   A. Probably her last day of employment.
5   Q. And between that time and December of 2001, you never
6   discussed Miss Patrick's case with Miss Dube?
7   A. No.
8   Q. Did you ever hear any complaints from anyone at Jannson
9   concerning Miss Oloff?
10  A. Miss Osoff?
11  Q. I'm sorry, Osoff.
12       MR. PALMQUIST: Objection. Vague.
13  A. No.
14  Q. Do you know if Jannson conducted an investigation of the
15  allegations Miss Patrick made?
16  A. No, we didn't.
17  Q. Did you ask Miss Osoff about the allegations?
18  A. Yes, I did.
19  Q. What did you ask her?
20       MR. PALMQUIST: Object to the form of the
21  question. Vague as to time.
22  A. I -- I can't specifically remember.
23  Q. Do you remember any conversation you had with Miss Osoff
24  about the claims Miss Patrick was making against

40

1   Jannson?
2       MR. PALMQUIST: Same objection.
3   A. I remember having numerous discussions with her as this
4   was happening. And after she left, after she walked
5   out --
6   Q. After Miss Patrick left?
7   A. Yes. But to tell you specifically what the conversation
8   was, I can just remember the basic overview of what we
9   discussed.
10  Q. When was the first time you became aware that Miss
11  Patrick was making these allegations against Jannson?
12       MR. PALMQUIST: Same objection as to time.
13  Q. I'm asking you for the time. When did that happen?
14  A. Probably the first time I saw a letter from her or her
15  attorney.
16  Q. And do you recall when that was?
17  A. Specifically, no, I don't.
18  Q. Generally?
19  A. It was maybe a month or two after she had left. It
20  wasn't a long period of time.
21  Q. When you saw that letter, when you read that letter,
22  what did you do?
23  A. I discussed it with Arlene.
24  Q. Where did that discussion take place?

41

1  A. Over the phone.

2  Q. Where were you physically?

3  A. Probably New Jersey.

    Q. And do you know where Miss Osoff was?

    A. Probably in her office.

6  Q. Had she faxed you the letter?

7  A. I don't know if she faxed me the letter or if I got a

8     copy of it.

9  Q. But when you had that conversation with Miss Osoff, you

10    had read the letter?

11  A. Yes.

12  Q. Did you ask Miss Osoff about the letter?

13  A. Yes, I did.

14  Q. What did you --

15  A. I asked her if the allegations that Laura had made were

16     accurate.

17  Q. And what did Miss Osoff say?

18  A. She said that the substance was quite -- of the

19     allegation was inaccurate and that she denied making

20     some of the statements that Miss Patrick accused her of

21     making.

22  Q. Did you go over each of the statements that had been

23     alleged?

24  A. I'm pretty sure we did.

42

1  Q. And did each one she deny making?

2  A. She either denied making them or told me they were out

3     of context.

4  Q. Do you recall Miss Patrick alleging that Miss Osoff had

5     stated that her reduced schedule would not work because

6     she would probably not be feeling well during her

7     pregnancy and would not be able to put in the necessary

8     time?

9  A. I'm sorry. Repeat that question.

10  Q. Do you recall discussing with Miss Osoff Miss Patrick's

11    allegation that Miss Osoff had said that Miss Patrick's

12    reduced schedule would not work because Miss Patrick

13    would probably not be feeling well during her pregnancy

14    and that Miss Patrick would not be able to put in the

15    necessary time at Jannson?

16          MR. PALMQUIST: Object to the form.

17  A. We discussed that.

18  Q. Is that something that Miss Osoff -- a statement that

19    Miss Osoff denied making or one that she said was taken

20    out of context?

21  A. Well, the fact that Miss Patrick was refusing to work

22    her previous schedule would make that a fact to me but

23    only based on what Laura had requested.

24  Q. So did Miss Osoff acknowledge making that statement?

43

1  A. No.

2  Q. Did she say it was taken out of context?

3  A. Most likely.

4  Q. Do you recall the allegation of Laura Patrick that Miss

5    Osoff said to Laura Patrick that Laura Patrick would not

6    be sure that she wanted to return to work after her

7    maternity leave until Miss Patrick had the baby?

8          MR. PALMQUIST: Object to the form. Go

9    ahead.

10  A. I believe she denied saying that.

11  Q. What about the allegation that Miss Osoff stated that

12    Miss Patrick would have to stay home with the baby when

13    the baby was ill?

14          MR. PALMQUIST: What's the question?

15  Q. Did Miss Osoff deny making that statement or say that it

16    was taken out of context?

17  A. She denied making that statement.

18  Q. What about the statement, Let's face it. It's a man's

19    world and the woman always stays home with the child?

20  A. She denied making that statement. Yeah, she denied

21    that.

22  Q. At some point did she acknowledge making it and say it

23    was taken out of context?

24  A. No.

44

1  Q. What about the statement that Miss Osoff made that

2    Jannson had already given Laura Patrick a gift in that

3    she had been given paid medical leave?

4          MR. PALMQUIST: Object to the form of the

5    question.

6  Q. Did she deny making that statement? Or did she say it

7    was taken out of context?

8  A. I believe she said that was taken out of context.

9  Q. And what about the allegation of Miss Patrick that Miss

10    Osoff questioned her, What happens if you have a

11    multiple birth?

12          MR. PALMQUIST: What's the question?

13  Q. Did Miss Osoff deny making that or say that it was taken

14    out of context?

15  A. She denied making it, as I recall.

16  Q. What about the allegation that Miss Osoff told Miss

17    Patrick that Miss Osoff would be hiring a designer to

18    work with Miss Patrick and that Miss Patrick would be

19    training her replacement?

20          MR. PALMQUIST: Object to the form of the

21    question.

22  Q. Did she deny making that statement? Or did she say it

23    was taken out of context?

