UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-CV-10427-RGS

*****************************************
LAURA PATRICK,                          *
        Plaintiff,                      *
                                        *
v.                                      *
                                        *
JANSSON CORPORATION,                    *
        Defendant.                      *
*****************************************

        DEPOSITION OF LAURA PATRICK, taken
pursuant to the applicable provisions of the
Federal Rules of Civil Procedure, before Susan L.
Prokopik, Registered Merit Reporter and Notary
Public in and for the Commonwealth of
Massachusetts, at the offices of Riley & Dever,
P.C., 210 Broadway, suite 201, Lynnfield,
Massachusetts, on Tuesday, January 25, 2005, at
10:04 a.m.

                KACZYNSKI REPORTING
        72 CHANDLER STREET, SUITE 3
        BOSTON, MASSACHUSETTS 02116

                (617) 426-6060

9090b848-634f-47eb-be47-55f4720ab753

Page 2

1  APPEARANCES:
2
   ON BEHALF OF THE PLAINTIFF:
3
   THERESA FINN DEVER, ESQ.
4  Riley & Dever, P.C.
   210 Broadway, suite 201
5  Lynnfield, MA 01940
   (781) 581-9880
6
7
   ON BEHALF OF THE DEFENDANT:
8
   DANIEL L. PALMQUIST, ESQ.
9  Leonard, Street and Deinard
   150 South Fifth Street, suite 2300
10 Minneapolis, MN 55402
   (612) 335-1500
11
12 ALSO PRESENT:
13    Joel Rudy
14
15
16
17
18
19
20
21
22
23
24

Page 3

1        INDEX
2
   EXAMINATION BY MR. PALMQUIST..............Page 4
3
4
5       EXHIBITS
6
   No.    Description          Page No.
7
   1  1/17/03 memo          93
8
   2  2/16/00 note          93
9
   3  6/23/01 note          93
10
   4  10/5/01 letter        93
11
   5  Salary Continuance Plan    93
12
   6  Response to Request for
13    Family Medical Leave        94
14 7  Charge of Discrimination    94
15 8  Complainant's Response to
      Respondents' Position Statement   94
16
   9  Complaint             94
17
   10 Plaintiff's Rule 26(A)
18    Disclosures           94
19 11 Jansson Information for Employees  94
20 12 Employee Acknowledgment      120
21
22       Transcript Marked
23    *** Page 9, line 17
24

Page 4

1             PROCEEDINGS
2                - - - - -
3             LAURA PATRICK
4   having been satisfactorily identified and duly
5   sworn by the Notary Public, was examined and
6   testified as follows:
7   EXAMINATION BY MR. PALMQUIST:
8   Q.  Miss Patrick, my name is Dan Palmquist and I
9       represent Jansson Corporation in this matter.
10      I'm here to ask you some questions about your
11      lawsuit.  You understand that?
12  A.  Yes.
13  Q.  Now, when you returned from your FMLA leave in
14      December of 2001, you told Arlene Osoff that you
15      wanted to cut back your hours from full-time to
16      32 hours per week, correct?
17  A.  No.
18  Q.  You told her you wanted to cut back your hours at
19      the plant; isn't that correct?
20  A.  Yes.
21  Q.  And Arlene Osoff told you that you would be
22      making approximately $22 or 22.50 an hour; is
23      that correct?
24  A.  Yes.  She did mention that.

Page 5

1   Q.  Okay.  She told you that you would make that
2       because you were moving from full-time to
3       whatever part-time arrangement you wanted; isn't
4       that correct?
5   A.  It wasn't considered part-time.  But because it
6       was not going to be five days, it was going to be
7       four days, she classified that as part-time.
8       Therefore, the change in the hourly rate.
9   Q.  Because you were moving from five days to four
10      days; is that correct?
11  A.  That's what she said, yes.
12  Q.  Now, Arlene Osoff didn't tell you your proposed
13      wage of 22 or 22.50 an hour would be that until
14      you told her you wanted to reduce your hours;
15      isn't that correct?
16  A.  I'm sorry.  Can you repeat the question?
17  Q.  Okay.  Arlene Osoff did not tell you that your
18      wage would be $22 an hour until you told her you
19      wanted to go from five days to four days a week;
20      is that correct?
21  A.  Yes.
22  Q.  Okay.  You are not claiming that she would have
23      proposed a reduced wage if you had not requested
24      a modified schedule, are you?

2  (Pages 2 to 5)

9090b848-634f-47eb-be47-55f4720ab753

Page 6

1  A. I'm not sure I quite understand what you're
2     saying. Just repeat that.
3  Q. Okay. Ms. Osoff proposed a $22 an hour wage
4     because you asked for a modified schedule, didn't
5     you?
6         MS. DEVER: Objection.
7         You can answer. I'm just stating an
8     objection.
9  A. Yes.
10 Q. Okay. She didn't say that she was paying you 22
11    — going to pay you $22 an hour because you're
12    female, did she?
13 A. No.
14 Q. She didn't propose that wage because you were
15    pregnant, did she?
16 A. No.
17 Q. Okay. She didn't propose that wage because you
18    took family and medical leave, did she?
19 A. No.
20 Q. Have you ever had your deposition taken before
21    today, Miss Patrick?
22 A. No.
23 Q. Do you understand the process and the purpose of
24    this deposition?

Page 7

1  A. Yes.
2  Q. I will be relying on you to give me complete and
3     thorough answers to my questions regarding your
4     allegations of discrimination. If you don't
5     understand a question, please ask me to repeat it
6     or rephrase it as you have already done.
7  A. Okay.
8         MS. DEVER: Could I state something?
9     When we start a deposition, we usually put some
10    stipulations on the record about objections. I
11    don't know if that's the practice in Minnesota
12    but --
13        MR. PALMQUIST: If you want to tell me
14    what the stipulations are.
15        MS. DEVER: Usually we would say that
16    the witness would have 30 days to review the
17    transcript once it is available to make any
18    corrections and to sign the transcript. And
19    usually we hold all objections except objections
20    as -- all objections as to form until the time of
21    trial except maybe objections as to privilege or
22    other such matters.
23        MR. PALMQUIST: Those two stipulations
24    are acceptable.

Page 8

1         MS. DEVER: Okay.
2         MR. PALMQUIST: And normal in Minnesota
3     as well.
4         MS. DEVER: Okay.
5  Q. It's very important that you answer verbally so
6     that the court reporter can record your
7     testimony.
8  A. Okay.
9  Q. If you please wait until I finish asking my
10    question until you start your answer, that will
11    help her in terms of transcribing everything that
12    happens here today. If you need a break at any
13    time, please let me know.
14        Are you taking any medication today?
15 A. No.
16 Q. Okay. How are you feeling today?
17 A. Fine.
18 Q. What did you do to prepare for today's
19    deposition?
20 A. I read through some notes that I wrote for my
21    lawyer.
22 Q. Do you have those notes with you?
23 A. Yes, I do.
24 Q. *** Can I see them, please?

Page 9

1         MS. DEVER: No. They're
2     attorney-client privileged. It was a letter she
3     wrote to me.
4         MR. PALMQUIST: She reviewed it to
5     refresh her recollection.
6         MS. DEVER: That doesn't -- I mean,
7     it's still attorney-client privilege.
8         MR. PALMQUIST: I'm afraid that the
9     rule is that if she used it to refresh her
10    recollection in preparation for the deposition
11    it's discoverable.
12        MS. DEVER: That's not the rule.
13        MR. PALMQUIST: You can mark that
14    portion of the deposition. We'll take that up at
15    another time.
16        MS. DEVER: Okay.
17        (*** Transcript marked.)
18 Q. Did you review anything else?
19 A. No.
20 Q. Did you meet with your attorney?
21 A. Yes.
22 Q. When did you meet?
23 A. Yesterday.
24 Q. How long did you meet with her?

3  (Pages 6 to 9)

9090b848-634f-47eb-be47-55f4720ab753

Page 10

1  A. An hour and a half.
2  Q. Did you talk with anyone else?
3  A. No.
4  Q. Who have you talked to about your lawsuit or your
5     charge of discrimination against the company
6     other than your attorney?
7  A. My husband.
8  Q. Anyone else?
9  A. No.
10 Q. Have you asked anyone if they would be a witness
11    for you in this case?
12 A. Define "witness."
13 Q. Have you asked anyone to testify or provide
14    testimony in this case?
15 A. Yes.
16 Q. Who?
17 A. I spoke with Anne Rascoe.
18 Q. Anyone else?
19 A. Wendy.
20 Q. Wendy Canty?
21 A. Yes.
22 Q. Anyone else?
23 A. No.
24 Q. Did you talk with Nicole Lee?

Page 11

1  A. No.
2  Q. Did you talk with Lucia McDougall?
3  A. No.
4  Q. Did you talk with Mike Stewart?
5  A. No.
6  Q. When did you speak with Anne Rascoe?
7  A. I don't know the exact date. I want to say maybe
8     two years ago.
9  Q. Did you speak with her by phone or in person?
10 A. By phone.
11 Q. Why did you call Anne Rascoe?
12 A. I called her because I believed her to have a
13    similar situation of mine and I wanted to get the
14    facts from her to make sure that my
15    interpretation of what I saw was correct before I
16    said anything to my lawyer.
17 Q. Did you speak with Anne before or after Mrs. Finn
18    Dever began representing you?
19 A. After.
20 Q. What did Ms. Rascoe tell you?
21 A. She told me that after she went out to have her
22    baby, she came back with reduced hours. And at
23    that time she was going to be taking reduced
24    responsibilities as well. And her pay scale was

Page 12

1     adjusted accordingly because of the change in her
2     responsibilities.
3  Q. What else did she say?
4  A. That pretty much was the gist of the
5     conversation. We talked personal about our
6     children and that pretty much was it. I did ask
7     her if she would be supportive of me if I was to
8     talk to the lawyer about her situation.
9  Q. What did she say to that?
10 A. She said she would.
11 Q. And by "supportive," what do you mean?
12 A. She would write a letter and talk to the lawyer
13    over the phone.
14 Q. Talk to Ms. Finn Dever?
15 A. Yes.
16 Q. Did she write a letter to your knowledge?
17 A. Not that I know of.
18 Q. Do you know whether your lawyer had any other
19    conversations with her?
20 A. I believe she made a phone contact.
21 Q. Do you know when that might have been?
22 A. I really don't recollect.
23 Q. Was it shortly after you talked with Ms. Rascoe?
24 A. Yes. Because after I talked to Anne, I told

Page 13

1     Theresa about that and she scheduled the phone
2     conversation or Anne might have reached her. I'm
3     not sure how that actually unfolded but it was
4     after that.
5  Q. Did Ms. Rascoe tell you she felt that she had
6     been treated unfairly?
7  A. Yes.
8  Q. What did she say about that?
9  A. She said that in many respects she was still
10    doing the same responsibilities. She was pretty
11    much doing the same job and she felt that that
12    was unfair that her pay be adjusted. She
13    understood that her pay would be adjusted for
14    coming back to her job doing less
15    responsibilities but she actually wasn't doing
16    less responsibilities. Therefore, felt that she
17    should be paid what she was originally paid when
18    -- before she left because that's the job she was
19    still doing.
20 Q. I'm sorry. Perhaps I asked this. Did she write
21    a letter?
22 A. Not to my knowledge.
23 Q. Do you remember anything else about your
24    conversation with Miss Rascoe?

4  (Pages 10 to 13)

9090b848-634f-47eb-be47-55f4720ab753

## Page 14

1   A. Not really, no.
2   Q. Other than that contact approximately two years
3      ago, have you spoken with her at all since then?
4   A. No.
5   Q. Has she contacted you at any time since then?
6   A. Just after that a Christmas card. Picture of her
7      daughter.
8   Q. When did you speak with Wendy Canty?
9   A. I believe I -- I think I spoke to Anne around
10     Christmastime a couple years ago and I spoke to
11     Wendy a couple months after that so it was early
12     in the following year.
13  Q. Would this be 2003?
14  A. Yes. I believe so. I'm not exactly sure of the
15     dates.
16  Q. Did you speak with Wendy by phone or in person?
17  A. By phone.
18  Q. Did you call her or did she call you?
19  A. I called her.
20  Q. Why did you call her?
21  A. I called her because I wanted to make sure before
22     I presented her name to my lawyer that my
23     impression of what I saw at work, I wanted to
24     make sure that I had my facts before I approached

## Page 15

1   the lawyer. Her situation being similar to Anne
2      Rascoe's.
3   Q. What was your impression of work or what had
4      happened at work?
5   A. My impression was that she went out to have her
6      child. She came back after her leave with
7      reduced hours and she was paid a different rate
8      for doing less responsibilities but it appeared
9      to me that she was doing the same job. Just
10     shorter hours.
11  Q. What did Miss Canty tell you?
12  A. She basically supported that observation.
13  Q. Can you be a little bit more specific about what
14     she said?
15  A. I believe she said that when she came back --
16     when she came back with her reduced hours, her
17     pay was cut and that she would be doing less
18     responsibility but in fact she was doing the same
19     responsibility. She was working in the same
20     office doing the same tasks.
21  Q. Did she tell you she felt she had been treated
22     unfairly?
23  A. She felt that that was not fair.
24  Q. What was Ms. Canty's job?

