UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-10427-RGS

LAURA PATRICK

v.

JANSSON CORPORATION

MEMORANDUM AND ORDER ON DEFENDANT'S
MOTION FOR SUMMARY JUDGEMENT

June 9, 2005

STEARNS, D.J.

Laura Patrick brought suit in Essex Superior Court against her former employer, Jansson Corporation (Jansson), alleging pregnancy discrimination in violation of G.L. c. 151B.[1]  Jansson removed the case to the federal district court on diversity grounds.  After the usual course of discovery, Jansson moved for summary judgment.  Patrick duly opposed the motion.[2]  On May 19, 2005, the court heard oral argument.

BACKGROUND

The facts in the light most favorable to Patrick are as follows.  Jansson is a Minnesota-based printing company specializing in high-end items such as social invitations and business cards.  Each year, Jansson introduces new product lines, which are featured at trade shows and in catalogues mailed to stationery stores.  Production

---

[1]While in her Complaint, Patrick alleges that Jansson violated the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 et seq. (Complaint ¶ 32) in her brief she makes clear that she is not pressing a FMLA claim.

[2]Jansson requested and was granted leave to file a reply brief, but never did so.

gears up four months in advance of the trade shows. Jansson was founded by Arlene Osoff and two partners in 1976. The company was eventually acquired by Taylor Corporation. After the acquisition, Osoff stayed on as Jansson's General Manager. In 2001, Jansson had eighty-eight employees, the large majority of whom (sixty-six) were women. Eight of Jansson's eleven senior managers (including Patrick) were female. Eleven of Jansson's twenty female assemblers were assigned part-time schedules as a childcare accommodation.

Patrick began working at Jansson as a customer service representative in August of 1994. Within a year, Patrick was promoted to Finishing Manager. In 1998, she received a further promotion to the position of Design Development Manager. In that job, she was responsible for the development, design, and initial production of Jansson's entire product offering. Other than Osoff, Patrick was the only designer employed at Jansson. Patrick received an annual salary of $52,260.

Between January of 2000 and November of 2001, Patrick took three FMLA leaves.[3] The first two leaves transpired without incident. When Patrick requested a third FMLA leave, Osoff suggested that Patrick take advantage of Jansson's recently instituted salary continuation plan. As a result of Osoff's intervention, Patrick received 75 percent of her regular salary during the seven weeks of her third FMLA leave. On November 26, 2001, as the third leave was coming to an end, Patrick called Osoff to tell her that she was

---

[3]Patrick took leaves for the following reasons: between January 17 and February 16, 2000, to undergo a fertility-related procedure; between February 28 and March 20, 2001, to undergo emergency surgery; and between October 15 and November 26, 2001, to undergo additional fertility treatments.

2

pregnant.  She asked Osoff for an additional week's leave.  Osoff agreed to the request.

On December 3, 2001, Patrick met with Osoff to discuss a change in her work schedule during the first trimester of her pregnancy.[4]  Patrick, who was concerned with the risk of a miscarriage, proposed to work a condensed four-day week.  Patrick also told Osoff that she did not want to work on Saturdays,[5] but that she would be "more than happy to come in an extra day in February."

Osoff told Patrick that a condensed schedule would result in the loss of her status as a salaried employee.  Osoff offered to pay Patrick an hourly rate of $22.50, an amount which was calculated by dividing Patrick's annual salary of $52,260 by 2,288 hours (the latter figure was based on the assumption that salaried employees typically worked four hours of uncompensated overtime each week).[6]  Jansson had no written policy requiring a salaried employee to work uncompensated overtime or to accept an hourly rate of pay in exchange for a flexible work schedule.

Patrick and Osoff met three times on December 7, 2001.  During these meetings, Patrick objected to the loss of her salaried status, arguing that a pay cut would be unfair

---

[4]Jansson argues that during the heightened production period, Patrick's physical presence was critical.  It is not clear from the record whether the first trimester of Patrick's pregnancy coincided with the pre-trade show period.

[5]Jansson maintains that Patrick requested that a second designer be hired to share the work load, that she be given Mondays off, and that she not be required to work overtime.  For summary judgment purposes, these allegations are disputed.