24  A. I believe she made the statement that she was going to

45

1   hire another designer, but she denied making that
2   statement that it would be Laura's replacement.
3   Q. Had you and Miss Osoff discussed hiring another designer
4       prior to December of 2001?
5   A. It was a discussion that we had intermittently.
6   Q. When did you first have any discussions with Miss Osoff
7       about hiring another designer?
8   A. Probably a couple years before that.
9   Q. Was that to give Miss Patrick help in her duties?
10  A. Probably to some respect, yes.
11  Q. How many hours was Miss Patrick working, do you know,
12      before December of 2001?
13  A. We didn't keep track of the hours. I can't answer
14      that. And I wasn't physically there to see when she
15      came and went.
16  Q. Did Jannson have any recordkeeping system for tracking
17      the hours of employers?
18  A. Not -- yes, they did. Of hourly employees, not of
19      salaried employees.
20  Q. Were salaried employees responsible for keeping time
21      records themselves?
22  A. No.
23  Q. And nobody at Jannson kept time records of salaried
24      employees; is that fair to say?

46

1   A. That's fair to say, other than just casual observation.
2   Q. But for at least a couple of years before 2001, you and
3       Miss Osoff were considering hiring another designer to
4       help Miss Patrick; is that fair to say?
5   A. Not necessarily to help Miss Patrick, but we discussed
6       hiring another designer off and on depending on what
7       some of our marketing plans were.
8   Q. What would have been the reason for hiring another
9       designer?
10  A. Wanting to put out additional catalogs, wanting to go
11      into different product lines.
12  Q. Were there any catalogs or product lines that Jannson
13      wanted to put out that they couldn't because they didn't
14      have another designer?
15           MR. PALMQUIST: Object to the form of the
16      question. Speculative.
17  A. Yeah, at times. You know, it's a changing environment
18      all the time.
19  Q. So was there a reason why you didn't hire another
20      designer?
21  A. Primarily financial. And we didn't really find anybody
22      that we felt strongly about wanting to hire.
23  Q. Had you advertised for another designer before December
24      of 2001?

47

1   A. We didn't aggressively seek one. But if one had sort of
2       shown themselves, we would have considered hiring them.
3   Q. Do you recall ever talking to any potential designer
4       during this time frame?
5   A. Yes.
6   Q. When was that?
7   A. I don't recall when it was.
8   Q. But you think it was prior to December of 2001?
9   A. Absolutely.
10  Q. Do you recall the name of that person?
11  A. No, I don't.
12  Q. We've got this one person that presented themselves as a
13      potential designer that wasn't hired prior to December
14      of 2001. Anybody else?
15  A. We had discussions with people that came in in other
16      positions about potentially training to go into the
17      design department, but nobody materialized.
18  Q. When did those discussions take place?
19  A. Over the course of the previous couple of years.
20  Q. And those discussions were between you and Miss Osoff?
21  A. Yes.
22  Q. Back to your conversation with Miss Osoff after you
23      received a copy of Miss Patrick's claim letter.
24  A. Okay.

48

1   Q. Besides reviewing the statements that Miss Patrick
2       alleged Miss Osoff had made, did you talk to Miss Osoff
3       about any other aspect of the letter?
4   A. We discussed the entire situation numerous times. Miss
5       Osoff was quite distressed about the situation.
6   Q. Did she tell you why she was distressed?
7   A. She felt Laura had betrayed her trust.
8   Q. Did you ask Miss Osoff what Jannson's policy was --
9   A. No.
10  Q. -- concerning going to part-time work?
11  A. No, because I knew what it was.
12  Q. What was it?
13  A. It was if someone was going from salary to hourly, the
14      calculation was based on somewhere between -- assuming
15      they had worked between a 44- and 47-hour week. And we
16      divided their weekly salary by those hours and paid
17      accordingly based on if their basic job tasks weren't
18      going to change.
19  Q. Where did you go to find out what that policy was?
20  A. It wasn't a policy. It was a practice.
21  Q. Where did you go to find out what the practice was?
22  A. Nowhere. It's something I've been using for 20 years.
23  Q. Was that practice something that was exclusive to
24      Jannson? Or was it something that all of Taylor used?

49

1    A.  The only thing I can absolutely tell you is it was a
2         policy I always used and -- not a policy. It's a
3         practice I always used whenever the situation came up
4         with any companies I was involved with.
5    Q.  Did you use it at Celebrations?
6    A.  I'm not sure if the -- yes. Yes, I'm pretty sure that
7         it came up there. And I used it at Chase.
8    Q.  How often would it come up, generally speaking?
9              MR. PALMQUIST: Object to the form of the
10        question.
11   A.  I'm thinking it would probably come up about once a year
12        on average.
13   Q.  Did you ever clear your practice with anyone at Taylor
14        or discuss your practice with anyone at Taylor?
15   A.  I probably discussed it with my previous boss.
16   Q.  Who was that?
17   A.  John Schmidt.
18   Q.  What was John Schmidt's position?
19   A.  He was the president of the imprinting division.
20   Q.  Did he give you any feedback about your practice?
21   A.  No, because I probably learned the practice from him.
22   Q.  You probably learned the practice from him?
23   A.  Correct.
24   Q.  Do you recall him telling you that this was his

50

1         practice?
2    A.  Not in those words.
3    Q.  Did he ever show you a policy from Taylor laying out
4         this practice?
5    A.  Not that I recall.
6    Q.  To date, have you ever seen a policy of Taylor laying
7         out this practice?
8    A.  No.
9    Q.  And that's not at Jannson either?
10   A.  Correct.
11   Q.  Did you ever discuss any of the IRS or Massachusetts
12        Department of Revenue ramifications or potential
13        ramifications of your practice with anyone at Taylor or
14        Jannson?
15             MR. PALMQUIST: Object to the form of the
16        question. Vague.
17   A.  No.
18   Q.  Why did you use 44 or 47 hours a week in making the
19        determination as to what a salaried employee's hourly
20        rate would be if they went part time?
21   A.  Because generally when we move someone from hourly to
22        salaried, we would calculate their salary in that same
23        manner going the other way.
24   Q.  Was that a practice or policy of --