## Page 16

1   A. She worked in the office that the flow of human
2      resource tasks happened. The accounting, report
3      generation for different departments. It was an
4      administrative-type office for the entire
5      company.
6   Q. Do you know what her job description was?
7   A. No, I do not.
8   Q. Who was her supervisor?
9   A. I believe her direct supervisor was Pamela
10     Greene.
11  Q. Did Miss Canty tell you she ever complained about
12     this?
13  A. She told me that she was upset about it and that
14     she had talked to Pamela about it several times.
15     And I believe she also talked to Arlene about it.
16  Q. Was there ever any resolution of that?
17  A. I'm not aware if there was.
18  Q. Was Miss Canty still working at Jansson when you
19     had this conversation with her?
20  A. No.
21  Q. Did you ask Miss Canty to write a letter?
22  A. I asked her if she would support me if it came to
23     that. She said that she would be more than happy
24     to and that Nicole went through a similar

## Page 17

1   situation. That she would contact Nicole and
2      have Nicole contact me. And she said if I needed
3      a letter written or needed to talk to the lawyer,
4      she would be more than happy to do that.
5   Q. Do you know whether she did talk with your
6      lawyer?
7   A. That I don't remember. I think there might have
8      been a phone call, not a letter, but I think
9      there might have been a phone call but I'm not
10     really sure.
11  Q. You're not aware of any letter that she's written
12     on your behalf?
13  A. No.
14  Q. Do you know whether she contacted Nicole Lee?
15  A. She said that she left her a message and that
16     Nicole said she would be willing to talk with me
17     but it never materialized.
18  Q. So did you have two conversations with Wendy?
19     The first one where you asked her if she would
20     support you and then a subsequent conversation
21     when she told you she had left a message for
22     Nicole?
23  A. I -- yes, I believe we did because I connected
24     with her again and she told me she had left a

5 (Pages 14 to 17)

KACZYNSKI REPORTING

9090b848-634f-47eb-be47-55f4720ab753

## Page 18

1  message for Nicole. And then I said if she -- if
2  she was busy and we had a hard time connecting
3  with each other, I would give her the lawyer's
4  number directly and she could call the lawyer
5  directly. I said I just want to make sure before
6  she approaches the lawyer that in fact her
7  situation was similar.
8  Q. Do you know whether Nicole ever contacted your
9      attorney?
10 A. That I don't know. I don't remember.
11 Q. Do you know what Nicole Lee's job was at Jansson?
12 A. I believe -- she definitely worked in the
13     commercial division in the customer service
14     office. And I believe she managed and organized
15     the office.
16 Q. Have you had any conversations with Wendy Canty
17     since early 2003?
18 A. No.
19 Q. Have you had any other communications with her
20     since then?
21 A. No.
22 Q. Where does Anne Rascoe live?
23 A. I believe she lives in Lake Placid. I'm not
24     really sure. The last time I spoke to her,

## Page 19

1  that's where she lived.
2  Q. New York?
3  A. Yes.
4  Q. How about Wendy Canty? Do you know where she
5      lives?
6  A. No, I don't.
7  Q. Do you know where Nicole Lee lives?
8  A. No, I don't.
9  Q. Did you ever tape record any conversations or
10     discussion that you had with anyone at Jansson?
11 A. No.
12 Q. Did you ever tape record any other conversation
13     or discussion at Jansson that you were not a part
14     of?
15 A. I'm sorry? I'm not sure I -- no, I didn't.
16     Nothing that a recorder was ever involved in.
17 Q. Okay. Have you destroyed any documents related
18     to this case?
19 A. No.
20 Q. How do you claim that Jansson discriminated
21     against you on the basis of your sex?
22 A. When I approached Arlene about my pregnancy, the
23     conversation was completely centralized around my
24     pregnancy. And she had made a predetermined

## Page 20

1  decision that I would not be able to handle the
2  job while I was pregnant and would not be able to
3  handle the job when I returned from my pregnancy
4  because of scheduling when you have a child.
5  Q. Was this on December 3, 2001?
6  A. There was several conversations that took place
7      between the week of December 3rd and December
8      7th. It was probably -- it came up in every
9      discussion that we had throughout the week.
10 Q. And what do you claim that she did to
11     discriminate against you on the basis of your
12     sex?
13 A. She had predetermined that I would not be able to
14     do my job because I was pregnant.
15 Q. Did she fire you?
16 A. No. She asked me to leave. She didn't actually
17     say, You're fired.
18 Q. Well, now I'm a little confused. She did fire
19     you or she didn't fire you?
20 A. I guess it's how you define being fired.
21     Sometimes people come right out and say you're
22     fired and sometimes it's said indirectly. I
23     took it as being fired but I was asked to leave.
24 Q. What did she say that led you to believe that she

## Page 21

1  was asking you to leave?
2  A. During our last conversation on that Friday, she
3      -- we had discussed -- we had rehashed everything
4      all over again. And there were a few comments
5      that she made about me not being capable in doing
6      my job if I was pregnant and she was concerned
7      with fertility treatments that there can be
8      multiple births and what was I going to do if I
9      had more than one baby. And I said to her, Well,
10     you'll be happy to know that it's confirmed that
11     I'm only having one.
12         She got very angry with me. And we
13     exchanged a few personal comments. And she said,
14     Obviously you're very upset with me and we cannot
15     come to an understanding. And I said, Well,
16     maybe we can just come to an agreement that we
17     agree to disagree on this.
18         And she said that I wasn't allowing any
19     dialogue between the two of us and that I was
20     obviously very angry and that I should leave. It
21     was a very heated moment. She had slammed her
22     fist on the table. She had pointed her finger
23     directly in my face. She was obviously very
24     upset. It got me very upset that she was so

6 (Pages 18 to 21)

9090b848-634f-47eb-be47-55f4720ab753

Page 22

1   upset.
2         And the conversation truly wasn't
3   productive. It was turning counterproductive.
4   So when she asked me to leave, I thought that was
5   the best thing to do.
6         MS. DEVER: Is this an okay place? I
7   just need to use the ladies' room just for one
8   minute.
9         MR. PALMQUIST: That's fine.
10        (Recess.)
11  Q. The conversation you just described occurred on
12     December 7, 2001; is that correct?
13  A. Yes.
14  Q. I would like to back up to the beginning of that
15     week to December 3rd when you came back from your
16     family and medical leave.
17  A. Mm-hmm.
18  Q. Act leave.
19  A. Mm-hmm.
20  Q. What time did you get to work that day?
21  A. Usually I was in at eight. I don't really know
22     what time I got in that day.
23  Q. Was it --
24  A. Probably eight.

Page 23

1   Q. Close to when you usually do?
2   A. Yes.
3   Q. Was Arlene there?
4   A. I don't believe so.
5   Q. Now, when did you meet with Arlene on December
6      3rd when you came back?
7   A. Well, as soon as I knew she was in, I went and
8      said hi to her. And I told her that we had a lot
9      to plan and wanted to talk to her as soon as she
10     had a moment.
11  Q. Did you meet with her that day about what you
12     were going to plan?
13  A. Yes.
14  Q. And what did you mean by you "had a lot to plan"?
15  A. Well, my job was a project oriented job. And I
16     wanted to lay out projects that were going to be
17     completed for our usual deadline, which was in
18     May. The New York show. And then the production
19     of those -- they're catalogs -- after that. So I
20     wanted to get everything in place, scheduling how
21     it was going to plan through until my maternity
22     leave, how it would plan through my leave, my
23     maternity leave, and then what would be happening
24     when I returned.

Page 24

1   Q. When was your maternity leave planned for?
2   A. My scheduled -- my due date was the end of July
3      but because of my physical circumstances and my
4      high-risk pregnancy, my due date was shifted to
5      the middle of July. So I was kind of in a
6      fortunate situation in some respects because I
7      knew exactly the day that my child was going to
8      be born so I could schedule things quite
9      precisely.
10  Q. And you knew that on December 3rd?
11  A. I didn't know that exact date but I had a
12     ballpark because I had already been advised of
13     that.
14  Q. Now, other than talking about work-related
15     project oriented plans, did you talk to Arlene
16     about your schedule between your return and when
17     you were going to go on maternity leave?
18  A. Yes.
19  Q. What did you tell her about that?
20  A. I told her I wanted to condense my work week into
21     four days.
22  Q. What else did you tell her?
23  A. That pretty much was the base of the
24     conversation.

Page 25

1   Q. What did you mean by "condense your work week
2      into four days"?
3   A. Because I was considered to be a high-risk
4      pregnancy, I had asked my doctor if it was okay
5      for me to continue working. He said yes. And I
6      said, To what level? And he said, Be
7      responsible. Not to overdo it.
8         And understanding my position in the
9      flow of how the work moves through the company of
10     the jobs that I was responsible for, I thought
11     through the scheduling that it could be done --
12     that I could do it within four days. But part of
13     that with Arlene would be that I would be allowed
14     just to do one job. I was often pulled for other
15     consultations, meetings, that directly did not
16     apply to my job. They were more everyday
17     functional scheduling of the company itself that
18     it was not necessary for me to be involved in.
19  Q. Is that your opinion?
20  A. No. It's not my opinion.
21  Q. Was there a written job description that said
22     that you weren't supposed to do those particular
23     duties?
24  A. I didn't have a written job description.

7 (Pages 22 to 25)

9090b848-634f-47eb-be47-55f4720ab753

Page 26

1  Q. So there wasn't a description that said that
2     wasn't part of your job?
3  A. That's right.
4  Q. So you felt that these other tasks were not
5     related to your job; is that correct?
6  A. They were not design oriented.
7  Q. Out of curiosity, how many hours a week do you
8     think you averaged working before you went out on
9     FMLA leave?
10 A. Probably 50 to 55.
11 Q. And when you came back on December 3rd, you told
12    Arlene you wanted to work 32 hours a week; is
13    that correct?
14 A. Not 32.
15 Q. Four days a week?
16 A. Four days a week.
17 Q. Okay. Did you tell her that you were willing to
18    work ten- or 12-hour days on those four days?
19 A. I said they would probably average between eight
20    and ten hours a day because it's just the way the
21    day flowed.
22 Q. Did you tell Ms. Osoff that you wouldn't work on
23    Mondays?
24 A. I told her that was the day that I wanted to have

Page 27

1     off.
2  Q. And did you tell Miss Osoff you wouldn't work on
3     Saturdays as well?
4  A. I told her I wanted to step back from Saturdays
5     because -- for my first trimester and then if it
6     was absolutely necessary, I would be more than
7     happy to come in an extra day in February.
8     February, March, April, which is when the crunch
9     gets pretty tight and I may be needed for extra
10    hours.
11 Q. I think you testified just a little bit ago that
12    your doctor said that you could work but you
13    needed to be responsible. Is that your
14    testimony?
15 A. Mm-hmm. Yes.
16 Q. Did he tell you that you could only work four
17    days?
18 A. No.
19 Q. Did he give you any sort of restrictions on your
20    ability to work?
21 A. Just the normal. No heavy lifting, standing on
22    your feet too long. That type of thing.
23 Q. Did he give you any restrictions about the
24    scheduling of your job?

Page 28

1  A. No.
2  Q. How were you going to perform in 32 to 40 hours a
3     week the same job that you were performing 50 to
4     55 hours a week before your leave?
5  A. Because I would be doing my design projects and
6     overseeing the production of the design samples.
7     Everything that I ultimately was responsible for
8     I would be able to do within those 40 hours or
9     those four days. What I was asking, that I not
10    be pulled for these other tasks that were not
11    necessary.
12       There were other management staff
13    within the company that were directly more
14    involved with these projects anyways so therefore
15    it made more sense that they focus in on it as
16    opposed to bringing in another person.
17 Q. All right. Can you give me an example of the
18    kind of tasks you're talking about?
19 A. Yes. There was a department called a finishing
20    department, which I happened to have run for a
21    couple years.
22 Q. What about the finishing department was not part
23    of your job?
24 A. It was where the work flowed through daily. The

Page 29

1     assembly and scheduling of it. And in the early
2     stages, I always oversaw it through the
3     transition of me leaving it and me going strictly
4     into design. And we were having a lot of
5     difficulties within the entire plant with quality
6     control. They were trying to cut back hours to
7     keep the overtime down. Therefore, a lot of work
8     was being printed sloppy, assembled sloppy
9     because they were rushing to get things done
10    within a short amount of time because the company
11    was trying to cut down the overtime to keep it
12    more manageable on a financial level.
13 Q. How were you brought into the finishing
14    department before you went on your leave? What
15    kinds of projects?
16 A. Well, there were problems with some of the staff
17    that I was very familiar with them so I might be
18    asked to sit in on their review or sit in on a
19    problem that they were having that I might be
20    more familiar with. The department was kept
21    untidy and I would go in and offer them some
22    organizational ideas on how to keep it clean and
23    organized.
24       Whenever anything was kind of deviating

8 (Pages 26 to 29)

9090b848-634f-47eb-be47-55f4720ab753

Page 30

1  from its normal function of running efficiently,
2  Arlene would always ask me to step in and see if
3  I could troubleshoot and get it back on cue.
4  Q. Were there other tasks that you believe were not
5  part of your design job that you were not going
6  to do going forward?
7  A. Yes. I was for quite a few hours a day working
8  on a computer program that the company was
9  switching over to. When we were purchased from
10  -- when we were purchased by Taylor Corporation,
11  they had a base computer program that they used
12  for order entry, for scheduling -- not
13  scheduling. Report writing, that type of thing
14  so we were basically trying to take a round peg
15  and put it in a square peg.
16         It wasn't quite fitting and I was asked
17  to work with the individuals that were
18  coordinating the computer system to offer insight
19  as to how the finishing department ran and how to
20  apply their program to -- how to adapt their
21  program to our program.
22  Q. Who asked you to do that?
23  A. Arlene.
24  Q. Did you tell her that wasn't part of your job?