[6]The math actually works out to an hourly wage of $22.84, which Osoff rounded down to "reflect" Patrick's reduced responsibilities.  If Patrick worked a forty-hour week at an hourly rate of $22.50, she would have earned an annual wage of $46,800 ($5,460 less than her existing salary).

in that there would be no real change in her responsibilities, and that if she worked her customary forty-hour week, she would make less money for doing the same job.  Osoff told Patrick that she would be stepping down from her position as Design Development Manager as soon as she had trained her replacement.  Patrick replied that she did not understand why she was being demoted when she had simply asked for a more flexible work schedule.[7]

In a conversation later that day, Osoff told Patrick that she would be sick during her pregnancy and unable to do her job.  To Osoff's question "what are you going to do if you have more than one baby?," Patrick answered that only one child was contemplated.  After a further exchange, Osoff slammed her fist on the desk and accused Patrick of being ungrateful for her "gift" of paid FMLA leave.  Patrick replied that she understood the paid leave to be a company benefit and not a gift.  When Patrick stated that she planned to return to work after having the baby, Osoff told her that she would not be able to make an informed decision about resuming work until after she had given birth.  Osoff asked Patrick, "what's going to happen if you need to stay home with the baby when he or she is ill?"  When Patrick replied that the question was not immediately relevant, Osoff replied "well, let's face it. It's a man's world.  The woman always stay home with the child."  Osoff complained to Patrick, "why should I pay for another designer?  Because if you didn't get pregnant, there was no need for me to hire another designer because you would be the

---

[7]At oral argument, Jansson contended that Patrick's claims of discrimination are contradicted by her deposition testimony.  A reading of the deposition transcript, however, reveals nothing more than that Patrick, in responding to ambiguous questions posed by Jansson's counsel, adopted the suggestion that the diminution in Patrick's job status and pay was never given an overtly discriminatory explanation by Osoff.

designer." Patrick and Osoff returned to the topic one more time on December 7. This last meeting grew confrontational and ended when Osoff slammed her fist on the table, pointed her finger directly in Patrick's face and told her to leave. Patrick understood Osoff to say that she was fired. Patrick left the workplace and did not return.[8]

## DISCUSSION

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Once the moving party asserts "an absence of evidence to support the nonmoving party's case," Celotex Corp. v. Caterett, 477 U.S. 317, 325 (1986), the latter must establish the existence of an issue that is both "genuine" and "material." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

To prevail on a claim of gender discrimination under Chapter 151B, Patrick has the initial burden of showing a prima facie case by a preponderance of the evidence, that is: (1) that she was within a protected class; (2) that she met her employer's legitimate performance expectations; (3) that she was actually or constructively discharged; and (4) that she was replaced by another employee with similar skills and qualifications.[9] St.

_____

[8]Four other female employees at Jansson were moved from a salaried position to a part-time reduced hourly rate of pay after requesting childcare-related scheduling accommodations. A fifth salaried employee, apparently a male, was also shifted to an hourly status after requesting a flexible work schedule.

[9]More specifically, where pregnancy discrimination is alleged, a prima facie case requires a plaintiff to show that: (1) she is pregnant (or has indicated an intention to become pregnant), (2) her job performance has been satisfactory, but that (3) the employer nonetheless dismissed her (or took some other adverse employment action), while (4)

Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993). While not identical in every respect, the interpretation of Chapter 151B by the Massachusetts courts largely mirrors the Supreme Court's interpretation of federal Title VII.     See Wheelock College v. Massachusetts Comm'n Against Discrimination, 371 Mass. 130, 137 (1976); Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 440-441 (1995).

A successful showing of a prima facie case "eliminates the most common nondiscriminatory reasons for the plaintiff's rejection," Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981), and creates (what is perhaps inaccurately termed) a "presumption" of discrimination. Blare, 419 Mass. at 441. Under the familiar McDonnell Douglas burden-shifting formula, an employer can eliminate the evidentiary force of the presumption by offering a legitimate, nondiscriminatory reason for the employment decision.  Once the employer meets this burden, which is one of production only, the plaintiff must prove that the employer's articulated justification is a cover up or pretext.[10]

_____

continuing to have her duties performed by a comparably qualified person. Smith v. F.W. Morse & Co., Inc., 76 F.3d 413, 421 (1st Cir. 1996).  Congress has extended specific protections to expectant mothers in the Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e.  A pregnant plaintiff bears the same burden as any other discrimination plaintiff of proving that an employer's nondiscriminatory explanation for an adverse action is a pretext for discrimination.  Smith, 76 F.3d at 421.