51

1    A.  It was a practice.
2    Q.  Was it your practice or Taylor's practice?
3    A.  It was a practice of both.
4    Q.  Was that a written policy or practice?
5    A.  Not specifically, but our salary proposal sheets
6         generally had that the expected hours of a salaried
7         person would be in that range.
8    Q.  What sheets were those that you just described?
9    A.  A salary proposal sheet.
10   Q.  Did you do a salary proposal sheet in connection with
11        Laura Patrick's request?
12   A.  No.
13   Q.  Why not?
14   A.  Because it wasn't going from hourly to salary. It was
15        going from salary to hourly.
16   Q.  So why would you use 44 to 47? What was that supposed
17        to be -- what was the theory behind it?
18   A.  The theory behind it is our expectation of a salaried
19        employee is to be available to solve problems that may
         come up outside of the normal working hours. So we
20        didn't want to put ourselves in a situation where a
21        person says, I only have to work 40 hours a week; that's
22        all that's expected of me.
23
24   Q.  So Laura Patrick, for example, when she was a salaried

52

1         employee, would have been expected to solve problems
2         that arose outside of normal working hours?
3    A.  Absolutely. And she did, according to her own
4         admission.
5    Q.  And that was going to change when she became an
6         hourly --
7    A.  According to what she was requesting it would.
8    Q.  What was your understanding of what she was requesting?
9    A.  She was requesting to only work four days a week,
10        Tuesday through Friday. She was not willing to work
11        Monday or Saturday regardless of the situation and, as I
12        recall, was requesting only working eight hours a day on
13        the days she worked.
14   Q.  Where did you get your understanding of what it was that
15        Miss Patrick was requesting?
16   A.  From Miss Osoff.
17   Q.  Did Miss Osoff show you any letter from Laura Patrick or
18        any written request?
19   A.  Yup. From what I understand, that was a verbal demand.
20   Q.  And you never spoke to Miss Patrick yourself?
21   A.  No, I didn't.
22   Q.  So all of the information as to what you understood Miss
23        Patrick wanted came from Miss Osoff?
24   A.  Correct.

53

1   Q. And Miss Osoff told you that she was not willing to work
2      beyond eight hours a day, four days a week?
3   A. I can't positively tell you of the eight hours. I can
       tell you that positively she refused to work other than
       Tuesday through Friday.
6   Q. And that would have been okay with you if she had agreed
7      to take the reduced hourly rate; correct?
8          MR. PALMQUIST: Object to the form of the
9      question. Go ahead.
10  A. Me personally, no. But with Arlene, yes. And I was
11     willing to go along with Arlene on that.
12  Q. What was Arlene going to do on Saturdays or Mondays or
13     after hours beyond the eight hours if she needed the
14     help of a designer?
15  A. She was going to have to do it herself.
16  Q. Did Arlene have any experience in design?
17  A. Very much so. She had trained Laura.
18  Q. In Jannson's employee handbook, I wouldn't find any
19     reference of the practice or policy that you just
20     described; correct?
21  A. Correct.
22  Q. Was overtime available? Would overtime have been
23     available to Miss Patrick?
24  A. Probably.

54

1   Q. Why do you say probably?
2   A. If she worked over 40 hours a week, she would have been
3      paid overtime if she had been an hourly employee.
4   Q. Why do you say only if she worked over 40 hours a week?
5   A. Our policy for paying overtime is based on 40 hours a
6      week.
7   Q. So if she worked her four eight-hour days and worked
8      only 32 hours, then she would have to work another eight
9      hours before she would be eligible for overtime pay?
10  A. Correct.
11  Q. Did you discuss Miss Patrick's overtime eligibility with
12     Miss Osoff?
13  A. There was no need to.
14  Q. Why not?
15  A. Our policy is to pay overtime over 40 hours.
16  Q. Even for employees that work less than 40 hours a week?
17  A. If they happen to work over 40 hours, they're paid
18     overtime.
19  Q. I'm sorry. You understand that Miss Patrick is going to
20     be working 32 hours a week; correct?
21  A. That's what she requested. Whether that would have been
22     the fact, I have no way of knowing.
23  Q. Was this ever discussed with Miss Osoff?
24  A. No.

55

1          MR. PALMQUIST: Object to the form of the
2      question. Was what ever discussed?
3   Q. Was overtime ever discussed with Miss Osoff?
4   A. No. There was no need to.
5   Q. As far as you were concerned there was no need to?
6          MR. PALMQUIST: Object to the form of the
7      question.
8   A. As far as anybody was concerned, there was nothing to
9      discuss.
10  Q. Well, the policy also says that only authorized people
11     can work overtime at Jannson; correct?
12  A. Yes.
13  Q. Was Miss Patrick authorized to work overtime at Jannson
14     if she had gone to the 32-hour a week schedule?
15         MR. PALMQUIST: Object to the form of the
16     question. Calls for speculation.
17  A. It would be handled on a situational basis.
18  Q. What does that mean?
19  A. If there was a project that needed to be done and Laura
20     was willing to stay there to do it and it was approved
21     by Arlene, she would have been paid overtime.
22  Q. So the authorization that's referred to in the handbook
23     only occurs on a case-by-case basis?
24  A. That's a fair interpretation.