Page 31

1  A. I told her it was taking away from my design job.
2  Q. Who was responsible for assigning your work?
3  A. I ultimately was. Arlene oversaw it.
4  Q. Were there other tasks that you thought were not
5  part of your job?
6  A. Yes. At times I was asked to speak with customer
7  service on how to enter orders that would assist
8  production in understanding their entry.
9  Q. Are there other tasks?
10  A. No. I was asked to sit in on management meetings
11  but that I felt was indirectly a part of my job
12  anyways.
13  Q. So that particular task you were willing to keep
14  doing?
15  A. Right. Because I understood the benefits of me
16  being a part of that.
17  Q. Okay. So we talked about the finishing
18  department, the computer program and speaking
19  with customer service regarding orders as tasks
20  that you thought were outside your job
21  description and were things that you were not
22  going to do going forward. Is that correct?
23  A. I said -- I never said that I would not do them.
24  I just said that they were time eaters and they

Page 32

1  kept me from keeping the design work on schedule
2  and that there were other individuals within the
3  company that were perfectly capable of doing the
4  same thing.
5  Q. Was that your decision to decide who did what at
6  the plant?
7  A. No. It wasn't my decision. Unless it was design
8  related. Then it was my decision.
9  Q. But overseen by Arlene?
10  A. Yes.
11  Q. Now, Arlene agreed to give you Mondays off,
12  didn't she?
13  A. Yes, she did.
14  Q. And she agreed to let Saturdays drop off for a
15  while, didn't she?
16  A. Yes, she did.
17  Q. And she agreed that it might be possible to
18  perform your job on those four days a week; isn't
19  that right?
20  A. Yes, she did.
21  Q. But you weren't happy with the pay; is that
22  correct?
23  A. Well, she was saying to me that my hourly rate
24  was being adjusted because I wouldn't be doing

Page 33

1  the same job. She said I would not be -- that my
2  responsibilities were going to change. I didn't
3  quite understand this because when I came back, I
4  had all plans to do my job. I wasn't asking to
5  step down from my position. And she said in essence
6  essence coming back and cutting -- what she
7  considered cutting back my hours or cutting back
8  my days, in essence I was stepping down from my
9  position and that she was going to hire another
10  designer and that I would be training my
11  replacement.
12  Q. Well, in fact, your responsibilities by your own
13  suggestion were going to be changed, weren't
14  they?
15  A. Not as a design development manager. As a design
16  development manager, I would still be designing
17  projects and I would still be coordinating their
18  production. I would still be participating in
19  the New York show. I would still be doing my
20  job.
21  Q. Okay. But not your job insofar as it related to
22  the finishing department, computer programs or
23  speaking with customer service, correct?
24  A. I would be more than happy to do those but as I

Page 34

1    said before, they're time eaters and that it was
2    not necessary for me to be involved in that
3    aspect. That there were other people that were
4    more capable of doing it. So if I was strictly
5    allowed to do my design development management
6    position, which is what my title was, then I
7    would be able to do it within that time frame.
8    Q. The job you were proposing was different from the
9    job that you were performing before you went out
10   on leave; isn't that right?
11   A. I was asking Arlene to look at my job more
12   closely and see that I was involved in areas that
13   were not necessary for me to be involved in.
14        MR. PALMQUIST: Could you repeat the
15   question, please?
16        (Question read.)
17   A. That was what we were discussing. My job was
18   never clearly defined as to what it was.
19   Q. Well, that's not exactly my question. My
20   question is, you had a job before you went on
21   leave --
22   A. Mm-hmm.
23   Q. -- that encompassed certain responsibilities that
24   you did, correct?

Page 35

1    A. Mm-hmm. Yes.
2    Q. And when you came back from leave, you were
3    proposing a different job that didn't include
4    some of the responsibilities you had before you
5    went out on leave; isn't that correct?
6    A. I was still doing the design development
7    management job, which is what my job was. The
8    other jobs or tasks that I was involved in were
9    things that I was asked for Arlene to just sit in
10   and help out another department with.
11   Q. Did you ever tell Arlene you wouldn't do those
12   things?
13   A. No, I didn't.
14   Q. Why did you do them if they weren't part of your
15   job?
16   A. Because that's the type of person I am. I'm more
17   than happy to help out whenever I can and when
18   I'm asked.
19   Q. Did you ever tell Arlene before your leave that
20   these other duties were not part of your job?
21   A. No. It was never discussed.
22   Q. Before the leave, did you think that, Gosh, I'm
23   doing a lot of duties that are really not part of
24   my job?

Page 36

1    A. No. The only thing I stressed to Arlene was that
2    it was very dangerous to run a company of this
3    level on just one designer. Arlene was planning
4    to retire. She had no set date. But she was
5    planning to retire. And she was sort of training
6    other individuals to pass the baton. And all of
7    us understood that indirectly.
8        I said to her it was very dangerous to
9    run a company of that level with just one
10   designer and that she really should be a design
11   team. Therefore, I felt it would strongly help
12   the company if we started to develop another
13   individual to work with me as an assistant.
14        I proposed this to her several years
15   ago because the more she left me alone to work on
16   the design projects because she trusted me and I
17   was doing a good job, the more involved she was
18   in the GM responsibilities. She didn't have to
19   collaborate as much with me on design.
20        So in realizing the flow, I had
21   discussed with her several times that I thought
22   we should start to develop a design team so just
23   in case if anything happened to anybody, if
24   anything happened to her, something happened to

Page 37

1    me, there would always be another individual
2    there to be able to keep the flow going until the
3    other person returned.
4    Q. Before you worked in the design position, who did
5    the design work at Jansson?
6    A. Arlene.
7    Q. And when you were out on leave, who did the
8    design work at Jansson?
9    A. It pretty much was put on hold until I came back.
10   I had set it up so that nothing really needed to
11   be done. The only thing that needed to be done
12   was the production of a catalog that was already
13   designed. There was another individual that
14   worked there that took care of coordinating the
15   production.
16   Q. Who was that?
17   A. Her name was Laura Kelly.
18   Q. So for the six weeks that you were out on that
19   family and medical leave or however long it was,
20   there was simply no design professional there?
21   A. Arlene was there if anything needed to be done.
22   But I had set it up so that that project was all
23   -- was in control. And the two projects I had to
24   work on when I got back, I had done a lot of

10 (Pages 34 to 37)

9090b848-634f-47eb-be47-55f4720ab753

Page 38

1    preliminary work and had left them in a filing
2    cabinet. I went over all of it with Arlene just
3    in case she needed to step into it for any
4    reason.
5  Q. Isn't it true that Arlene was perfectly capable
6    of doing all the design work while you were out
7    on leave?
8  A. She is very capable of doing any design work but
9    there wasn't any design work that needed to be
10   done when I was out.
11 Q. And how do you know that?
12 A. Because I coordinate the department. It's what I
13   do so I had set it up so that everything was in
14   its place before I left and had a meeting with
15   Arlene about that before I left.
16 Q. Just a moment.
17       Did you also tell Arlene when you came
18   back on December 3, 2001 that you wouldn't work
19   any overtime?
20 A. Define "overtime."
21 Q. More than 40 hours a week.
22 A. Yes.
23 Q. Did you also tell Ms. Osoff that you were not
24   prepared to continue your employment with Jansson

Page 39

1    if Jansson did not accede to or agree to these
2    demands that you were making?
3  A. Can you repeat that, please?
4  Q. Did you tell Arlene that you were not prepared to
5    continue your employment with Jansson if Jansson
6    did not allow you to cut back to four days a
7    week, not work Mondays, not work Saturdays, and
8    not work any overtime?
9  A. No.
10 Q. In other words, if Arlene had not agreed to any
11   of your demands, you would have stayed employed?
12 A. If she would not agree to any of my --
13 Q. Correct.
14 A. I never thought of that.
15 Q. Let's talk about the wage that Arlene proposed to
16   you. What is your basis for claiming that she
17   should have paid you $25 an hour?
18 A. If I'm understanding what you're asking me
19   correctly, if she was considering my four days to
20   be less than 40 hours, which she labeled
21   part-time, or I would become an hourly employee,
22   I said, That's fine. If for some reason I worked
23   38 hours, I understand you are only going to pay
24   me for 38 hours.

Page 40

1        So I don't understand -- I do not know
2    where she came up with the number but our numbers
3    didn't jibe. And my calculation was that you
4    take my yearly salary and calculate it to an
5    hourly rate and then only pay me that rate for
6    the hours that I work. So if there was a week
7    that I only worked 38 hours or 37 hours or 39
8    hours, then you would only pay me for those hours
9    with the calculation of my base pay.
10 Q. What was that calculation?
11 A. It was approximately $25 an hour.
12 Q. And did you get that by taking your annual salary
13   and dividing by 2,080?
14 A. I'm not sure how I did it. I think what I did
15   was I took -- divided it by 52 weeks and then
16   divided it by hours.
17 Q. Okay. And 52 weeks, 40 hours a week?
18 A. Yes.
19 Q. So 52 times 40 I think is 2,080?
20 A. I don't know. I'm not a mathematician.
21       MS. DEVER: There is a calculator right
22   there.
23 A. You can do the math. I don't know. It may work
24   out to be the same.

Page 41

1  Q. What did Arlene tell you when you told her that
2    you expected to be paid $25 an hour?
3  A. She said that's not the company policy.
4  Q. What was the company policy according to Arlene?
5  A. According to Arlene, the company policy was when
6    you work non -- when you're a nonsalary
7    individual, hourly salary individual, she brought
8    to my attention that when you work salary, from
9    what I understand there is a certain amount of
10   hours that's built in for overtime, which I
11   believe when she does her calculations, maybe
12   those hours are taken away. I'm not really sure
13   how she did the math.
14 Q. Can you remember with any specificity what
15   exactly Arlene said was the company policy?
16       MS. DEVER: Objection.
17 A. She said that when you came back -- I'm sorry.
18   I'm going to answer it the same way because I'm
19   not sure if I'm maybe not answering it correctly
20   but she said to me that when you are an hourly
21   employee, you get a different rate because they
22   take out the overtime. I don't know what that
23   means.
24       I never knew that that's how -- I

11 (Pages 38 to 41)

KACZYNSKI REPORTING

9090b848-634f-47eb-be47-55f4720ab753

Page 42

1  thought I was getting paid $25 an hour because I
2  was worth -- I was a valued employee at $25 an
3  hour. And it was just a professional
4  understanding that at times you're going to work
5  extra hours but you're not paid for them. It's
6  -- that was just to -- that was my understanding.
7  Q. How did you respond to Arlene when she told you
8  that about the hours that are built in for
9  overtime in the salary?
10 A. I told her, first of all, I didn't know that that
11    was a policy. A policy. And that was the
12    policy. And that why should I be paid less for
13    doing the same job?
14 Q. What did Arlene say to that?
15 A. She said that all hourly employees that come from
16    salaried pay are adjusted the same way.
17 Q. Did you have any reason to doubt her at that
18    time?
19 A. I'm not sure I understand what you're asking.
20 Q. Did you think she was making that up?
21 A. No. I thought --
22 Q. Do you think she was making it up now?
23 A. Well, there's nothing in the handbook that
24    applies to it so I'm not sure where the

Page 43

1  calculation comes from. If it was policy, I went
2  and looked in the book to make sure that I might
3  have missed something.
4  Q. Well, how much an employee gets paid isn't
5    necessarily going to be in the handbook, is it?
6  A. Not how much they're paid but a guideline for
7    adjusting I would assume from salary to an hourly
8    person or however they name it or however it's
9    titled. I would assume that something like that
10   -- even if Arlene was to say, Well, it's policy,
11   I would expect a policy to be in the book
12   applying to that statement.
13 Q. Why would you expect that?
14 A. Because it's a policy. All policies were in the
15   handbook.
16 Q. Do you think Arlene was treating you differently
17   from other employees that moved from salary to
18   hourly?
19 A. I don't know.
20 Q. Do you believe that now?
21         MS. DEVER: Objection.
22 A. I'm not sure really what you're asking me. I'm
23   not sure what you're asking.
24 Q. Well, do you think that Arlene singled you out

Page 44

1  when you asked her for a reduced schedule or a
2  different schedule and applied this policy of
3  moving from salary to hourly?
4  A. Well, it's not my business of other employees. I
5    don't know what actually went on with other
6    employees. But if she is sitting across the desk
7    telling me it's a company policy and it's done
8    with everybody, she is my supervisor. I would
9    tend to believe that that was so.
10 Q. Now, you said you had several conversations with
11   Arlene the week of December 3rd to December 7,
12   2001; is that correct?
13 A. Yes.
14 Q. And we talked I think about what happened maybe
15   on Monday, the day you came back. Is that what
16   we've talked about so far or have these sort of
17   melded together here?
18         MS. DEVER: Objection.
19 Q. I'm just asking.
20 A. Most of the conversations were taking place on
21   Monday and Friday.
22 Q. Do you remember any conversations Tuesday,
23   Wednesday or Thursday?
24 A. I do remember that there was very little exchange

Page 45

1  between us like Wednesday, Thursday. I think we
2  talked again on Tuesday about the same thing. It
3  was pretty quiet between the two of us Wednesday
4  and Thursday.
5  Q. How did the conversation end on Monday?
6  A. I believe she said that we'll talk more about it
7    later.
8  Q. Did she tell you she had to consult with anybody?
9  A. Not that I'm aware of.
10 Q. Well, let's now move to the Friday conversation
11   then. What time did you meet with Arlene on
12   Friday?
13 A. I believe it was mid-morning.
14 Q. Where did you meet with her?
15 A. In her office.
16 Q. Was there anyone else present?
17 A. No.
18 Q. How did the conversation begin?
19         Withdraw that. What did you say?
20 A. We talked more about the salary or the hourly
21   rate.
22 Q. What did you tell Arlene about the salary and the
23   hourly rate?
24 A. I told her that I did not think it was fair for

12 (Pages 42 to 45)

9090b848-634f-47eb-be47-55f4720ab753

1    me to be paid less money for doing the same job.
2    Q.  What else did you say?
3    A.  Well, we talked a lot about the job as far as me
4        being pregnant and not being able to do it.
5    Q.  That's what you said?
6    A.  No.  That's what she said.
7    Q.  I'm asking you what you said at that meeting.
8    A.  What I said.  All of my responses were -- most of
9        what I said was in response to her comments that
10       she made to me.
11   Q.  You don't remember anything specific other than
12       responding to Arlene that you said at that
13       meeting?
14   A.  No.
15   Q.  Now, Arlene told you that you could not work
16       Mondays, correct?
17   A.  She said she would agree to not working -- for me
18       not to be there on Mondays.
19   Q.  Okay.  And she agreed to the four day a week
20       schedule?
21   A.  Yes.
22   Q.  And she agreed to leaving Saturdays off?
23   A.  For the first trimester.
24   Q.  Which is what you asked for?