[10]The burden shifting formula was devised for the typical case in which a plaintiff's only means of proving discrimination is through circumstantial evidence.  The McDonnell Douglas framework thus comes into play when there is no direct evidence of a discriminatory motive.  Direct evidence shifts the burden of persuasion from the employee to the employer who must then prove it would have made the same decision even if it had not taken the protected characteristic into account.  Price Waterhouse v. Hopkins, 490 U.S. 228, 242 (1989).  A plaintiff is not required to produce direct evidence of discrimination to sustain a "mixed-motive" case, only evidence sufficient to establish that animus was a motivating factor in the adverse employment decision.  Desert Palace, Inc. v. Costa, 539 U.S. 90, 101-102 (2003) (modifying Price Waterhouse in this respect).

Historically, Massachusetts had been more generous to plaintiffs than the federal courts by requiring a plaintiff to prove only that the employer's explanation for the adverse employment decision was pretextual, not that the true reasons were (necessarily) discriminatory. Blare, 419 Mass. at 443. Federal law has since Blare tended to converge with the Massachusetts approach. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000). Cf. Lattimore v. Polaroid Corp., 99 F.3d 456, 465 (1st Cir. 1996) ("When the *prima facie* case is very strong and disbelief of the proffered reason provides cause to believe that the employer was motivated by a discriminatory purpose, proof of pretext 'may' be sufficient [without the introduction of any additional evidence of discrimination]."). Compare Wheelock College, 371 Mass. at 138 ("[I]f the employee has proved a prima facie case . . . and the employer gives an explanation for a hiring decision which has no reasonable support in the evidence or is wholly disbelieved (and hence is transparently a pretext), the employee should prevail.").

In Massachusetts, "[s]ummary judgment is a disfavored remedy in the context of discrimination cases based upon disparate treatment."[11] Blare, 419 Mass. at 439. Thus, the issue of discriminatory intent in the great majority of cases is a question of fact. Anderson v. City of Bessemer, 470 U.S. 564, 572-573 (1985). "The ultimate question of the defendant's state of mind is elusive and rarely is established by other than

---

[11]Although Patrick's brief also advances a disparate impact claim, she conceded at oral argument that the scant statistical evidence suggesting that a greater proportion of women than men suffered an adverse consequence from Jansson's "policy" of moving workers who request flexible time from salaried to hourly status is insufficient to support this alternative theory of discrimination. See Donnelly v. Rhode Island Bd. of Govs. for Higher Educ., 110 F.3d 2 (1st Cir. 1997).

7

circumstantial evidence, which requires the jury to weigh the credibility of conflicting explanations . . . ." Blare, 419 Mass. at 439-440.

Jansson does not dispute that Patrick falls within a protected class and that she was a satisfactory (indeed an exemplary) employee. Nor does Jansson dispute for present purposes the contention that plans were afoot to replace Patrick as Senior Development Designer.  Rather, Jansson argues that Patrick's prima facie case fails because she cannot show any adverse employment action.  Jansson argues that Patrick was neither terminated nor were her working conditions made so intolerable that resignation (constructive discharge) was a reasonable response to what in Jansson's eye were modest adjustments in Patrick's pay and job description.