56

1   Q. Is there anything in writing -- is there any form that
2      Jannson uses to authorize someone to work overtime?
3   A. Generally, the supervisors or managers sign off on the
4      pay sheets to approve the overtime.
5          No. Approval is the wrong word. To be aware
6      of the overtime. We follow the state guidelines for
7      paying overtime. So if someone works overtime and is
8      not authorized to do it, we pay it and then have a
9      discussion with them.
10  Q. Do you know how many employees at Jannson that were
11     offered the part-time work at a reduced hourly rate that
12     Miss Patrick was?
13         MR. PALMQUIST: Object to the form of the
14     question.
15         MR. DEVER: I object to it, too.
16  A. I know there were approximately four people that fell
17     into that category. Whether there were more requests
18     than that, I don't know.
19  Q. Who were those four people?
20  A. I don't recall their names. There was a Nicole Lee. I
21     don't recall offhand the names of the other people.
22  Q. Were they all women?
23  A. At Jannson I believe so.
24  Q. Were there other employees at someplace other than

57

Jannson that were offered the same --

A. There were other employees at Chase that went from salary to hourly, both male and female, that I was responsible for.

Q. What were their names?

A. I can remember three at Chase specifically. There was Dwayne LeClair, Eddie Wadsworth, and Diane Welch.

Q. Why did Dwayne LeClair seek to go from salary to hourly?

A. He didn't seek it. He requested it.

Q. Why did you do that?

A. Because we were changing his position.

Q. And it's your recollection that you used the exact same formula that you used with Miss Patrick?

A. A similar calculation.

Q. What was different about it?

A. I don't recall.

Q. What about Eddie Wadsworth?

A. It was the same situation as Dwayne. And we used approximately the same formula with him.

Q. Do you recall what was different about Eddie or what accounted for the difference?

A. The variation in any of these would have been based on the position they were going from and to and their responsibilities accordingly.

58

Q. So if their responsibilities changed --

A. If their responsibilities were less, we would take that calculation plus a calculation based on the reduced responsibilities.

Q. And if the responsibilities didn't change, there would be no change in the formula?

A. Correct.

Q. And that formula, again, is what?

A. Between 44 and 47 hours, dividing their salary by those two numbers, but somewhere between those two numbers.

Q. Why again is it 44 and 47, somewhere between 44 and 47? Where did that number come from?

        MR. PALMQUIST: Object to the form of the question. Asked and answered.

Q. You can still answer.

A. It was just the practice of our expectation of what people work when they are on salary.

Q. Those are really your expectations, though, because this was your practice --

A. Correct.

Q. -- not Taylor's or Jannson's; correct?

A. Correct.

        MR. PALMQUIST: Object to the form of the question. It misstates his testimony.

59

Q. How did you decide between 44 and 47?

A. It was a subjective decision.

Q. Do you recall what number you used with Miss Patrick?

        MR. PALMQUIST: Object to the form of the question. It misstates his testimony and assumes facts not in evidence.

A. I believe it was probably closer to 44.

Q. Why is that?

A. Because of Arlene's insistence -- Arlene's recommendation.

Q. Did Arlene tell you what her recommendation was based upon?

A. It would have been based on her very high opinion of Laura.

Q. At Jannson, there were no men --

A. I'm sorry.

Q. That's okay.

        MR. DEVER: We'll go off the record.
        (Discussion off the record.)
        MR. DEVER: We'll go back on the record.

Q. At Jannson it was only women -- aside from the two men that you identified, Dwayne and Eddie, and they were at Chase; correct?

A. Yes.

60

Q. At Jannson, there were only women that were affected by your practice; correct?

A. As far as my recollection goes, and you do need -- 80 percent of the employees at Jannson were women.

Q. They were no men that went from being a salaried employee to an hourly employee at Jannson; is that fair to say?

        MR. PALMQUIST: Object to the form of the question. Asked and answered.

A. Not that I recall.

Q. Ann Roscoe?

A. I know the name. I don't recall her specifically.

Q. Nicole Lee?

A. I remember Nicole.

Q. And she went from a salaried position to an hourly rate?

A. Yes, at her request.

Q. And what formula did you use to calculate how she would be paid?

        MR. PALMQUIST: Object to the form of the question. Lack of foundation. Assumes facts not in evidence.

A. I would have to assume it's the same as the 44 to 47 hours.

Q. And Wendy Canty?

61

1 · · MR. PALMQUIST: Is there a question?

2 Q. Do you not understand the question, Mr. Rudy?

3 A. What was the question?

· Q. Do you recall Wendy Canty?

A. I recall the name. I can't put a person with the name.

6 Q. Do you recall why Nicole Lee asked to go from a salaried

7   position to an hourly position?

8 A. I believe it was a day care situation.

9 Q. By the way, do you know, did Miss Lee ask to go to an

10   hourly position? Or did she just ask to reduce the

11   number of hours that she worked? Do you have any idea?

12 A. I don't have any idea.

13 Q. Wendy Canty, you don't know why she asked to work fewer

14   hours either?

15 A. No. Why she asked to work fewer hours?

16 Q. Yes.

17 A. No.

18 Q. What about Lucia McDougal?

19 A. It was a day care issue with Lucia.

20 Q. And it's fair to say that none of these people asked to

21   be paid less per hour than what they were making as

22   salaried employees; correct? They just wanted to work

23   less hours?

24 A. I don't know the answer to that.

62

1 MR. PALMQUIST: Object to the form of the

2   question.

3 Q. You don't know of any instance where an employee asked

4   to be paid a lesser amount, correct, rather than a

5   prorated amount?

6 A. I don't know that and would have a hard time believing

7   anyone would ever ask for less money.

8 Q. Mike Stewart, do you know who Mike Stewart is?

9 A. He went from hourly to salaried. And his compensation

10   would have been changed according to that formula.