1    A.  Yes.
2    Q.  And she agreed to no overtime, correct?
3    A.  For the first trimester.
4    Q.  Which is what you asked for, correct?
5    A.  Yes.
6    Q.  But she didn't agree with you on the wage; is
7        that correct?
8    A.  That's correct.
9    Q.  And what was your response to that?
10   A.  That I didn't understand why I had to take a cut
11       in pay for doing the same job.
12   Q.  Didn't you tell her that you were going to quit
13       because of that?
14   A.  No.  I told her that we needed to come to some
15       kind of agreement.
16   Q.  What did you mean by that?
17   A.  Which means we need to discuss this further.
18   Q.  Wasn't she telling you the decision had been
19       made?
20   A.  She didn't actually come out and say that the
21       decision had been made.
22   Q.  She told you what you were going to make, didn't
23       she?
24   A.  Yes.  She calculated the numbers and gave them to

1    me.
2    Q.  And you didn't agree with them?
3    A.  No, I did not.
4    Q.  What was there to discuss?
5    A.  Because at that point she was telling me that I
6        wouldn't be doing the same job.  That I would be
7        training my replacement and I would be stepping
8        down from my position.
9    Q.  What was your response to that?
10   A.  I said that that's not what I planned -- I said,
11       Because I'm pregnant and coming back to work to
12       do my job, I don't understand why I have to step
13       down from that.  And she said it was because I
14       would not be able to do the job being pregnant.
15       It was something she had predetermined and that's
16       what we were discussing mostly that day.
17   Q.  Well, let's talk about that.  Why do you say that
18       her decision was predetermined?
19   A.  She said that I may be unwell during my pregnancy
20       and may not be able to work.  She was concerned
21       about my possibility of having multiple births.
22       She was concerned that after the baby was born I
23       wouldn't be able to make that decision now about
24       coming back until I held the baby in my arms.

1        She said, What's going to happen when the baby
2        gets sick?  She said, you know, It's a man's
3        world.  The woman stays home with the baby.
4        You're not going to be able to come in.  What are
5        you going to do about day care?  That type of
6        thing.
7    Q.  Well, let's take each of those.  You first said
8        that she said you may be unwell.  Was that during
9        your pregnancy or after the baby was born?
10   A.  During my pregnancy.
11   Q.  What was your response to Arlene when she said
12       that?
13   A.  That that couldn't be determined.
14   Q.  How did Arlene respond to that?
15   A.  I don't remember.
16   Q.  Do you claim that that comment was
17       discriminatory?
18   A.  Yes.
19   Q.  Why?
20   A.  Because I felt basically she was telling me that
21       because I was pregnant I wouldn't be able to do
22       my job.
23   Q.  Are there any other facts that lead you to
24       believe that that comment was discriminatory?

13 (Pages 46 to 49)

9090b848-634f-47eb-be47-55f4720ab753

## Page 50

1  A. No.

2  Q. You said Arlene also asked you about the

3     possibility of multiple births. What exactly did

4     she say?

5  A. She said, What are you going to do if you have

6     more than one baby?

7  Q. All right. How did you respond to that?

8  A. I said, You would be happy to know that it's

9     already been confirmed. I'm only having one.

10 Q. What did Arlene say to that?

11 A. She slammed her fist on the desk and said, How

12    dare you speak to me so sarcastically?

13 Q. Was your response sarcastic?

14 A. I apologized to her for sounding curt. But I

15    said, You're taking this conversation to a place

16    that it doesn't need to be.

17 Q. How did you respond to that?

18 A. How did she respond to that?

19 Q. I'm sorry. How did she respond to that?

20 A. She pointed her finger at me and raised her voice

21    saying that I was being ungrateful.

22 Q. Were those her words?

23 A. I believe she said that I was not appreciative of

24    the gift she had given me.

## Page 51

1  Q. What was she referring to?

2  A. I asked her that because I did not know what she

3     was referring to. And she said she was referring

4     to my paid leave. Then I said to her that I was

5     not aware that that was a gift. I thought that

6     that was a company benefit that was -- that I was

7     entitled to as an employee for Jansson and that I

8     filled out all the proper paperwork for that

9     leave and that I do not consider that a gift.

10 Q. What leads you to believe that Ms. Osoff's

11    comment about the possibility of multiple births

12    was discriminatory?

13 A. Because I felt it had nothing to do with what we

14    were talking about. We were talking about my

15    job, not about how being pregnant with more than

16    one child might affect my job.

17 Q. But in fairness, you were talking about

18    scheduling of your job, weren't you?

19 A. Yes.

20 Q. You also said Ms. Osoff made a comment that you

21    could not make a decision about coming back until

22    you had had your baby. What did she say?

23 A. She said that. Exactly that.

24 Q. Okay. And what was your response to that?

## Page 52

1  A. I said that my intention was to come back

2     full-time and pick up my position and do what I

3     always did.

4  Q. Are we talking -- are these comments

5     chronological that we're talking about? I mean,

6     did that -- may be unwell comment was the first

7     one and the possibility of multiple births was

8     the second comment she said?

9  A. I don't know exactly when they happened.

10        MR. PALMQUIST: I'm sorry. Could you

11    read back the question just to me? Question and

12    answer.

13        (Question and answer read.)

14        MS. DEVER: Before you continue, could

15    I use -- I need another bathroom break. I

16    apologize. I'm drinking water because of my

17    cold. We can go off the record.

18        MR. PALMQUIST: I'll hold on to that

19    question.

20        (Recess.)

21 Q. Did Arlene respond?

22 A. I believe -- no. I don't know if she did.

23 Q. The next thing you said Arlene told you was,

24    What's going to happen -- what did she say?

## Page 53

1  A. I'm not sure I understand what you --

2  Q. Yeah. My notes are incomplete.

3  A. Okay.

4  Q. Hold on a second.

5        "What's going to happen if you need to

6     stay home with the baby when he or she is ill?"

7        Is that correct?

8  A. Yes.

9  Q. What was your response to that?

10 A. I told her it pretty much was irrelevant to what

11    we were discussing. She said, Well, let's face

12    it. It's a man's world. The woman always stays

13    home with the child.

14 Q. And what was your response?

15 A. I told her that that was really personal. That

16    really wasn't any of her business, but I said,

17    You know that my husband works an opposite

18    schedule of me and we're actually in a unique

19    position that we would be able to coordinate.

20 Q. How did Arlene respond?

21 A. I don't remember.

22 Q. What leads you to believe that Arlene's comment

23    was discriminatory?

24 A. Because I felt that she kept focusing on the

14 (Pages 50 to 53)

Page 54

1  pregnancy and how it was going to affect the way
2  I worked or the possibility of not being able to
3  come to work because I was going to be sick. And
4  I just felt that all of these comments may have
5  some relevance but it wasn't what we were talking
6  about.
7       I said anything was possible but all we
8  can plan on is what we know.
9  Q. Whether or not you returned from your maternity
10  leave was important for scheduling who was going
11  to do your job, wasn't it?
12  A. Yes.
13  Q. And whether or not there was coverage in the
14  designer position if you were home with your baby
15  was a legitimate question about scheduling,
16  wasn't it?
17  A. I'm not -- can you repeat that?
18  Q. Figuring out the coverage for the designer
19  position in your absence was a legitimate thing
20  for Arlene to be looking at, wasn't it?
21  A. Right. That's what we were trying to discuss.
22  Q. Now, Ms. Osoff also told you that she would be
23  hiring a designer to work with you; isn't that
24  right?

Page 55

1  A. Yes. And that was my replacement. Or what she
2  said was going to be my replacement. Those were
3  her words.
4  Q. Now, didn't you suggest to Arlene that she hire
5  somebody to work with you?
6  A. Yes. Work with me. But not to replace me.
7  Q. Do you remember any other comments that Arlene
8  made to you during this conversation on December
9  7?
10  A. In response to the comment that I just made, she
11  said, Why should I pay another salary for another
12  designer? Because if you didn't get pregnant,
13  there was no need for me to hire another designer
14  because you would be the designer.
15  Q. All right. I would like you to tell me exactly
16  what you remember Miss Osoff saying about that.
17  What exactly did she say?
18  A. I think that's somewhat exactly what she said.
19  She said, Do you expect me to pay an additional
20  salary plus your own for another designer?
21  Essentially she said, If you didn't get pregnant,
22  I was not planning to hire another designer
23  because you would be the designer.
24  Q. Well, that's where I'm a little confused. You

Page 56

1  said essentially she said that. Did she say
2  that?
3  A. Yes. She did say that.
4  Q. "If you didn't get pregnant, I wouldn't have to
5  hire a new designer?"
6  A. Right.
7  Q. Had she hired a new designer at that point?
8  A. No.
9  Q. Is it possible that she said that because you
10  were going to work a reduced schedule going
11  forward?
12  A. She wasn't -- from what I understood is that she
13  wasn't hiring this designer as an assistant. She
14  was hiring this designer for me to train to
15  replace me. She actually said in essence, You
16  would be retraining your replacement.
17  Q. To do the job that you were doing before you were
18  on your leave?
19       MS. DEVER: Objection.
20  A. To do the design development manager job.
21  Q. Okay. Are there any other comments that you
22  recall Ms. Osoff making on December 7th?
23  A. Not at this time.
24  Q. Before December 7, 2001, did Miss Osoff ever make

Page 57

1  any comments to you that you feel were
2  discriminatory?
3  A. Yes. Because when I first came back on the 3rd
4  is when the initial conversation started. Some
5  of these comments were made and then also
6  repeated at other times when we had other
7  conversations during that week.
8  Q. Well, what comments do you recall her making on
9  December 3rd?
10  A. I don't know exactly. I do know that the first
11  initial comment came up about not being able to
12  work when I was pregnant. Or I might be out when
13  I was pregnant. I might be sick when I was
14  pregnant.
15  Q. What was it? Might not be able to work or might
16  be out while you were pregnant?
17  A. I'm using "might be out" and "might not be able
18  to work" in the same context. Same meaning.
19  Q. Okay. You might not be able to work because you
20  would be out?
21  A. Exactly.
22  Q. Got you. And you think she made that comment on
23  December 3rd as well?
24  A. Yes.

KACZYNSKI REPORTING

9090b848-634f-47eb-be47-55f4720ab753

Page 58

1 Q. Any of these other comments that we've been
2   talking about did she make on December 3rd?
3 A. Yes.
4 Q. Which ones?
5 A. The one about if the baby was sick, I would have
6   to stay home with the baby. Didn't know if I
7   would be able to work afterwards until I held the
8   baby in my arms. I just remember her saying
9   that.
10 Q. All right. Before December 3, 2001, did Arlene
11   make any comments to you that you believe were
12   discriminatory?
13 A. No.
14 Q. Before December 3, 2001, did Arlene do anything
15   that leads you to believe that she was
16   discriminating against you on the basis of your
17   sex?
18 A. No.
19 Q. Before December 3, 2001, did Arlene make any
20   comments that leads you to believe that she was
21   discriminating against you on the basis of your
22   pregnancy?
23 A. No.
24 Q. Before December 3, 2001, did Arlene do anything

Page 59

1   that leads you to believe that she was
2   discriminating against you on the basis of your
3   pregnancy?
4 A. No.
5 Q. Have you identified all of the comments that you
6   allege Ms. Osoff made to you that week of
7   December 3rd to December 7, 2001?
8 A. I believe so.
9 Q. When did you start work at Jansson?
10 A. August of '94.
11 Q. What was your position?
12 A. Customer service.
13 Q. What did you do as a customer service
14   representative?
15 A. It was mostly customer contact. Answering
16   questions over the phone. Writing orders.
17 Q. How long did you have that position?
18 A. Just under a year.
19 Q. Then what was your position?
20 A. I was the finishing manager.
21 Q. Was that a promotion?
22 A. Yes.
23 Q. Who promoted you?
24 A. Arlene.

Page 60

1 Q. What were your duties as finishing manager?
2 A. You oversaw the daily scheduling of the finishing
3   department.
4 Q. Did you supervise people?
5 A. Yes.
6 Q. Had you had supervisory experience before that?
7 A. Yes.
8 Q. At Jansson?
9 A. No.
10 Q. How many people did you supervise?
11 A. Oh, I want to say approximately ten. Maybe more.
12 Q. This promotion occurred in roughly August of '95?
13 A. I have no idea really. I don't remember.
14 Q. But you think you did your customer service job
15   for about a year?
16 A. Yeah. It wasn't very long.
17 Q. How long were you the finishing manager?
18 A. A couple years.
19 Q. What was your next position at Jansson?
20 A. Design development manager.
21 Q. When did you take over that job?
22 A. I believe that was in '98. I'm not exactly sure.
23 Q. Was that a job that you went from finishing
24   manager to design development manager or was

Page 61

1   there a transition period?
2 A. Um, there was a small transition because I was
3   training the person that was going to be running
4   finishing. And because I knew finishing so well
5   and was very successful at running it
6   efficiently, Arlene wanted me to continue
7   overseeing it so I kind of juggled both jobs but
8   the design job itself was something that I did
9   when I was in customer service.
10     Arlene was training me and involved me
11   in design during customer service, during
12   finishing, and then when the actual transition
13   went through is when they actually carved out an
14   office for me, which is where I worked.
15 Q. Was the move from finishing manager to design
16   development manager a promotion?
17 A. Yes.
18 Q. Did you receive an increase in pay?
19 A. Yes.
20 Q. Who promoted you?
21 A. Arlene.
22 Q. Had you had design experience before you took
23   this job?
24 A. Yes.

16 (Pages 58 to 61)

9090b848-634f-47eb-be47-55f4720ab753

Page 62

1    Q. Where?
2    A. I had my own bridal design company.
3    Q. Any other experience in design?
4    A. Yes. That's actually what my degree is in.
5       Design.
6    Q. Where is your degree from?
7    A. Endicott College, Beverly.
8    Q. Was it in bridal design or was it in --
9    A. Clothing.
10   Q. Clothing design. Is that a four-year degree?
11   A. No. It is an Associate's.
12   Q. What were you designing for Jansson?
13   A. I'm sorry?
14   Q. What were you designing for Jansson?
15   A. Personalized invitations. Greeting cards.
16   Q. Anything else?
17   A. I worked with Arlene on like the design layout of
18      advertisements. She was working on the
19      possibility of designing some new product lines.
20   Q. Product lines other than personalized invitations
21      and greeting cards?
22   A. Yes.
23   Q. What other product lines?
24   A. Like notepad sets, that type of thing.