Patrick, for her part, maintains that a constructive discharge occurred when Osoff told her that she would be responsible for training a person to take her place in senior management, and that as a result, she would take a loss in pay.  In the alternative, Patrick contends that she reasonably believed that she had been fired by Osoff on December 7, 2001, when Osoff yelled at her and told her to leave the premises.[12]

In a wrongful termination case, an allegation of constructive discharge "presents a 'special wrinkle' that amounts to an additional prima facie element.  In such cases, the plaintiff must prove that [her] employer imposed 'working conditions so intolerable [] that a reasonable person would feel compelled to forsake [her] job rather than to submit to looming indignities.'" Landrau-Romero v. Banco Popular de Puerto Rico, 212 F.3d 607, 613 (1st Cir. 2000) (internal citations omitted).  "Typically, the employer must either (1)

---

[12]Osoff maintains that she merely wanted Patrick to leave her office.

take something of consequence from the employee, say, by discharging or demoting her, reducing her salary, or divesting her of significant responsibilities, or (2) withhold from the employee an accouterment of the employment relationship, say, by failing to follow a customary practice of considering her for promotion after a particular period of service." Blackie v. Maine, 75 F.3d 716, 725-726 (1st Cir. 1996) (internal citations omitted). "A constructive discharge also may occur when an employer effectively prevents an employee from performing [her] job." Sanchez v. Puerto Rico Oil Co., 37 F.3d 712, 719 (1st Cir. 1994).

To prove a constructive discharge, a plaintiff must offer evidence of more severe harassment than that required for a hostile work environment claim. Hernandez-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 48 (1st Cir. 1998). For example, an injury to an employee's pride resulting from the loss of a promotion will not, in and of itself, support a finding of constructive discharge. See Serrano-Cruz v. DFI Puerto Rico, Inc., 109 F.3d 23, 27 (1st Cir. 1997). Because the test is objective, the employer's subjective intent is immaterial. Ramos v. Davis & Geck, Inc., 167 F.3d 727, 732-733 (1st Cir. 1999). So, too, are the employee's hurt feelings, no matter how sincerely held. Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir. 2000). Instead, the employee must show that her working conditions were "so difficult or unpleasant that a reasonable person in [her] shoes would have felt compelled to resign." Marrero v. Goya of Puerto Rico, Inc., 304 F.3d 7, 46 (1st Cir. 2002), citing Alicea Rosado v. Garcia Santiago, 562 F.2d 114, 119 (1st Cir. 1977).

9

Massachusetts and federal law are in accord in defining a constructive discharge.

"The test is met if, based on an *objective* assessment of the conditions under which the employee has asserted [she] was expected to work, it could be found they were so difficult as to be intolerable. . . .  A single, isolated act of an employer (or an agent of the employer) usually will not be enough to support a constructive discharge claim.  Thus, evidence of a single unfavorable performance review or even of a demotion generally will not be deemed sufficient to support a claim. . . .  In order to amount to a constructive discharge, adverse working conditions must be unusually 'aggravated' or amount to a 'continuous pattern' before the situation will be deemed intolerable."

GTE Products Corp. v. Stewart, 421 Mass. 22, 34-35 (1995) (citations omitted).  See also

Rubin v. Household Commercial Financial Services, Inc., 51 Mass. App. Ct. 432, 446

(2001) (acknowledging that a constructive discharge may be found where an employee is

stripped of her authority to the point that her job is effectively given to someone else).

Taking the facts in the light most favorable to Patrick, a reasonable observer could

conclude that she had in fact been dismissed on December 7, 2001.  Osoff's angry

demeanor appeared to leave little room for further negotiations or discussion.  Moreover,

Osoff's order that Patrick "leave," coming as it did in the context of demeaning comments

about the ability of a mother of a newborn to perform satisfactorily in the workplace and

the announcement of an imminent demotion and a loss of pay, might reasonably have

been interpreted by Patrick as notice that she had been terminated.[13]

---

[13]I do not rule out the possibility that a finder of fact might conclude that the demotion, loss of pay, and disparagement of motherhood (particularly in the case of a woman who had undergone lengthy and invasive fertility treatments) was sufficiently humiliating to amount to a constructive discharge, although the question is a close one.

ORDER

For the foregoing reasons, Jansson's summary judgment motion is <u>DENIED</u>.  The

clerk will set the case for trial.[14]

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE

---

[14]As guidance to counsel, the court intends to submit the case fo the jury on Patrick's theory of pregnancy discrimination.  Although she also articulates a generic claim of gender discrimination, pregnancy discrimination is, the appropriate subset of the generic claim for jury purposes.