11 Q. Now, except for Mr. Stewart, do you recall if Miss

12   Roscoe, Miss Lee, Miss Canty or Miss McDougal complained

13   about having to take a cut in hourly pay?

14 A. I recall there was some discussion of some of the people

15   not being terribly thrilled about it.

16 Q. Do you recall who those conversations took place with?

17 A. They would have taken place with Arlene, them and

18   Arlene.

19 Q. You never had any conversations yourself, though?

20 A. No one ever brought the issue to me directly.

21 Q. Did Miss Osoff tell you that people were complaining?

22 A. She told me that there were some people that weren't

23   happy about it, but in most cases they accepted it.

24 Q. Did she identify who those people were?

63

1 A. Probably, but I don't remember who they were.

2 Q. Earlier you testified that you were following the

3   Massachusetts standards as it relates to overtime?

4 A. Correct.

5 Q. Do you know what those standards are?

6 MR. PALMQUIST: Objection. Lack of

7   foundation.

8 A. Not off the top of my head.

9 Q. Did you consult with anyone at Jannson as to what those

10   requirements are?

11 A. No. We would have had — I would have had someone at

12   Taylor Corp or Taylor Corp would have notified me what

13   the policies are. That's part of their

14   responsibilities.

15 Q. How would that notification have taken place?

16 A. Fax, e-mail, letter, verbally on the phone.

17 Q. Do you have any letter in your possession that lays out

18   what the Massachusetts requirements are concerning

19   overtime?

20 A. No.

21 Q. So you think it probably came over the phone?

22 MR. PALMQUIST: Object to the form of the

23   question.

24 A. I can't answer that.

64

1 Q. You might have thrown it out, in other words, if it had

2   been faxed to you or sent to you?

3 A. It was probably — it probably would have been

4   correspondence with our human resource department that I

5   would have read and then given over to the human

6   resource department.

7 MR. DEVER: Let me mark this as the next

8   exhibit.

9 (Exhibit No. 2 memo marked.)

10 Q. I'm showing you what's been marked as Exhibit 2. Would

11   you read that.

12 A. No, I can't.

13 Q. I'm sorry.

14 A. I really can't.

15 MR. PALMQUIST: Can we go off and I'll read

16   it to him?

17 MR. DEVER: I'll read it to him.

18 A. I'm sorry. I can't see it.

19 Q. You're not alone with not being able to read without

20   your glasses. This is a memorandum with, "Jannson"

21   written at the top. It says, Memo to the file from

22   Arlene Asoff — I'm sorry, Osoff, to Pamela Green, Re:

23   Wendy on leave, March 6, 2000.

24 Wendy asked to speak to us again regarding

65

1   her status and salary review now that she has returned

2   from family leave. She said that she has spoken to

3   people as well as the Department of Labor, and she and

4   they did not think her salary adjustment as an hourly

5   employee was legal. She was told that she had requested

6   a change in job status, that the salary adjustment was

7   company policy for anyone returning from leave

8   requesting a similar adjustment to part-time status and

9   hours. She was told that if she wanted to return as a

10  full-time employee with the same overtime requirements

11  as every other salaried employee, she would receive the

12  same salary as she received prior to her leave.

13  A. Okay.

14          MR. DEVER: It's been marked as confidential.

15  I assume it's from Wendy's employment file.

16          MR. PALMQUIST: Can you mark this portion of

17  the deposition as confidential.

18  A. That would be something that I would have been aware of,

19  yes.

20  Q. Did you contact anyone at the Department of Labor or the

21  Massachusetts Department of Employment and Training to

22  discuss your practice?

23  A. I believe Arlene probably would have contacted somebody

24  at Taylor Corp.

66

1   Q. Not you, though?

2   A. No, I didn't.

3   Q. But you were aware of this issue?

4   A. Yeah.

5   Q. Was the issue ever resolved?

6   A. It was resolved in some way.

7   Q. Do you know how it was resolved?

8   A. No, I don't recall.

9   Q. Did you take the last tissue?

10  A. I think I did.

11          (Laughter.)

12  Q. Who would Miss Osoff have contacted at Taylor regarding

13  the legality of your practice?

14          MR. PALMQUIST: Object to the form of the

15  question. Lack of foundation.

16  A. I don't think she would have checked the legality of our

17  practice. I think we were pretty comfortable with our

18  practice.

19  Q. What was that level of comfort based upon, in your

20  mind?

21          MR. PALMQUIST: Object to the form of the

22  question.

23  A. It was based on our experience with the labor

24  department. It's also possible that Pamela Green would

67

1   have checked with the state about that to verify it.

2   Q. You didn't ask her to, though?

3   A. Not that I recall.

4   Q. And you don't know if Miss Osoff asked her to either;

5   correct?

6   A. No, I don't know that.

7   Q. Does Nicole Lee still work for Jannson?

8   A. No.

9   Q. What about Wendy Canty?

10  A. No.

11  Q. What about Lucia McDougal?

12  A. Yes.

13  Q. What about Mike Stewart?

14  A. No.

15  Q. And you don't know Ann Roscoe?

16  A. I don't recall Ann Roscoe. I'm sorry.

17  Q. Do you know if she's working for Jannson now?

18  A. No, she's not.

19  Q. Do you know why Nicole Lee left Jannson?

20  A. No.

21  Q. Do you know why Wendy Canty left Jannson?

22  A. No.

23  Q. Do you know why Mike Stewart left?

24  A. Yes. He left and moved to Japan -- or Korea, one of

68

1   those.

2   Q. Do you remember any discussion with either Miss Osoff or

3   Miss Green concerning Wendy Canty's complaint?

4   A. Not specifically, no.

5   Q. What do you mean "not specifically"?

6   A. No. I don't recall any particular conversation about

7   it.

8   Q. Do you recall the substance of her complaint?

9   A. I remember having a discussion with Arlene about it.

10  Q. But you don't remember what the substance of that

11  conversation was?