Page 63

1    Q. Did Arlene tell you why she was promoting you
2       from finishing manager to design development
3       manager?
4    A. Well, I know she thought I was extremely talented
5       and I was extremely efficient and organized. And
6       she wanted to train another individual to be able
7       to design so that she could take a back seat.
8    Q. Did she tell you those things?
9    A. Yes.
10   Q. How did you respond?
11   A. I was flattered.
12   Q. And did Arlene train you in the design
13      development position?
14   A. She didn't train me in the position but what she
15      did is train me to understand the Jansson
16      product so that we could keep the integrity of
17      the product and so I could properly design for
18      that type of product.
19   Q. Tell me a little bit more about that. What does
20      that mean, the integrity of the product?
21   A. It was a high-end company. It filled a niche
22      within the industry for certain style, I should
23      say. And it was kind of considered like a
24      Jansson look and she wanted to continue that look

Page 64

1    but also remain competitive in the market to some
2    of the trends that were coming up that she wanted
3    to keep a cutting edge on. I offered a fresh
4    eye.
5    Q. How did she train you in the product?
6    A. Just working with me.
7    Q. Did you work closely with her?
8    A. Yes.
9    Q. Did she continue to do some of the design duties
10      early on?
11   A. Early in my taking the position, yes.
12   Q. How long do you think it was between when you
13      started in that position and completely took over
14      the design duties?
15   A. I don't really recollect. I want to say maybe
16      about six months.
17   Q. Did you view that promotion as an opportunity?
18   A. Define "opportunity."
19   Q. Well, was it a good thing?
20   A. Yes, it was. A very good thing.
21   Q. Did you like working with Arlene at that time?
22   A. I always enjoyed working with Arlene.
23   Q. How would you describe your working relationship
24      with Arlene?

Page 65

1    A. Professional.
2    Q. Did you exchange personal confidences with Arlene
3       at any time you worked with her?
4    A. We did discuss my getting pregnant.
5    Q. What do you recall about that?
6    A. I wanted her to be aware of what I was going
7       through to get pregnant because I was going to be
8       needing to use vacation and sick time to take
9       time off. That I wasn't actually going to be
10      taking a scheduled vacation, that I would be
11      putting time -- that time aside for fertility
12      treatments. And I shared that personal part of
13      my life with her because I knew that it may
14      directly affect the scheduling of my job.
15   Q. When did you first start fertility treatments?
16   A. I want to say -- they wanted to start in '99 but
17      they could not because I had to have two surgical
18      procedures before they could start. So I started
19      in 2000, I believe.
20   Q. And did you take vacation and sick time for some
21      of those treatments?
22   A. Yes, I did.
23   Q. Did anyone ever object to you doing that?
24   A. No.

17 (Pages 62 to 65)

9090b848-634f-47eb-be47-55f4720ab753

Page 66

1   Q. When was the first time you went, you took time
2      off for fertility treatments?
3   A. I believe it was January of 2000.
4   Q. And did you take family and medical leave --
5   A. No.
6   Q. -- for that?
7   A. No.
8   Q. You just have to wait until I finish my question.
9   A. I'm sorry.
10  Q. How long did you take off in January of 2000?
11  A. I believe it might have been a week or three
12     days.
13  Q. Did you talk with Arlene about that at the time?
14  A. Yes.
15  Q. What was her response?
16  A. Just to let her know what days they were.
17  Q. Did she object?
18  A. No. She just asked that I had all my work in
19     order before I left, which I did.
20  Q. When is the next time you recall taking time off
21     for fertility treatments?
22  A. The following month. I was rushed to the
23     hospital with an abscess. That was unexpected.
24     I was in the hospital I believe for nine days,

Page 67

1      which resulted in a miscarriage. And I was out
2      for additional time after that.
3   Q. Was that Family and Medical Leave Act?
4   A. No.
5   Q. Did Arlene visit you in the hospital?
6   A. No.
7   Q. Did she object to the time that you took off for
8      this?
9   A. No.
10  Q. Do you claim that Jansson treated you
11     discriminatorily with regard to this leave?
12  A. No.
13  Q. What's the next time you recall taking time off
14     for fertility treatments?
15  A. June. I believe it was June.
16  Q. The same year?
17  A. Yes.
18  Q. So we're still in 2000?
19  A. Yes.
20  Q. And how long did you take off then?
21  A. Hold on a minute. That might not have been then.
22        I'm sorry. I have to go backwards
23     because it helps me remember it better. That all
24     happened in 2001. What happened in 2002 --

Page 68

1      January of 2002, I'm sorry, was a scheduled
2      surgery that I was out for a few weeks. I'm
3      sorry. I missed a year in there.
4   Q. Now, the last day of your employment was December
5      7, 2001?
6   A. Yes.
7   Q. And so these -- what you have been describing for
8      me, this all happened in 2001?
9   A. Yes. Yes. I took -- those three days I'm
10     talking about were in January.
11  Q. Okay.
12  A. Um -- it was in January. I had the abscess and
13     miscarriage in February.
14  Q. Mm-hmm.
15  A. And then I had another cycle in June.
16  Q. Okay. And how much time did you take off in
17     June?
18  A. Just a few days.
19  Q. Any objections from Jansson?
20  A. No.
21  Q. Did you have any conversations with Arlene about
22     that at the time?
23  A. Just normal scheduling and, you know, bring her
24     up to speed on what was going on before I left

Page 69

1      and she brought me up to speed with things when I
2      came back.
3   Q. Did you have any conversation with her about how
4      the treatments were going?
5   A. Yes. She always asked me how things were.
6   Q. And are you claiming that those comments were
7      discriminatory?
8   A. No.
9   Q. When was the next time you took off work for
10     fertility treatments?
11  A. October.
12  Q. And that was Family and Medical Leave Act leave,
13     correct?
14  A. Yes. Because she told me that that was available
15     to me because of a situation that had come up at
16     that particular time that I would have to be out.
17     I had to have an additional surgery that the
18     doctor wanted to team up with a fertility cycle
19     and I was going to have to take additional drugs
20     that I was going to be very uncomfortable with
21     and he recommended that I take the time off so he
22     filled out the proper paperwork that was needed
23     for that time off.
24  Q. And you took approximately six weeks off?

18 (Pages 66 to 69)

Page 70

1  A. It was mid October and I returned December 3rd so
2     yes.
3  Q. Did Arlene object or did Jansson object to your
4     taking this leave?
5  A. No.
6  Q. And Arlene had you apply for the salary
7     continuation during that leave as well; isn't
8     that correct?
9  A. That's a part of that benefit.
10 Q. Had you received that before?
11 A. No, because I was using vacation and sick time.
12 Q. You applied for salary continuation during that
13    leave, correct?
14 A. If that's what that -- that policy -- that
15    benefit was, if that's the name of it, that's --
16 Q. Okay.
17 A. I don't know the name of it so if that is the
18    name of it, I'm sorry.
19 Q. Fair enough.
20 A. That is what I filled out.
21 Q. You were paid for some portion of your leave?
22 A. Yes, I was. According to those guidelines.
23 Q. And it was not just vacation or sick time?
24 A. No. Because I had used previous vacation and

Page 71

1     sick time earlier in the year. And Arlene let me
2     know that that was available. She suggested it.
3  Q. Did Arlene object to your taking a leave in
4     October of 2001?
5  A. No.
6  Q. Did she know what procedures you were going to be
7     going through?
8  A. I explained to her why I needed that much time
9     off.
10 Q. From the time you started these treatments in
11    2001 until October, 2001, did you share with
12    Arlene how it was going?
13 A. If the conversation came up, yes.
14 Q. Did she ask?
15 A. Yes.
16 Q. Did that make you uncomfortable?
17 A. No. I took it as her caring about me.
18       MR. PALMQUIST: This might be a good
19    spot to stop for a break. Okay?
20       MS. DEVER: Sure.
21       (Lunch recess.)
22
23
24

Page 72

1            Afternoon Session
2  Q. I would like you to describe for me your job
3     history since you left Jansson.
4  A. Actual jobs worked or -- the process of looking
5     for?
6  Q. Both. Let's start with any jobs that you've had
7     since you left Jansson.
8  A. I worked for a company called Marsha
9     Incorporated.
10 Q. Sorry?
11 A. Marsha Incorporated.
12 Q. Marsha?
13 A. Yes.
14 Q. What did you do there?
15 A. I designed children's clothing.
16 Q. When did you get that job?
17 A. September of 2003.
18 Q. How long did you work there?
19 A. Until very early May, 2004.
20 Q. How much were you making there?
21 A. I started, I believe, at 15 and then was given an
22    increase to 18.
23 Q. Eighteen dollars an hour?
24 A. Yes.

Page 73

1  Q. Why did you leave there?
2  A. The company was trying to compete with China and
3     decided not to invest in going overseas and
4     closed the company down.
5  Q. So they shut down?
6  A. Yes. They closed.
7  Q. What was the next job you held?
8  A. None since then.
9  Q. Could you describe for me your job search efforts
10    beginning in December of 2001?
11 A. Yes. I aggressively worked with -- well, I used
12    kind of two sources. One was the paper and the
13    other was the Internet. Just aggressively sent
14    out applications.
15 Q. How many applications do you think you sent out?
16 A. A lot. Well, you know, maybe one or two a week.
17    Maybe might have had a good week where there were
18    three or four things and maybe the following week
19    there wasn't really quite anything. The week
20    after that you might send out two or three. So I
21    would probably say it might have averaged ten a
22    month.
23 Q. Ten a month from December, 2001 until you got
24    your job in September of 2003?

19 (Pages 70 to 73)

KACZYNSKI REPORTING

9090b848-634f-47eb-be47-55f4720ab753

1    A. Yes. Well, during the first couple months that I
2       had the baby, my search wasn't as aggressive.
3    Q. When was your baby born?
4    A. July 16, 2002.
5    Q. What kinds of jobs were you applying for?
6    A. Kind of a combination of things. Since my skills
7       were somewhat unique and specialized, there
8       weren't a lot of companies in this area that did
9       that type of work. So I started to apply my
10      skills in a more general way so, for example,
11      there was a chocolate company that was looking
12      for someone to design new chocolate products and
13      actually the job sounded pretty similar to the
14      job I did at Jansson so I would apply for
15      something like that.
16   Q. You were looking for design jobs?
17   A. Design, and then I started to look more into
18      administrative-type jobs. Because at that point
19      where there wasn't anything readily available for
20      design and I was starting to notice that I didn't
21      have the degree that they were looking for, I
22      started to look into different-type jobs that I
23      might be able to adapt my skills to.
24   Q. What kind of administrative jobs did you apply

1       for?
2    A. Um, mainly like within publications. Advertising
3       agencies.
4    Q. Did you have any interviews?
5    A. No.
6    Q. Did you place any limitations on your search?
7    A. I'm not sure I understand what you mean by
8       "limitations."
9    Q. Well, maybe you already testified to this but you
10      said you applied for some design jobs and some
11      administrative-type jobs.
12   A. Mm-hmm.
13   Q. Were there any other general categories of jobs
14      that you saw in the newspaper and said, I'm going
15      to apply for all these jobs?
16   A. I'm sorry. I'm not really sure --
17         MS. DEVER: Objection.
18   A. -- I understand what you mean. I want to answer
19      it correctly so I want to make sure I understand
20      what you mean.
21   Q. Yeah. Let me just rephrase that. Were there any
22      other categories of jobs that you applied for?
23   A. Besides design and administrative?
24   Q. Correct.

1    A. I don't believe so.
2    Q. Were you actively looking for employment between
3       December, 2001 and July 16, 2002 when you had
4       your baby?
5    A. Yes.
6    Q. And you said you were not as active after the
7       baby was born. When did that pick up again?
8    A. He was born mid July. I would say late
9       September. That same year.
10   Q. And in late September, you resumed at the same
11      level you were before you had your baby?
12   A. Yes. I made some adjustments. I had someone
13      look over my resume to see if there was something
14      that might -- that I could change that might make
15      it more appealing to actually get an interview.
16      I was starting to look at refining my resume so
17      that I could possibly -- maybe that was holding
18      me back from not getting a job or -- I started to
19      venture into possibilities of maybe why I wasn't
20      getting any bites.
21   Q. Did you go to an outplacement service?
22   A. No. I have a friend who is a recruiter. That's
23      her profession. And she sat down and helped me
24      work through my resume and rewrite it.

1    Q. Did you keep any kind of job log?
2    A. Yes. I have one I believe I kept for you.
3    Q. Did you keep a record of companies that you
4       applied to or contacted?
5    A. Yes.
6    Q. Is that the same log?
7    A. That is the log, yes.
8    Q. And you haven't worked since May of '04; is that
9       correct?
10   A. Correct.
11   Q. And you're still looking for a job at the same
12      level and with the same intensity that you were
13      between December, 2001 and when you got your job
14      in September of 2003?
15   A. Well, when I was laid off or when the company
16      closed, Marsha, Inc., closed and I was collecting
17      unemployment, I spoke to a career counselor there
18      and started to aggressively get involved with
19      some new programs that they had put in place.
20      Seminars for helping individuals that may want to
21      retrain for maybe a different type of job that
22      were thinking of making career changes.
23         So I started to get into that type of
24      thing. And in order to become more competitive

KACZYNSKI REPORTING

9090b848-634f-47eb-be47-55f4720ab753

1   in the marketplace, I needed to update some of my
2   skills. So they guided me through that process.
3   Q. What was the name of this career counselor?
4   A. It's -- I believe North Shore Career Center in
5   Salem.
6   Q. Did you pay a fee for this service?
7   A. No.
8   Q. Are you claiming that you suffered emotional
9   distress damages because of your employment at
10  Jansson?
11  A. Yes.
12  Q. What conduct do you claim caused you to suffer
13  emotional distress?
14  A. I'm sorry? What do you mean by "what conduct"?
15  Q. What caused you stress, distress?
16  A. Finance. Finances. The lack of.
17  Q. What did Jansson do to cause you distress
18  regarding your finances?
19  A. Not working with them anymore.
20  Q. Have you been to see a doctor, psychologist or
21  counselor about emotional distress issues you
22  claim to have suffered in connection with your
23  employment at Jansson?
24  A. No.