12  A. No, I don't.

13  Q. Did you keep any records of your conversations with Miss

14  Osoff concerning Miss Canty's complaint?

15  A. No.

16  Q. And did you discuss the substance of Miss Canty's

17  complaint with anyone above you at Taylor?

18  A. Not that I recall.

19  Q. Do you know what responsibilities Nicole Lee had when

20  she was at Jannson?

21          MR. PALMQUIST: Objection. Vague as to

22  time.

23  A. She was in charge of our commercial customer service

24  department.

69

Q. What about Wendy Canty's?  Same question.

A. Don't know.

Q. What about Lucia McDougal?  What are her rresponsibilities now?

A. She works in art and design and customer service or marketing and customer service.

Q. And was she employed by Jannson in December of 2001?

A. Yes.

Q. What were her responsibilities then?

A. Don't know.

Q. For Nicole Lee —

A. Yes.

Q. — did her job responsibilities change after she went — or after she became an hourly employee?

A. I don't know.

Q. What about Wendy Canty?  Do you know?

A. I don't know.

Q. What about Lucia McDougal?  Did her responsibilities change after she became an hourly employee?

A. Don't know.

THE WITNESS:  I'm just going to get a cup of water over here, if that's okay.

MR. DEVER:  You sure can.

MR. PALMQUIST:  Why don't we take a short

70

break.

MR. DEVER:  Sure.

(Recess.)

MR. DEVER:  Back on the record.

Q. Did Miss Osoff tell you that Laura Patrick had refused to work any more than the 32 hours a week that she was requesting?

MR. PALMQUIST:  Objection.  Asked and answered.

A. I don't recall the 32-hour part of it.  I do recall she would only work Tuesday through Friday.

Q. Did Miss Osoff tell you that Miss Patrick had refused to handle any emergency situations or things like that that may come up?

A. She told me Laura refused to be flexible on it, even if something came up.

Q. Did Miss Osoff tell you what she had asked Miss Patrick to do with regard to being flexible?

What was your understanding of what Miss Osoff wanted Miss Patrick to do?

MR. PALMQUIST:  Object to the form of the question.

A. Arlene was willing to work with Laura to let her do basically what she had demanded but was asking — had

71

mentioned at times if there was an extreme situation that would require some flexibility, was she willing to be flexible.  And Arlene told me that Laura was unwilling to be flexible about it, but Arlene was still willing to let her work the schedule she demanded.

Q. Do you have any notes concerning that conversation with Miss Osoff?

A. No, I don't.

Q. Did you take any notes at the time?

A. No.

Q. Did you ask Miss Osoff to put her proposal to Miss Patrick in writing?

A. It never got that far.

Q. Did you ever ask her to put her proposal to Miss Patrick in writing?

A. Don't recall.

MR. PALMQUIST:  Object to the form of the question.

Q. Do you know if Miss Osoff ever gave Miss Patrick a proposal in writing about what her job requirements would be?

A. No.  We didn't have job descriptions.

Q. Just again, there were no — were there any responsibilities that Miss Patrick was going to be

72

relieved of if she went to an hourly rate?

MR. PALMQUIST:  Object to the form of the question.  That she asked for?

A. As I recall, she insisted that she would be able to do the same job, even with her new schedule, so there would have been no need to have that.

Q. For all of the women that we discussed that went from salaried positions to hourly positions at Jannson, were all of their requests due to child care issues?

MR. PALMQUIST:  Object to the form of the question.  Lack of foundation.

A. I can't answer that.

Q. Well, let's go back to — I think you said Miss Roscoe.  Miss Roscoe you don't know; correct?

A. Correct.  I recall Nicole Lee.  It was a child care issue.

Q. The same with Wendy Canty?

A. And I believe for Wendy Canty.

Q. And for Lucia McDougal?

A. Yes.

Q. And, of course, Laura Patrick, her request was based on pregnancy, child care needs; correct?

MR. PALMQUIST:  Object to the form of the question.  Assumes facts not in evidence.

73

1  A. I can only assume so. I don't know for a fact.

2  Q. You didn't have any discussion with Miss Osoff as to why

3     Miss Patrick was requesting —

4  A. It was for health reasons.

   Q. And health reasons related to what?

6  A. Her pregnancy. And that's hearsay anyway.

7          MR. PALMQUIST: Wait for a question.

8          THE WITNESS: Sorry. Sorry.

9  Q. Do you know when Jannson first started advertising to

10    replace Miss Patrick?

11 A. We never did replace her.

12 Q. Do you know when Jannson first advertised seeking a

13    replacement designer for Miss Patrick?

14 A. I don't believe we did.

15 Q. Who does the design work at Jannson now?

16 A. Now, Sandy Riordan.

17 Q. Is it fair to say that she replaced Miss Patrick?

18 A. No.

19 Q. Why not?

20 A. She was a designer at Chase. And she added that

21    responsibility to what she was already doing.

22 Q. So Miss Riordan is now doing the work that Miss Patrick

23    had been doing?

24 A. Yes.

74

1  Q. But she came from Chase rather than from the outside?

2  A. Yes.

3  Q. And she's continuing to do her work at Chase?

4  A. Yes.

5  Q. Do you recall placing an advertisement for a designer —

6  A. No.

7  Q. — in the Boston Globe?

8  A. I don't recall.

9  Q. Is that something that Miss Osoff would have had the

10    authority to do on her own?

11 A. Yes.

12 Q. So if she placed an ad, that wouldn't surprise you?

13 A. No.

14 Q. Did she ever discuss with you placing an ad in the

15    Boston Globe?

16 A. I don't recall.

17 Q. When was the last time you spoke with Miss Patrick?

18 A. Yesterday.

19 Q. Yesterday? What did you talk about?

20 A. Her family, life in general.

21 Q. That was at her deposition; correct?

22 A. Yes.

23 Q. Prior to that, when was the last time you spoke to her?

24 A. Probably about a year ago.

75

1  Q. What were the circumstances or what was the substance of

2     that conversation?