1   Q. I would like to get some more detail from you
2   regarding your claim of emotional distress or
3   mental anguish. Would you describe for me the
4   symptoms that you experienced -- let's start with
5   from December, 2001 until September, 2003 when
6   you started your new job?
7   A. I'm sorry. Can you rephrase --
8   Q. I would like for you to describe for me the
9   symptoms that you have experienced of emotional
10  distress.
11  A. From what dates?
12  Q. From December, 2001 to September of 2003.
13  A. Well, it was after December 7th that the
14  emotional distress started.
15  Q. How did it manifest itself? What did you
16  experience?
17  A. Well, when Arlene asked me to write a letter of
18  resignation, which was the final say of not being
19  employed by Jansson any longer, I was not
20  financially prepared to not have a job.
21  Q. Let's talk about that letter. When did she ask
22  you to write a letter of resignation?
23  A. That Friday, December 7th.
24  Q. What was your response?

1   A. At that time I said I would write one.
2   Q. And did you?
3   A. No, I did not.
4   Q. Why did she ask you to write a letter of
5   resignation?
6   A. Because when she asked me to leave and I got up
7   to leave, when I opened the door, she said, I
8   want you to write me a letter of resignation.
9   And I said, Fine. I'll take care of it over the
10  weekend.
11  Q. But you're claiming now that you didn't resign;
12  is that correct?
13  A. Well, when I thought about it over the weekend, I
14  felt that I wasn't resigning from my position. I
15  wanted to work my position.
16  Q. But you wanted to work your position at $25 an
17  hour; isn't that correct?
18  A. Yes.
19  Q. And you weren't going to work your position for
20  $22 an hour, were you?
21  A. Well, that was the disagreement that we were
22  trying to resolve.
23  Q. And from your perspective, there was no
24  resolution of that because Arlene didn't agree to

1   pay you $25 an hour, did she?
2   A. At that time, we weren't coming up with a new
3   agreement. We weren't resolving it.
4   Q. You walked out when she said you weren't going to
5   get paid $25 an hour. Isn't that true?
6       MS. DEVER: Objection.
7   A. I walked out when she asked me to leave.
8   Q. Isn't it true that she asked you to leave now as
9   opposed to working for two weeks after you had
10  given your two-week notice saying that it was
11  unnecessary for you to stay for the two weeks?
12  Isn't that correct?
13  A. She said it was unnecessary. I offered to help
14  if she needed it. When I was getting up to leave
15  on my way to the door, I said, If you need help,
16  if you would like me to stay for two weeks and
17  help -- or to the end of the month is I believe
18  what I said. I didn't say two weeks.
19      If you would like me to stay to the end
20  of the month and help through the transition, I
21  would be happy to do that.
22  Q. But the only transition is because you told her
23  you were submitting your resignation; isn't that
24  correct?

KACZYNSKI REPORTING

9090b848-634f-47eb-be47-55f4720ab753

Page 82

1  A. She said that after.
2  Q. But you agreed you were going to give her a
3     resignation notice, correct?
4  A. I did agree I would write one.
5  Q. Isn't it true Miss Osoff told you she didn't want
6     you to leave?
7  A. Yes. She did say that.
8  Q. Okay. Didn't she also tell you she didn't think
9     you wanted to leave either?
10 A. That's true.
11 Q. Isn't it true that you said that your demands
12    were not negotiable and that you were leaving on
13    December 7th?
14 A. No. I didn't say that.
15 Q. When Ms. Osoff told you that you could simply
16    leave and not come back, it was because she said
17    if you're really resigning, you can simply leave
18    and not come back; isn't that correct?
19 A. I'm not sure if it was said in those exact words.
20 Q. Something to that effect?
21 A. Yes.
22 Q. Now, Miss Osoff hadn't hired a replacement for
23    you at that time, had she?
24 A. No.

Page 83

1  Q. Was there a lot of work that was going to happen
2     between December 7th and the end of the year?
3  A. Yes. Because I was just returning from being out
4     for several weeks and there were two main
5     catalogs that needed to be somewhat established
6     before January.
7  Q. Before the end of the year?
8  A. Yes. Because after the Christmas rush the
9     pressroom was available and I wanted to expedite
10    the work so it could get within that time frame.
11 Q. But you knew Miss Osoff was fully capable of
12    performing those duties; isn't that correct?
13 A. Yes.
14 Q. Let's go back. We were talking about your
15    emotional distress damages or symptoms, I guess,
16    and what I would like to ask you in a little bit
17    more detail about is what kinds of physical
18    symptoms, if any, did you experience after you
19    left your employment in December of 2001.
20 A. Very high level of anxiety. Uncertainty. I was
21    pregnant. I was starting a family. I was
22    concerned for their security. I also felt a
23    tremendous loss. Jansson was a big part of my
24    life. It's where I was expecting to spend

Page 84

1     several years. And it was not there anymore.
2  Q. Any other symptoms that you experienced?
3  A. Because of the way the situation was handled, I
4     developed a level of insecurity.
5  Q. What do you mean by that?
6  A. I was an extremely dedicated employee and I
7     worked very hard for the company. I excelled in
8     my position. And I felt there was only a
9     one-sided loyalty there from me.
10 Q. Anything else?
11 A. No.
12 Q. Did you ever take any medication as a result of
13    your alleged mental anguish and emotional
14    distress?
15 A. I wasn't able to. I was pregnant.
16 Q. After you gave birth, did you take any
17    medication?
18 A. No.
19 Q. How long did these symptoms of anxiety,
20    insecurity, these things that you've been talking
21    about, how long did they last?
22 A. To this very day.
23 Q. Have you ever taken any medication for any other
24    psychological problem at any time?

Page 85

1  A. No.
2  Q. And I think I asked you this, but have you seen a
3     psychologist or counselor?
4        MS. DEVER: Objection.
5        You can answer.
6  A. No, I don't.
7  Q. You have not?
8  A. Yes. You asked that before. No, I have not.
9  Q. Sorry.
10 A. Sorry. I'm trying to follow you so --
11 Q. Okay. Where were you born?
12 A. Milton, Massachusetts.
13 Q. Okay. And where have you lived in your life?
14    You lived in the area your whole life?
15 A. Yes. In the Boston area. North of -- south of
16    the city and north of the city.
17 Q. I think we talked a little bit about your
18    educational background. You have an Associate's
19    degree in --
20 A. Yes.
21 Q. -- clothing design?
22 A. Yes.
23 Q. Did you graduate from high school on time?
24 A. Yes.

22 (Pages 82 to 85)

KACZYNSKI REPORTING

9090b848-634f-47eb-be47-55f4720ab753

Page 86

1  Q. You have siblings?
2  A. Yes.
3  Q. How many?
4  A. Seven. I had seven. Sorry.
5  Q. Any learning disabilities as a child?
6  A. No.
7  Q. Did you have a happy childhood?
8  A. Yes.
9  Q. Did you have many friends growing up?
10  A. Yes.
11  Q. Any health-related problems as a child?
12  A. No.
13  Q. Any mental health issues or problems as a child?
14  A. No.
15  Q. Any problems related to your parents?
16  A. No.
17  Q. I would like you to describe your job history.
18     Let's just start from when you got your
19     Associate's degree to Jansson.
20  A. My first job out of college was with Louis of
21     Boston. I went in as a salesperson. I was
22     having a hard time breaking into the design field
23     so I went into retail, which was part of my
24     major. I worked for them for six years.

Page 87

1  Q. Louis?
2  A. Louis of Boston. Louis Incorporated I believe it
3     is.
4  Q. Okay.
5  A. I worked for them for six years. After that, I
6     opened my own design company, which I worked for
7     -- I believe it was about ten years. And I
8     picked up additional work while I was running my
9     business.
10  Q. Describe for me what your design company was.
11  A. It was a custom bridal design shop. And brides
12     would come to me with ideas of what they wanted
13     their wedding gown to be. I would draw up a
14     draft, pattern, sew. It entailed a lot of tasks
15     that you have when you run your own company. The
16     financials. The promotional-type literature.
17  Q. Did you actually make the clothing, too?
18  A. Yes. In the beginning. And when I got too busy,
19     I eventually subcontracted the work to other
20     seamstresses.
21  Q. And you made a living at this for ten years?
22  A. Yes. For different periods throughout the ten
23     years, I worked for other companies on a
24     part-time basis for extra income.

Page 88

1  Q. Doing the same thing?
2  A. For one company, yes. And for another company, I
3     touched on my retail experience.
4  Q. Can you give me a range of the kinds of revenues
5     you were generating with your own business?
6  A. Not a whole lot. Small. Small business.
7  Q. More than 10,000 a year?
8  A. Yes. But --
9  Q. More than 50?
10  A. Under 50.
11  Q. Under 50.
12  A. Yes. It was very minimal.
13  Q. Okay. More than 20?
14  A. Yes. Probably. Let's put it this way. In the
15     good years. There was always that start-up
16     period, which I worked while I was starting it
17     up. And there were a few years that this did
18     pretty good. I just drew a very small paycheck
19     because I pretty much put the money back into the
20     company.
21  Q. What do you think your best year was? Forty?
22  A. It's been a long time. I don't really remember.
23  Q. Okay. Fair enough.
24  A. I really don't.

Page 89

1  Q. I'm just trying to put bookends on it. That's
2     fine.
3  A. I'm sorry. I really don't.
4  Q. All right. You said you did your design company
5     for ten years supplemented by various other
6     part-time employment; is that correct?
7  A. Yes.
8  Q. And does that lead us up to Jansson?
9  A. Yes.
10  Q. Why did you leave Louis?
11  A. I think that was more design-related. I wanted
12     to establish more of my design degree as opposed
13     to the retail.
14  Q. You left voluntarily?
15  A. Yes.
16  Q. Why did you decide to leave your design company
17     to go to work for Jansson?
18  A. I think it came to a turning point where I was in
19     the middle of writing a small business loan for
20     funding to open up an actual bridal shop, which
21     would generate more revenue and become a more
22     permanent situation but there was a lot of talk
23     in the area that there was a large discount
24     bridal shop coming into the area. And a lot of

23  (Pages 86 to 89)

9090b848-634f-47eb-be47-55f4720ab753

1  bridal shops were already going under because of
2  it.
3      Because the process of me writing the
4  loan and working with the small business
5  consultant, you know, was a process of about a
6  year and in that meantime, the shop had come in
7  and a couple of bridal shops had already gone
8  out. And I felt it was too much of a risk and I
9  didn't want to take that type of financial risk.
10 Q. Did you submit the SBA loan or --
11 A. No, I didn't.
12 Q. Are you married now?
13 A. Yes.
14 Q. How many times have you been married?
15 A. Once.
16 Q. Were you ever engaged before?
17 A. No.
18 Q. Any problems associated with your marriage?
19 A. No.
20 Q. Have you been in marriage counseling?
21 A. No.
22 Q. Have you ever attempted suicide?
23 A. No.
24 Q. Have you ever had thoughts of suicide?

1  A. No.
2  Q. Have you ever made a claim of any kind against an
3      employer prior to this lawsuit?
4  A. No.
5  Q. Have you ever been convicted of a crime of any
6      kind?
7  A. No.
8  Q. Have you ever been involved in any other
9      litigation?
10 A. No.
11 Q. Court cases?
12 A. No.
13 Q. Who were your friends at Jansson?
14 A. Define "friends."
15 Q. Were there any people at Jansson that you
16     socialized with outside of work?
17 A. Maybe, you know, we went out to -- for a bite to
18     eat or a drink after work but never actually made
19     plans from home to meet. It was usually just a
20     connection from work or extension of work.
21 Q. Who did you have a drink with after work?
22 A. Pamela Greene, Paul Capasso, Lucia McDougall.
23 Q. Anyone else?
24 A. No. Sometimes it was more than one person would

1      come along so -- there might have been a group.
2      Combination of people.
3  Q. Do you keep in contact with anybody that still
4      works at Jansson?
5  A. One particularly that has remained after all this
6      time.
7  Q. Who is that?
8  A. Sandy Dube.
9          MR. RUDY: She is not there anymore.
10         THE WITNESS: She is not there anymore?
11         MR. RUDY: Sorry.
12 Q. Who is Sandy Dube?
13 A. Sandy -- you mean what did she do when she was at
14     Jansson?
15 Q. Yeah.
16 A. She wore many hats. She worked with the
17     accounts. She helped out customer service.
18 Q. When was the last time you talked to Sandy?
19 A. A few weeks ago when my brother died.
20 Q. What did you talk to Sandy about?
21 A. My brother's death.
22 Q. It was about your brother?
23 A. Mm-hmm.
24 Q. Do you see Sandy on a regular basis or had you

1      seen her on a regular basis before that?
2  A. We get together every few months.
3  Q. Have you talked to her about this lawsuit?
4  A. No.
5  Q. Anyone else that you keep in contact with at
6      Jansson?
7  A. Every -- periodically I might hear from Hollie
8      Prince just to say hi.
9  Q. Hollie Prince?
10 A. Yes.
11 Q. Who did you talk to regarding your decision to
12     bring this lawsuit other than your attorneys?
13 A. My husband.
14         MR. PALMQUIST: Okay. Do you want to
15     take just a short break? I'm going to have her
16     mark some exhibits and we're going to run through
17     a few of those.
18     (Off the record.)
19     (Recess.)
20     (1/17/03 memo marked Exhibit No. 1.)
21     (2/16/00 note marked Exhibit No. 2.)
22     (6/23/01 note marked Exhibit No. 3.)
23     (10/5/01 letter marked Exhibit No. 4.)
24     (10/10/01 Salary Continuance Plan

24 (Pages 90 to 93)