3  A. I called her to see if she was willing to come to work

4     at Jannson Chase or work with us.

5  Q. You offered for her to come back to work?

6  A. Yes.

7  Q. What were the terms of your offer?

8  A. Never got that far.

9  Q. What did you say to her?

10 A. I asked her if she was willing to come back to work for

11    us.

12 Q. Were those your exact words?

13 A. Yes. I can't tell you as a fact those were my exact

14    words, but they were approximate.

15 Q. Was it to do freelance work?

16 A. That was an option.

17 Q. But you're saying you also offered for her to come back

18    in a salaried position?

19 A. No, I wasn't that specific. I asked her if she was

20    willing to come back to work for us.

21 Q. And you didn't get into whether or not it would be a

22    part-time position, a salaried position, or a freelance-

23    type position?

24 A. No. I thought it was important that the question get

76

1     answered first before we talked about details.

2  Q. So you never offered to reinstate her? You just offered

3     to explore employment opportunities with her?

4  A. Correct.

5  Q. And it could have been freelance; it could have been a

6     salaried position, and it could have been a part-time

7     position?

8  A. Those are all possibilities. Those were all

9     possibilities.

10 Q. But it's fair to say the conversation never got that

11    far?

12 A. Correct.

13 Q. What did Miss Patrick say?

14 A. She said she would have to think about it and she would

15    have to talk to her lawyer and she would call me back.

16    And she did.

17 Q. Did she say what she would have to think about? If

18    there were no terms of employment offered, did she say

19    what she was going to have to think about?

20 A. She told me she was going to think about whether she

21    would consider it.

22 Q. Okay. Had you spoken to anyone at Taylor concerning

23    bringing Miss Patrick back to work for Jannson?

24 A. No.

77

1  Q. It's something you did on your own?

2  A. Yes.

3  Q. Did you have any discussions with Pamela Green

   concerning Laura Patrick?

   A. I'm sure I have.

6  Q. When was the last time you spoke to Miss Green about

7     Miss Patrick?

8  A. Don't recall.

9  Q. A year ago? Two years ago?

10 A. I haven't a clue.

11 Q. What was Miss Green's position at Jannson?

12 A. At that time?

13 Q. Let's say in 2001, December 2001.

14 A. She was in charge of human resources, accounts

15    receivable, accounts payable, and purchasing.

16 Q. Who did she report to?

17 A. Arlene.

18 Q. At some point you learned that Laura Patrick had left

19    Jannson; correct?

20 A. Yes.

21 Q. In December of 2001?

22 A. Absolutely.

23 Q. What was your understanding of how she left?

24 A. That she stormed out.

78

1  Q. And who told you that?

2  A. Arlene.

3  Q. Did Miss Osoff tell you what she said to Miss Patrick

4     just before Miss Patrick supposedly stormed out?

5  A. They were discussing the pay proposal and her schedule,

6     and Laura refused to discuss what Arlene had proposed to

7     her.

8  Q. And, again, that proposal was not in writing, as far as

9     you know?

10 A. Correct.

11 Q. Did Arlene tell you what Laura said when she left?

12 A. I remember she told me that just previous to that Laura

13    asked if she wanted her to stick around to clean up some

14    loose ends. And Arlene said there was no need for her

15    to. But other than that, I don't remember any details

16    of the situation.

17 Q. Did Miss Osoff write a report as to this whole incident?

18 A. Oh, yeah.

19 Q. Where is that report?

20 A. I would assume it's in Laura's personnel file.

21 Q. Did she give you a copy of the report?

22 A. I'm pretty sure I read a copy of it, yeah.

23 Q. Did you keep a copy of it? Do you know?

24 A. Not other than her personnel file.

79

1  Q. So that written report and whatever Miss Osoff told you

2     would be the basis of your knowledge concerning Miss

3     Patrick's separation from Jannson?

4  A. That's correct.

5  Q. Did Miss Osoff tell you that Miss Patrick had quit?

6  A. Yes. And she -- I believe she told me that Laura was

7     going to send her resignation.

8  Q. Did Miss Patrick ever send a resignation letter?

9  A. No.

10 Q. Did you ask Miss Osoff if she had?

11 A. I don't remember.

12 Q. Do you know if Miss Patrick applied for unemployment

13    benefits?

14 A. I believe she did.

15 Q. Did Jannson object to her receiving unemployment

16    benefits?

17         MR. PALMQUIST: Object to the form of the

18    question.

19 A. I would assume so.

20 Q. Did you know that nobody from Jannson showed up for the

21    hearing on the --

22 A. Yes, I do know that.

23 Q. Why is that?

24 A. We chose to not show up.

80

1  Q. When you say "we" chose, who chose?

2  A. Arlene and I.

3  Q. Did you have a discussion with Arlene about not showing

4     up?

5  A. Yes.

6  Q. What did you say to Arlene?

7  A. I believe I told her to -- let's not make an issue out

8     of it. If she collects unemployment, she collects

9     unemployment. I didn't want to be a jerk.

10 Q. What did Arlene say?

11 A. Don't remember.

12 Q. You don't remember anything she said at that meeting?

13 A. I assume she didn't object because I would remember if

14    she did.

15 Q. Was this a face-to-face discussion you had with Arlene?

16 A. No.

17 Q. Was it over the telephone?

18 A. It would have been over the telephone.

19 Q. And you don't remember Arlene objecting to that and

20    saying, No, she quit; she's not entitled to unemployment

21    benefits?