9090b848-634f-47eb-be47-55f4720ab753

Page 94

1  marked Exhibit No. 5.)
2      (Response to Request for Family Medical
3  Leave marked Exhibit No. 6.)
4      (Charge of Discrimination marked
5  Exhibit No. 7.)
6      (Complainant's Response to Respondents'
7  Position Statement marked Exhibit No. 8.)
8      (Complaint marked Exhibit No. 9.)
9      (Plaintiff's Rule 26(A) Disclosures
10 marked Exhibit No. 10.)
11     (Jansson Information for Employees
12 marked Exhibit No. 11.)
13 Q. Ms. Patrick, I'm handing you what's been marked
14    as Deposition Exhibit No. 1. Would you take a
15    moment to review that, please?
16 A. I'm sorry. This is 12/22/2000? Is that what
17    this is? Is that what that is? 2000? I mean,
18    '00?
19 Q. I believe so.
20 A. Okay.
21 Q. I'm asking you, though.
22     MR. RUDY: Might have been cut off.
23 That's what it looks like.
24     MS. DEVER: Is there a question? I

Page 95

1  can't remember.
2      MR. PALMQUIST: There isn't. No. Not
3  yet.
4      MS. DEVER: Okay.
5  A. Okay. So this --
6      MS. DEVER: There's no question.
7  A. Oh, okay. I'm just looking it over? I'm sorry.
8  Q. Can you tell me what that is?
9  A. Oh. This was a surgery -- a scheduled surgery
10    that I had in January. That was the one that I
11    flipped the day I was -- it was one of the
12    surgical procedures I needed to have before I
13    could start my fertility treatments.
14 Q. And does this document refresh your recollection
15    as to what the dates were of that particular
16    surgery?
17 A. I'm confused.
18 Q. I will suggest that I think that that 12/22/00 is
19    probably a mistake. It looks like the date's --
20 A. It was in -- I believe --
21 Q. Right. That's what I'm suggesting but I don't
22    know that.
23 A. All right. I had a -- I'll just brief you on
24    this because this is the best way for me to

Page 96

1  understand this. I got married in '98. Saw a
2  fertility specialist in '99. I had a series of
3  tests during the fall. I had a minor surgical --
4  in November of '99, which I did over the
5  Thanksgiving weekend. And then that's when they
6  determined I needed additional surgery, so that
7  they would have been notified about it in '99 it
8  was. It was scheduled for January, 2000. And
9  then it goes from there.
10     Okay? So that's what I believe this
11 is. The date's confusing to me.
12 Q. If you look at the second to last page of Exhibit
13    1 --
14 A. 1/17.
15 Q. This is the certification from your health care
16    provider. Is this when you had an abdominal
17    myomectomy?
18 A. Yes.
19 Q. Who was your treating health care provider?
20 A. You mean what was my insurance provider or the
21    doctor?
22 Q. No. Your doctor.
23 A. Dr. Rein.
24 Q. Is that him on the last page of this exhibit?

Page 97

1  A. Yes.
2  Q. Did you fill this out or did somebody at Jansson
3     do this?
4  A. Someone at Jansson did.
5  Q. Do you know whether you took this as FMLA leave?
6  A. No, I didn't.
7  Q. Have you ever seen this before today?
8  A. No. I haven't.
9  Q. Do you claim that anyone at Jansson retaliated
10    against you because you took this leave?
11 A. No.
12 Q. I'm handing you what's been marked Deposition
13    Exhibit 2. Would you tell me when you're done
14    reviewing that?
15 A. Yes.
16 Q. Do you know what this is?
17 A. Yes.
18 Q. What is it?
19 A. This is a letter from Dr. Rein just stating that
20    I was undergoing the surgery and the time frame
21    that I would be out from work.
22 Q. I'm handing you now what's been marked as
23    Deposition Exhibit No. 3. Can you tell me when
24    you're done reviewing that?

25 (Pages 94 to 97)

9090b848-634f-47eb-be47-55f4720ab753

Page 98

1   A. Okay.
2   Q. Can you tell me what this is?
3   A. This was a fertility cycle that I went through.
4      And that I would be out for those given days but
5      I actually wasn't out for those days. I went in
6      and took some work home and worked from home for
7      a few of them.
8   Q. What were the dates of this absence?
9   A. Well, they're saying June 20th to June 27th.
10  Q. Did you take any of that period off?
11  A. Yes.
12  Q. How many days did you take off?
13  A. Probably -- I'm just going by memory of the
14     cycle, what the cycles are like. Probably maybe
15     three or four of the days.
16  Q. Who was the doctor that signed off on this, if
17     you know?
18  A. I don't know who did -- I'm trying to think. It
19     was a part of Dr. Rein's team so it would have
20     been one of the doctors within his group. I
21     can't read his signature so I really don't know.
22  Q. Is the Brigham and Women's Hospital where you
23     received your fertility treatments?
24  A. Yes.

Page 99

1   Q. Is that different from the North Shore Medical
2      Center?
3   A. Yes. It's a combination of two places. You go
4      for part of your treatment in the North Shore.
5      Dr. Rein's affiliated with Brigham and Women's so
6      you actually do the part of the procedure, the
7      surgical part of the procedure you actually do at
8      Brigham's.
9   Q. I'm handing you what's been marked as Exhibit No.
10     4. Would you please review that?
11  A. Okay.
12  Q. Can you tell me what that is?
13  A. This is a letter from Dr. Rein explaining a
14     particular procedure that I was going to be going
15     through during my next fertility cycle. And he
16     was recommending that I medically -- for medical
17     reasons take a particular amount of time off.
18  Q. I'm handing you what's been marked as Deposition
19     Exhibit No. 5. Would you take a moment to review
20     that, please?
21  A. Okay.
22  Q. Is that your signature on the second page of
23     Exhibit No. 5?
24  A. Yes.

Page 100

1   Q. And is this your application for salary
2      continuance with Taylor during your FMLA leave?
3   A. Yes. Now that I see the title on top, that's
4      what it's referred to as.
5   Q. All right. I'm handing you now what's been
6      marked as Deposition Exhibit No. 6. Would you
7      take a moment to review that, please?
8   A. Okay.
9   Q. Is that your signature on the last page of
10     Deposition Exhibit No. 6?
11  A. Yes.
12  Q. Can you tell me what this is?
13  A. This looks like a combination of office paperwork
14     from Jansson for the leave that I took in
15     October, 2001 and it also looks like a form that
16     I believe Dr. Rein had to fill out and sign. So
17     they're copies of both.
18  Q. This was your Family and Medical Leave Act leave
19     from October to November of 2001, correct?
20  A. Yes.
21  Q. Do you claim that Jansson retaliated against you
22     for taking this leave?
23  A. No.
24  Q. Did they impede or otherwise prevent you from

Page 101

1      asserting your rights under the Family and
2      Medical Leave Act for taking this leave?
3   A. No.
4   Q. On the second page of Exhibit 6, towards the
5      bottom, it says "Paid benefits SCP." Do you know
6      what that stands for?
7   A. No.
8   Q. Do you claim that Jansson did not fulfill any of
9      its duties or obligations under the Family and
10     Medical Leave Act when it granted you this leave?
11  A. What was the first part of the question? Did I
12     --
13  Q. Are you claiming that Jansson failed to --
14        MR. PALMQUIST: Could you read it back?
15     I'm sorry.
16  A. I just needed that first part.
17  Q. Okay.
18  A. I believe I want to say no but I just want to
19     make sure.
20        (Question read.)
21  A. No.
22  Q. Do you claim that Jansson took any adverse
23     employment action against you for your having
24     asserted or having taken this leave?

KACZYNSKI REPORTING

9090b848-634f-47eb-be47-55f4720ab753

Page 102

1   A. No.
2   Q. I'm handing you what's been marked as Deposition
3       Exhibit No. 7. Take a moment to review that,
4       please, and let me know when you're done.
5   A. Okay.
6   Q. Can you tell me what this is?
7   A. This is a complaint filed with the discrimination
8       board in Massachusetts.
9   Q. And is everything in this Exhibit 7 true and
10      accurate to the best of your knowledge?
11  A. Yes.
12  Q. Is that your signature on the bottom of page one
13      of Exhibit 7?
14  A. Yes.
15  Q. And is that your signature -- I'm sorry. Strike
16      that. There is no signature.
17          I would like you to turn to page two of
18      Exhibit 7 and review paragraph number seven.
19  A. Okay.
20  Q. What led you to believe that it was medically
21      necessary for you to decrease your hours to a
22      four-day work week rather than the five or six
23      days that you had previously been working?
24  A. In talking to my fertility specialist in regards

Page 103

1       to my newly discovered pregnancy, I asked him to
2       give me an outline of the -- what to expect the
3       next couple of months. And he explained to me
4       that I would be considered a high-risk pregnancy
5       and that I needed to be careful, to take care of
6       myself. And as I said to you before, to be
7       responsible.
8           And that's when -- my husband was
9       present with me and he said that, you know, we
10      should discuss work. And I talked to Dr. Rein
11      about that. And he said that I was able to work
12      but to not go overboard. Just to be careful.
13      Because I wasn't quite out of the woods yet.
14  Q. Did you tell Miss Osoff it was medically
15      necessary for you to work a four-day work week?
16  A. I told her what Dr. Rein said. That we had
17      discussed it.
18  Q. And Dr. Rein hadn't specifically ordered you to
19      work four days a week; is that correct?
20  A. No.
21  Q. No, that's not correct, or no, he didn't order
22      you to work four days a week?
23  A. No. He didn't order me to work four days a week.
24  Q. On the third and fourth pages of Exhibit 7 is a

Page 104

1       listing of comments that you allege Ms. Osoff
2       made to you on December 7th. And it's December
3       7, 2001; is that correct? Is this a typo?
4   A. That's a typo.
5   Q. Have we talked about all of those comments here
6       today?
7   A. We've covered all of them.
8   Q. On the last page of Exhibit 7, paragraph 12, you
9       claim that "Unable to endure Miss Osoff's tirade
10      of discriminatory comments and arbitrary pay cut,
11      I was constructively discharged from my
12      position."
13          Do you know what that means?
14  A. Yes.
15  Q. What does that mean to you?
16  A. Well, I believe what it's saying here is Arlene's
17      comments to me being discriminatory between my
18      pregnant and my job and then between that and the
19      pay cut, that I was constructively discharged
20      from my position. I mean, it pretty much says it
21      right there.
22  Q. What does "constructively discharged" mean to
23      you?
24  A. Constructively discharged means that the

Page 105

1       situation at hand -- in other words, we couldn't
2       come to an agreement about what we were trying to
3       negotiate or compromise on.
4   Q. And so you were justified in leaving?
5   A. Yes. I wasn't actually fired but I was asked to
6       leave and to write my resignation.
7   Q. Under paragraph 14, you claim that Jansson's
8       treatment of you constitutes discrimination on
9       the basis of gender and pregnancy. Have we
10      talked today about all of the allegations that
11      you claim constitute discrimination on the basis
12      of gender and pregnancy?
13  A. Yes.
14  Q. Are there any other allegations that you haven't
15      talked about here today that you are including in
16      your claim against the company?
17  A. No.
18  Q. Paragraph 14 also indicates that you believe that
19      Jansson's treatment of you constitutes a
20      violation of the Family and Medical Leave Act.
21      How do you claim Jansson violated the Family and
22      Medical Leave Act?
23  A. Well, I'm not sure that I'm extremely well read
24      on the Family and Medical Leave Act and I went

27 (Pages 102 to 105)

9090b848-634f-47eb-be47-55f4720ab753

Page 106

1    through the guidance of my counsel on that.
2  Q. But as you sit here today, you can't tell me any
3     facts that lead you to believe that the company
4     violated the Family and Medical Leave Act with
5     regard to your situation; is that correct?
6  A. Well, in not ensuring my position to be there for
7     me when I come back from my maternity leave, I
8     believe that there is some type of discrimination
9     there.
10 Q. Did you ever take maternity leave?
11 A. No, but it was on the table open for discussion.
12 Q. Paragraph 16 of Exhibit 7 indicates you claim you
13    have suffered emotional distress and lost wages
14    as a result of Jansson and Miss Osoff's treatment
15    of you. Have we talked about all the ways that
16    you claim to have suffered emotional distress
17    here today?
18 A. Yes.
19 Q. How much in lost wages are you claiming you have
20    suffered as a result of Jansson and Miss Osoff's
21    treatment of you?
22 A. At least a year's salary.
23 Q. And what do you base that on?
24 A. I base that on from the time I left and my

Page 107

1    aggressive job search through my pregnancy,
2    during the time that my child was born and after.
3    I wasn't able to retrieve or bounce back from
4    that within that year. And still to this day.
5  Q. Any other lost wages you're claiming in this
6     matter?
7  A. I'm not sure if it's considered wages but my
8     401(k) I had invested in, I think there was a
9     technicality of dates and that I wasn't entitled
10    my matched amount so I'm asking for that.
11 Q. Can you explain that to me a little bit? You had
12    an account and --
13 A. Yes.
14 Q. Your employer matched a certain amount?
15 A. There was a certain amount vested after a certain
16    date and there was a discrepancy in the date. I
17    think it was a matter of days.
18 Q. How much was in the 401(k)?
19 A. You know, I don't remember offhand. It was
20    several thousand. And then I believe there was
21    around 2,000 that was -- that I lost because of
22    that date change. And --
23 Q. These are funds that would have been contributed
24    to the account if you remained employed to a

Page 108

1    certain date?
2  A. Yes.
3  Q. And this would have been contributed from the
4     company to your account?
5  A. Yes.
6  Q. A sort of matching fund?
7  A. Yes.
8  Q. Is there any other element of damages that you
9     are claiming in this matter?
10 A. No.
11 Q. I'm handing you what's been marked as Patrick
12    Exhibit No. 8. It's a legal pleading dated
13    October 24, 2002. And the last page of Exhibit 8
14    is an affidavit of Laura E. Patrick dated October
15    24, 2002. Is that your signature on the last
16    page?
17 A. Yes.
18 Q. In paragraph one, you indicate, "At no time did I
19    request to change my position from an exempt
20    position to a nonexempt position." Do you know
21    what that means?
22 A. No, because it's never been described to me in
23    that wording before.
24 Q. Do you know who makes determinations about exempt

Page 109

1    and nonexempt employment at Jansson?
2  A. I believe Arlene to make all those decisions.
3  Q. In paragraph three, you indicate, "Miss Osoff
4     never told me that all managerial and salary
5     positions at Jansson have built into their salary
6     structure an assumption of five to seven hours of
7     overtime."
8          Is that still an accurate statement?
9  A. Yes, it is.
10 Q. Is it your claim that she never told you anything
11    about the assumptions that went into setting
12    salaries for salary level positions?
13 A. No.
14 Q. Paragraph four you indicate, "At no time did I
15    tell Miss Osoff that I wanted to decrease my
16    responsibilities."
17         Is that a true statement?
18 A. Yes, it is.
19 Q. Paragraph six, "I know the identity of the
20    employee referred to as NL. Upon reducing her
21    schedule, NL was tasked with the same exact --
22    the exact same responsibilities she had before
23    her reduction."
24         How do you know that?