22 A. She may have said that. But I think she agreed with me

23    that we wouldn't fight it.

24 Q. Did you have any discussions with Miss Osoff about how

81

1    Miss Patrick's separation from Jannson should be
2    recorded in the company records?
3    A. Don't remember. I don't believe I would have.
4    Q. Does Jannson have a form that its HR department uses
5    when someone leaves the company?
6    A. Yes.
7    Q. Did you talk with Miss Osoff about how that form should
8    be filled out?
9    A. Don't remember.
10   Q. Did Miss Osoff tell you how the form was going to be
11   filled out?
12   A. Don't remember.
13   Q. Whose responsibility was it to fill out the form?
14   A. It probably would have been Pamela Green's.
15   Q. And you never had any discussion with Pamela Green about
16   how the form should be filled out?
17   A. I don't remember.
18        MR. DEVER: If you can just give me two
19   minutes, I think we're very close to being done. I just
20   don't want to get in trouble with Theresa for not asking
21   all the questions.
22        (Pause.)
23   Q. We're going to be done very soon, Joel. Sorry.
24   A. I'm really sorry to hear that.

82

1    Q. Do you have an address for Pamela Green?
2    A. At work I do, yeah. She lives in Waltham.
3    Q. Paul Capasso, do you know where he lives?
4    A. You asked me that before. I think it's --
5    Q. Is it Wrentham?
6    A. Wrentham or right by there.
7    Q. What made you call Miss Patrick about a year after her
8    separation from Jannson?
9    A. We needed help with our design work.
10   Q. Did you hire somebody else?
11   A. No.
12   Q. Was it that there was more work than -- I'm sorry -- the
13   woman that worked for both Chase and Jannson could do?
14   A. Yes. And I was thinking about expanding some of our
15   marketing, if we would be able to hire another
16   designer.
17   Q. And that hasn't happened?
18   A. No, it hasn't.
19   Q. Miss Osoff wasn't bound by your practice concerning
20   part-time employment, correct, that she could have --
21   A. No.
22   Q. -- offered Miss Patrick whatever salary she wanted to?
23   A. No.
24   Q. That's not true?

83

1    A. That's not true.
2    Q. She was bound by your practice?
3    A. She was bound by my approval.
4    Q. Was that true for all employees at Jannson, that you had
5    final say as to what their salary was?
6    A. Essentially.
7    Q. Were there guidelines that were used by Taylor to help
8    you set those salaries?
9    A. Yes and no.
10   Q. What do you mean by yes and no?
11   A. There was -- we used a lot of our own discretion on what
12   we hired people at on an hourly basis.
13   Q. When you say "we," is that you as it relates to Jannson?
14   A. Yes.
15   Q. Or is it you and Arlene?
16   A. Me and Arlene. I gave her a little more leeway than I
17   would have given most people.
18   Q. So Arlene could have proposed any arrangement, but you
19   would have final approval over it?
20   A. Correct.
21   Q. Does Taylor have any written directions or policies
22   concerning salaries for its employees?
23   A. Yes.
24   Q. What are those called? Do you know?

84

1    A. We have hourly pay scales. And we have entry-level
2    supervisor salary guidelines.
3    Q. Any other job classifications that Taylor uses?
4    A. I'm not sure I understand the question.
5    Q. Does Taylor have a policy or a document where jobs are
6    classified and pay scales are associated with different
7    job classifications?
8    A. Yes, we did.
9    Q. Does that go beyond the entry-level supervisory salary
10   guidelines? Does it include all employees?
11   A. Most employees.
12   Q. Did you consult that when you were determining what to
13   do with Laura Patrick?
14   A. No, because she was so beyond any of our existing scales
15   that we wouldn't have consulted them.
16   Q. And you were comfortable that you had the authority to
17   not consult those, to use your own discretion in
18   conjunction with Arlene Osoff?
19   A. Correct.
20   Q. Once again, how would anyone at Jannson learn of your
21   practice as it relates to reducing their hours of work?
22        MR. PALMQUIST: Object to the form of the
23   question.
24   A. They would only learn about it if they had asked for --

85

1   they had been in a similar situation.
2          MR. DEVER: I think I'm done.
3          THE WITNESS: Hallelujah.
           MR. DEVER: Thank you, Mr. Rudy.
           You may not be done yet. Mr. Palmquist might
6   have some questions for you.
7          MR. PALMQUIST: I have no questions, and we
8   will read and sign.
9          MR. DEVER: Thank you.
10         (Whereupon the deposition concluded at
11  2:05 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24

86

1                   CERTIFICATE
2          I, JOEL RUDY, do hereby certify that I have
3   read the foregoing transcript of my testimony, and I
4   further certify under the pains and penalties of perjury
5   that said transcript is a true and accurate record of
6   said testimony.
7
8
9          Dated at _____, this day of
10  _____, 2005.
11
12
13         _____
14         JOEL RUDY
15
16
17
18
19
20
21
22
23
24

87

1                   CERTIFICATE
2   COMMONWEALTH OF MASSACHUSETTS )
3                   )  ss.
4   COUNTY OF MIDDLESEX      )
5          I, Deborah L. Nemetz, Registered
6   Professional Reporter and Notary Public within and for
7   the Commonwealth of Massachusetts, do hereby certify:
8          That JOEL RUDY, the witness whose
9   deposition is hereinbefore set forth, was duly
10  identified and sworn by me, and that the foregoing
11  transcript is a true record of the testimony given by
12  such witness.
13         I further certify that I am not related
14  to any of the parties in this matter by blood or
15  marriage, and that I am in no way interested in the
16  outcome of this matter.
17
18         IN WITNESS WHEREOF, I have hereunto set
19  my hand and seal this_____ day of _____, 2005.

21         _____
22              Notary Public
23  My Commission expires:
24  September 12, 2008