28  (Pages 106 to 109)

9090b848-634f-47eb-be47-55f4720ab753

## Page 110

1  A. It was through my observation. And she was one
2     of the individuals that I wanted to speak to in
3     regards to that.
4  Q. I think we talked about -- this is Nicole Lee?
5  A. Yes.
6  Q. And you never talked to her?
7  A. No. I talked to her while she still worked at
8     Jansson because her office was right next to
9     mine.
10 Q. Did you talk about her change from salary to
11    hourly while she was still working there?
12 A. I believe yes, we did. And she said that she was
13    in agreement but that when -- that she would be
14    doing less responsibility so I thought her pay
15    cut was because she had stepped down from her
16    position. But she had mentioned to me that she
17    was still doing the same work.
18 Q. Did she complain to you while she was still
19    working there that she was still doing the same
20    work?
21 A. She made a statement to me once about it, which
22    is something that I had remembered, which is why
23    I wanted to talk to her to confirm.
24 Q. So when Arlene Osoff told you that your hourly

## Page 111

1     wage was going to be different from what you
2     expected, that wasn't a surprise to you, was it?
3  A. Yes, it was.
4  Q. Yet you had seen other employees go from salary
5     to hourly and understood that their pay had
6     changed?
7  A. It was my impression that it was because they
8     were doing less responsibility. In other words,
9     they stepped down from their original position.
10 Q. And the job you were proposing had fewer
11    responsibilities than the one that you performed
12    before you went out on leave; isn't that right?
13 A. No, it wouldn't.
14 Q. All right. I'm handing you now what's been
15    marked as Deposition Exhibit No. 9. It's a copy
16    of the complaint in this matter.
17       Have you had a chance to review that?
18 A. Yes.
19 Q. Have you seen that before?
20 A. I don't believe so. I'm not sure. A lot of
21    these statements have been discussed.
22 Q. Is there anything in this document that we
23    haven't talked about yet today?
24 A. I believe we've touched on everything.

## Page 112

1  Q. You applied for unemployment benefits after you
2     left Jansson?
3  A. Yes.
4  Q. And were they initially denied?
5  A. Yes.
6  Q. Why were they initially denied?
7  A. I don't know the exact reason. I just know that
8     the impression I was getting is that the other
9     party, because of the response from the other
10    party, they made the decision that it would not
11    be covered.
12 Q. And you appealed that decision?
13 A. Yes, I did.
14 Q. Did you have the help of an attorney?
15 A. Yes, I did.
16 Q. And was there an actual hearing on your appeal?
17 A. Yes, there was.
18 Q. And was Jansson represented at that hearing?
19 A. No, it was not.
20 Q. Did you go to the hearing?
21 A. Yes.
22 Q. And your attorney went with you?
23 A. Yes.
24 Q. Who else was there?

## Page 113

1  A. Just the individual who was conducting the
2     hearing.
3  Q. What happened at the hearing?
4  A. They had a set of questions that they asked me.
5     I answered them. And after we were finished, she
6     said she would make a decision and let me know.
7  Q. Okay. Do you remember any of the questions they
8     asked you?
9  A. Similar to yours.
10 Q. On page five of Exhibit 9, paragraph 33 alleges
11    that "Jansson's policy of arbitrarily pro rating
12    downward the hourly salary rate of employees
13    working less than 40 hours per week disparately
14    impacts females in violation of Massachusetts
15    General Law Chapter 151B."
16       Do you know what that means?
17 A. I don't know exactly what Chapter 151B is. But
18    this policy that Arlene refers to seems to
19    directly affect the women in the company that
20    became pregnant and reduced their hours.
21 Q. Why do you claim it only impacts people who are
22    pregnant?
23 A. Because the individuals that I have spoken to or
24    felt experienced this were all females.

29 (Pages 110 to 113)

KACZYNSKI REPORTING

Page 114

1  Q. And those were Wendy, Anne and Nicole?
2  A. Yes.
3  Q. Anyone else?
4  A. There are other women that experienced the same
5     situation. Darlene, I can't remember her last
6     name. And Lucia McDougall. All of which I was
7     under the impression was taking on less
8     responsibility, taking -- doing a different job.
9     In turn, I thought their change in salary
10    reflected that.
11        MS. DEVER: I just ask, could we take
12    another break? I know --
13        MR. PALMQUIST: Sure.
14        MS. DEVER: I don't know if you're
15    reaching toward the end.
16        MR. PALMQUIST: I am. I'm getting
17    close. I'm getting very close.
18        MS. DEVER: Okay.
19        (Recess.)
20        (Question and answer read.)
21 Q. How do you know those individuals didn't have
22    decreased responsibilities?
23 A. I'm sorry. How did I --
24 Q. How do you know that -- let's start with Wendy

Page 115

1     Canty.
2  A. Mm-hmm.
3  Q. Did not have decreased responsibilities.
4  A. How did I know that Wendy didn't have --
5  Q. Yes. After she came back from her leave.
6  A. When I had talked to her over the phone, she said
7     that she really was doing the same job. Pretty
8     much the same tasks.
9  Q. She told you?
10 A. Yes.
11 Q. Okay. Was that true for Anne as well?
12 A. Yes.
13 Q. Did you ever talk to Lucia McDougall about that?
14 A. No, not really. I just an observation.
15 Q. So no one told you that she was doing the same
16    responsibilities? You just observed that you
17    thought she was?
18 A. Yes. And technically she was -- her title was
19    taken away from her and assigned to someone else.
20 Q. But you don't personally know what duties and
21    responsibilities she had in her position, do you?
22 A. I do because I worked closely with her.
23 Q. Did you assign her duties and responsibilities?
24 A. No. That wasn't my job.

Page 116

1  Q. Who assigned the duties and responsibilities to
2     her?
3  A. Arlene.
4  Q. How do you know Darlene's responsibilities were
5     not reduced?
6  A. She worked in customer service as well. And
7     again, it was just my observation. I believe she
8     was taking on extra responsibilities during
9     somebody else's leave and then when it was her
10    turn, she also was -- she was doing different
11    responsibilities. So it was my impression
12    through my observation that Darlene was doing
13    less responsibility.
14 Q. Okay. And I think we talked about Nicole Lee?
15 A. Mm-hmm.
16 Q. She told Wendy that her duties -- she didn't
17    think her duties decreased? Is that correct?
18 A. I don't know what she told Wendy. I know that
19    she told Wendy that she would be willing to talk
20    to me and we would work something out for all of
21    us to meet. I think that's what we were trying
22    to do is to meet.
23 Q. You don't have any personal knowledge of what
24    Nicole Lee's duties and responsibilities were in

Page 117

1     her job, do you?
2  A. No, just an impression of what they would be like
3     because she worked for the commercial division
4     customer service and since I was familiar with
5     the setup of customer service, she was the
6     manager and I understood what the structure of it
7     was. And she had a very small office so she was
8     still taking on the same responsibilities even
9     after technically she was not the office manager
10    there.
11 Q. And you don't know what your duties and
12    responsibilities would have been under your
13    four-day work week because you never started
14    that, did you?
15 A. I knew what my responsibilities would be because
16    I knew what my job was and what needed to be
17    done.
18 Q. But you never worked that four-day work week, did
19    you?
20 A. Obviously. We never got to that point.
21 Q. Other than these examples that we've just talked
22    about, are you aware of any facts that lead you
23    to believe that Jansson's, quote, unquote, policy
24    of pro rating downward the hourly salary rate of

30  (Pages 114 to 117)

KACZYNSKI REPORTING

Page 118

1    employees working less than 40 hours per week has
2    a disparate impact on females? Any other facts
3    that leads you to believe that, other than those
4    examples that we've talked about?
5  A. No.
6  Q. Okay. Are you aware of any situations where this
7    policy was applied to males?
8  A. No.
9  Q. Would you make the same claim if the policy was
10   applied to males?
11 A. Good question. I think I would -- I think it
12   would depend on if they were doing the same job.
13   If they were doing the same job, why should they
14   take a cut in pay just for doing the same job but
15   within different hours? If he was taking less
16   responsibility and doing a different job that was
17   valued at a less pay rate, then I could
18   understand that that applies.
19 Q. But if it were applied to a man, then it wouldn't
20   be discriminatory, would it?
21 A. I think it's discriminatory towards the position
22   as well. I am just familiar with it being with
23   women so it's -- it gives me the impression that
24   it really is a policy that seems to strongly

Page 119

1    discriminate women that happen to get pregnant.
2  Q. All right. I'm handing you now what's been
3    marked as Deposition Exhibit No. 10. These are
4    some disclosures that your attorney made in this
5    case. Have you seen these before?
6  A. I haven't actually seen this paperwork. I never
7    actually saw my personnel file. I did see the
8    correspondence between myself and Jansson
9    concerning the settlement demand and the charge
10   of discrimination. If that's what you're
11   referring to.
12 Q. I'm just asking if you've seen this before.
13 A. Okay.
14 Q. Have you seen it before today?
15 A. I haven't seen this actual paper.
16 Q. Before today. Okay. Were you aware that Jansson
17   made an offer of reinstatement to you?
18 A. Define "reinstatement."
19 Q. Giving you your job back.
20 A. Yes. Through Joel.
21 Q. Why did you reject that?
22 A. I didn't feel confident working for a company
23   that I felt didn't support me.
24 Q. We're going to mark one more here.

Page 120

1        (Employee Acknowledgment marked Exhibit
2    No. 12.)
3  Q. I'm handing you two documents marked Deposition
4    Exhibits 11 and 12. Deposition Exhibit 11 is a
5    copy of the employee handbook at Jansson
6    effective January 1, 2001. And Deposition 12,
7    Exhibit 12 is an acknowledgment form dated April
8    11, 2001.
9        You don't have to look at the whole
10   handbook but if you could tell me if that's your
11   signature on Deposition Exhibit No. 12.
12 A. Yes, it is.
13 Q. And did you receive a handbook while you were
14   employed by Jansson?
15 A. Yes.
16 Q. Did you read it?
17 A. Yes.
18 Q. Does Deposition Exhibit 11 look like the handbook
19   you received? Take some time to look at it if
20   you need to.
21 A. Without knowing the exact content of this, it
22   looks like a copy of it. It was a booklet.
23 Q. Did you receive more than one handbook when you
24   were at Jansson?

Page 121

1  A. Just this one.
2        MR. PALMQUIST: I just want to take a
3    very short break. I think we're probably done.
4        MS. DEVER: Okay.
5        (Recess.)
6  Q. Have we talked about all of the facts that
7    underlie your lawsuit against the company here
8    today?
9  A. I believe we have.
10 Q. Is there anything that you can think of before we
11   end that you are asserting that was unfair or
12   discriminatory or retaliatory by Jansson?
13 A. We pretty much discussed it.
14        MR. PALMQUIST: I have no further
15   questions.
16        MS. DEVER: I have no questions.
17        MR. PALMQUIST: Okay.
18        (Whereupon, the deposition was
19   concluded at 2:36 p.m.)
20
21
22
23
24

31 (Pages 118 to 121)

KACZYNSKI REPORTING

9090b848-634f-47eb-be47-55f4720ab753



Page 122

1    Excerpt from Rule 30(e):
     Submission to Witness; Changes; Signing.
2
          When the testimony is fully transcribed,
3    the deposition shall be submitted to the witness
     for examination and shall be read to or by
4    him/her, unless such examination and reading are
     waived by the witness and by the parties. Any
5    changes in form or substance which the witness
     desires to make shall be entered upon the
6    deposition by the officer with a statement of the
     reasons given by the witness for making them.
7
     ****************************************
8
9        I, Laura Patrick, have examined the above
     transcript of my testimony and it is true and
10   correct to the best of my knowledge, information
     and belief. Any corrections are noted on the
11   errata sheet.
12
          Signed under the pains and penalties of
13   perjury this    day of      , 2005.
14
15
          _____
16           Deponent's Signature
17       On this    day of      , 2005, before
     me, the undersigned notary public, personally
18   appeared         , proved to me through
     satisfactory evidence of identification, which
19   were        , to be the person whose name is
     signed on the preceding or attached document, and
20   who swore or affirmed to me that the contents of
     the document are truthful and accurate to the
21   best of his/her knowledge and belief.
22
23        _____
              Notary Public
24   My commission expires:

Page 123

1        COMMONWEALTH OF MASSACHUSETTS
2        ESSEX, SS.
3
4            I, Susan L. Prokopik, Registered Merit
5        Reporter and Notary Public duly commissioned and
6        qualified in and for the Commonwealth of
7        Massachusetts do hereby certify that there came
8        before me on the 25th day of January, 2005 the
9        person hereinbefore named, who was satisfactorily
10       identified by me and duly sworn to testify to the
11       truth of her knowledge concerning the matters in
12       controversy in this cause; that she was thereupon
13       carefully examined upon her oath and her
14       examination reduced to typewriting under my
15       direction; and that the deposition is a true and
16       accurate record of the testimony given by the
17       witness.
18           I further certify that I am not
19       interested in the cause of this action.
20
21               SUSAN L. PROKOPIK, RMR, CRR
22                  (CSR #124893)
23
         My commission expires:
24          April 15, 2005

32 (Pages 122 to 123)

KACZYNSKI REPORTING

9090b848-634f-47eb-be47-55f4720ab753